279 P.3d 1237

STATE of Hawai'i, Respondent/Plaintiff–Appellee

v.

Less Allen SCHNABEL, Petitioner/Defendant–Appellant.

No. SCWC–29390.

Supreme Court of Hawai'i.

May 11, 2012.

Emmanuel V. Tipon, Sparlin & Tipon, for petitioner/defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, for respondent/plaintiff-appellee.

ACOBA, DUFFY, and McKENNA, JJ.; and RECKTENWALD, C.J., dissenting, with whom NAKAYAMA, J., joins.

Opinion of the Court by ACOBA, J.

 We hold first, that, Hawai'i Revised Statutes (HRS) § 571–84(h) clearly and unambiguously prohibits the use of evidence from juvenile proceedings in any adult criminal case for any purpose whatsoever. Accordingly, the Intermediate Court of Appeals (ICA) gravely erred in affirming the ruling of the circuit court of the first circuit (the court), that Respondent/Plaintiff–Appellee State of Hawai'i (Respondent) would be allowed to introduce evidence from the prior juvenile proceedings of Petitioner/Defendant–Appellant Less Allen Schnabel, Jr. (Petitioner), if Petitioner testified on cross-examination in the instant case that he did not know a single punch could cause the death of a person, *State v. Schnabel*, No. 29390, 2010 WL 4546655, at *2–3 (App. Nov. 12, 2010) (mem.). Secondly, we hold that the statement of the Deputy Prosecuting Attorney

(DPA) to the jury during closing arguments not to "get too caught up in the mumbo jumbo of all the words [of the jury instructions,]" among other statements, infringed on Petitioner's right to have the case against him proven beyond a reasonable doubt. Accordingly, the December 15, 2010 judgment of the ICA, filed pursuant to its November 12, 2010 Memorandum Opinion (memo op.),[1] affirming the court's September 10, 2008 judgment of conviction and sentence, is vacated. This case is remanded for proceedings consistent with this opinion.[2] Each of the aforesaid errors, standing alone, provides an ample basis for vacation. However, in order to avoid similar errors from being made on remand, both errors are addressed.

I.

The following essential matters are from the record and the submissions of the parties.

A.

On April 22, 2007, at Zablan Beach Park in Nanakuli, Hawai'i, Petitioner allegedly caused the death of Christopher Reuther (decedent) by one punch. *Id.* at *1. Respondent's witnesses testified that they met decedent at the park, began conversing with him, and eventually invited him to camp with them overnight. At some point decedent left the group, against their warning not to do so, and headed toward the restrooms. According to Respondent's witnesses, as decedent was walking to his car, Petitioner approached him from behind and hit him in the face. Immediately thereafter, decedent "spun out" in a "half-circle" or "jump[ed] around" before collapsing to the ground. Respondent's witnesses testified that Petitioner's actions were unprovoked.

1. The memo op. was filed by presiding Judge Alexa D.M. Fujise and Associate Judges Lawrence M. Reifurth and Lisa M. Ginoza.

2. We find no error in the other points raised by Petitioner and affirm the ICA's opinion insofar as it held that (1) trial counsel was not ineffective for failing to subpoena the physician who had attended to Christopher Reuther prior to his death and who had signed the death certificate, *Schnabel*, 2010 WL 4546655, at *3, (2) the DPA did not engage in prosecutorial misconduct in

displaying a power point slide during closing arguments which stated, "Is there a substantial and unjustifiable risk of death from one punch? ... Ask [Reuther] if it's substantial and unjustified. He's dead!", *id.* at *3–4, (3) there was sufficient evidence to sustain Petitioner's conviction notwithstanding Petitioner's asserted claim of self-defense, *id.* at *5–6, and (4) there was sufficient evidence that Petitioner recklessly caused Reuther's death, *id.* at *6–7.

The defense's witness, Kristie Reverio (Reverio), testified that decedent was walking towards the parking lot and taking photographs near where she and Petitioner were standing. Petitioner confronted decedent and asked him if he was taking pictures of them. Decedent responded that he had only taken a picture of the stop sign. Reverio and Petitioner thought decedent was being "sarcastic" and asked to see his camera's viewfinder. Decedent held out the camera for them, but then pulled it back and began walking towards his car with a "smirk" on his face. Petitioner told decedent, "[Y]ou cannot be doing things like that over here, you need to leave."

Decedent then approached Petitioner and stated, "[Y]ou cannot tell me what to do," while in a "fighting stance." Reverio thought Petitioner and Decedent "were going to fight." At that moment, Petitioner punched Decedent on his right cheek. Decedent then fell backward, stood back up, staggered forward, and fell down.

## B.

On May 8, 2007, Petitioner was charged with (1) Manslaughter, Hawai'i Revised Statutes (HRS) § 707–702(1)(a) (Supp.2007) [3] and (2) Unauthorized Entry into a Motor Vehicle in the First Degree, HRS § 708–836.5 (Supp. 2007).[4] Prior to trial, Respondent filed a Notice of Intention to Use Specified Evidence (Notice) indicating that, at trial, it would seek to introduce the following evidence relating to Petitioner's juvenile pro-

ceedings: (1) on September 1, 2002, Petitioner attended a party at Nanakuli Beach Park and as complainant attempted to "shake [Petitioner's] hand, [complainant] was suddenly punched on the left side of his face[,] causing [him] to fall to the ground where he was thereafter kicked in the face several times [,]" [5] (2) Petitioner was "present at his entire trial[,]" and (3) Dr. Jorge Camara (Dr. Camara) testified "that an orbital fracture … can cause not only a rupture of the bone socket[,]" but could also cause a "subdural hematoma in the brain[,]" which "could then create a 'substantial risk of death.'" Respondent attached a transcript of Dr. Camara's testimony given at Petitioner's juvenile proceedings as an exhibit to its Memorandum in support of the Notice. According to Respondent, the aforementioned evidence was admissible to show that Petitioner "was on notice that similar acts in the future could cause much more serious injuries[.]"

The defense filed a motion in limine to preclude Respondent from introducing Dr. Camara's testimony pursuant to Hawai'i Rules of Evidence (HRE) Rules 402 (2010) [6] and 403 (1993).[7] At the hearing on the motion, Respondent argued that evidence from the juvenile proceedings was relevant to Petitioner's "knowledge" that his conduct, i.e., a single punch, could cause a substantial risk of death. The defense argued that the injuries involved in the juvenile proceedings were "not the same type of injury" as the one in this case because the juvenile case involved "punches and kicks" which were "likely to be

---

**3.** HRS § 707–702(1)(a) provides that "[a] person commits the offense of manslaughter if … [t]he person recklessly causes the death of another person[.]"

HRS § 702–206 (1993) provides in part that "[a] person acts recklessly with respect to his conduct when he consciously disregards a substantial and unjustifiable risk that the person's conduct is of the specified nature."

**4.** HRS § 708–836.5, entitled "Unauthorized entry into motor vehicle in the first degree," states, in relevant part:

(1) A person commits the offense of unauthorized entry into motor vehicle in the first degree if the person intentionally or knowingly enters or remains unlawfully in a motor vehicle, without being invited, licensed, or otherwise authorized to enter or remain within the

vehicle, with the intent to commit a crime against a person or against property rights.

**5.** Although Respondent stated that it intended to use at trial the "evidence" from Dr. Camara that complainant was "kicked in the face several times[,]" in fact Dr. Camara testified that he did not know exactly where complainant was kicked, but that complainant was punched in the eye.

**6.** HRE Rule 402 states in relevant part that "[e]vidence which is not relevant is not admissible."

**7.** HRE Rule 403 states that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

much more damaging than a punch." Defense counsel additionally noted that Dr. Camara did not testify that those acts "would cause[,]" but "could cause," bleeding in the brain. Finally, it was argued by the defense that at the time of the juvenile proceedings, Petitioner was seventeen years old and "in a traumatic situation where we hope he was paying attention but well may not have been."

After taking the matter under advisement, the court initially ruled that Respondent could not introduce any evidence relating to Petitioner's juvenile proceedings.[8] Subsequently, however, during further pre-trial proceedings, Respondent moved the court to reconsider its ruling. Respondent also asked the court, in the alternative, "to at least allow [Respondent] to—if [Petitioner] ... takes the stand and is cross-examined[,] to make reference to the fact[.]"[9] The court answered that reconsideration was "not going to happen," but considered "what [might] happen[ ] if [Petitioner] takes the stand and he says he was completely unaware, totally unaware, hit somebody in the head, that they [sic] might cause them [sic] serious injury or death."

Defense counsel stated that if the court allowed Respondent to ask Petitioner whether he knew a single punch "could," as opposed to "would," cause death, Petitioner's "answer will be 'no.' " Defense counsel related that even if he did respond in that manner, evidence of Dr. Camara's testimony would not be "sufficient to prove that [Petitioner] did know differently" since Dr. Camara's testimony was about "a punch and kicks" which, when "combined[,] could cause subdural hematoma [which] could cause

death[.]" Defense counsel further asserted that the evidence would "mislead the jury," "distract [it] from trying this case[,]" and would "be highly prejudicial[.]"

The court then expressed its concern that "most of the men on the jury—...—understand that a large man that punches another man could kill him." Thus, the court responded that, if Respondent laid a foundation regarding Petitioner's height and weight on the date of the incident and argued that the punch "was a sucker punch or a false crack[,] ... and [Petitioner] says no way" a punch can cause the death of a person, its "inclination [would be] to give [Respondent] some latitude over [the defense's] strong objection[.]"

### C.

In addition to the testimony described *supra*, the chief medical examiner for the City and County of Honolulu (medical examiner) also testified. The medical examiner related that based on the information provided by the hospital and from the investigator who read the hospital reports, the cause of death was believed to be an aneurysm. She recounted, however, that because there was a "small tear" in decedent's "basilar artery" and a bruise behind his ear consistent with a "fist blow," it was her opinion that decedent died as a result of a "traumatic subarachnoid hemorrhage" caused by an "assaultive blunt force injury to the head." The medical examiner observed that while "you see subarachnoid hemorrhage, non-trauma related[,]" trauma-related subarachnoid hemorrhage is "not very common." In her opinion, decedent's injury was "unique."

---

8. The court ruled as follows:
 [T]his court finds that both the breadth and depth and intensity of the emotions around this case were other than what the court initially thought they would be. Therefore, I'm going to deny this prior incident completely. *The only option would be [Respondent would] have to approach the court. [The court would] have to hear what [Petitioner] had to say, if anything, then measure it at that point,* but basically it's not coming in at all. I'm not going to bet against myself so to speak or anticipate.... I understand that it's relevant under [HRE Rule] 404 ... but [HRE Rule 403] has caused me to reconsider.... [T]he way the jurors responded

and my take was ... way more emotion than I thought ... it would be with the jurors.... It's a mainland visitor; it's Nanakuli; it's a law student; they donated the organs and he apparently allegedly did nothing to provoke it, but we all gotta hear the story ... when it actually comes out, so it's not coming in. No if [sic], and [sic] or buts[.]"
(Emphasis added.)

9. It would appear Respondent was referring to the "fact" that Petitioner was present during his juvenile proceedings and heard Dr. Camara's testimony.

As to the difference between the medical examiner's conclusion regarding the cause of death and the conclusion of the hospital, she stated, "I think at that point[,] all [the hospital doctors] knew from their scans was that [decedent] had [ ] bleeding in the subarachnoid space, which means covering the brain[.]" She explained that the hospital would not have seen the tear "because there was no time for them to inject dye in the[ ] blood vessels[,] ... [b]ut at the autopsy, [she] injected dye." The medical examiner stated that she "did not see any aneurysms as the doctors suspected, but instead saw [a] tear[.]" In her view, "you never see an aneurysm right [t]here [where the tear was located; y]ou see aneurysms in different areas, but what I saw was a fresh, tiny torn area."

Petitioner did not testify. After the prosecution rested, the court permitted defense counsel to state on the record that Petitioner had decided not to testify based in part on the fact that Respondent would be allowed to introduce Dr. Camara's testimony from Petitioner's juvenile proceedings if Petitioner testified that he did not know a single punch could cause the death of a person. The court stated,

> And [ ] the reasons stated by you ... I think are pretty accurate, that we started picking jury [sic], I was going to let in the so-called prior with a limiting instruction. It became clear to me that the gravity was going to keep us from getting a jury and the jury read it differently than I did, and so the Court decided to keep that out and not allow it. *The Court decided that [if] the door was opened, it would give a very limiting instruction there, but allow [Respondent] to get into the earlier situation.*

(Emphases added.)

### D.

On July 7, 2008, the court instructed the jury, among other things, as to the presumption of innocence and proof beyond a reasonable doubt.[10] On the same day, during closing argument, the DPA stated,

> And when you go in the deliberation room, read the[ jury] instructions but use your common sense. That's what this is all about. It's all about common sense. *Don't get too caught up in the mumbo jumbo of all the words but use your common sense.... [D]ig deep down inside and ask yourself, deep down inside, you know, the gut feeling we talk about deep down inside. Put aside those words.* You've heard them. You're analyzing them. *And then you reach down deep inside, deep down inside: Is he guilty?* And if you can say that, *that's your common sense.*

**10.** The court gave the jury the standard instruction as follows:

> You must presume the defendant is innocent of the charges against him. This presumption remains with the defendant through the trial of the case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.
>
> The presumption of innocence is not a mere slogan but an essential part of the law that is binding upon you. It places upon the prosecution the duty of proving every material element of the offense charged against the defendant beyond a reasonable doubt.
>
> You must not find the defendant guilty upon mere suspicion or upon evidence which only shows that the defendant is probably guilty. What the law requires before the defendant can be found guilty is not suspicion, nor probabilities, but proof of the defendant's guilt beyond a reasonable doubt.
>
> What is reasonable doubt?
>
> *It is a doubt in your mind about the defendant's guilt which arises from the evidence presented or from the lack of evidence and which is* based upon reason and common sense. Each of you must decide, individually, whether there is or is not such a doubt in your mind after careful and impartial consideration of the evidence.
>
> Be mindful, however, that a doubt which has no basis in the evidence presented, or the lack of evidence, or reasonable inferences therefrom, or a doubt which is based upon imagination, suspicion or mere speculation or guesswork is not a reasonable doubt.
>
> What is proof beyond a reasonable doubt?
>
> If, after consideration of the evidence and the law, you have a reasonable doubt of the defendant's guilt, then the prosecution has not proved the defendant's guilt beyond a reasonable doubt and it is your duty to find the defendant not guilty.
>
> If, after consideration of the evidence and the law, you do not have a reasonable doubt of the defendant's guilt, then the prosecution has proved the defendant's guilt beyond a reasonable doubt and it is your duty to find the defendant guilty.
> (Emphasis added.)

(Emphases added.) The defense immediately objected. The court held a bench conference during which defense counsel argued that the jury was not permitted to decide whether Petitioner was guilty "on their gut." Defense counsel stated, "It's whether [Respondent] has proven beyond a reasonable doubt that [Petitioner]'s guilty that they have to answer. To say otherwise implies that if you have a gut feeling he's guilty, he's just guilty, forget the instructions."

The DPA responded that "[t]he argument is that the feeling inside is your common sense speaking to you. Common sense is what supports all of their decisions in applying the law and determining what the facts are." The court overruled the defense's objection, but gave the following instruction to the jury:

> Ladies and gentlemen of the jury, I give attorneys some latitude at closing. The instructions you have as to what reasonable doubt is and isn't and *that pity, passion and prejudice have no play, I'll allow you to argue that basically as an illustration of your take on common sense.* There's no definition of common sense so I'll give you a little bit of latitude over objection.

(Emphasis added.)

Two days later, on July 9, 2008, the court, without explaining its reasons for doing so, generally instructed the jury once again on reasonable doubt.[11] Following deliberations, which took place thereafter, the jury found Petitioner guilty of Manslaughter and not guilty of Unauthorized Entry Into a Motor Vehicle. Petitioner was sentenced to twenty years of imprisonment. The judgment of

conviction and sentence was entered on September 10, 2008.

## II.

On October 2, 2008, Petitioner filed a notice of appeal from the judgment of conviction and sentence. Relevant to our disposition, Petitioner contended that (1) the court abused its discretion in ruling that evidence from Petitioner's juvenile proceedings would be admissible if Petitioner testified that he did not know his conduct could cause death and (2) Respondent engaged in prosecutorial misconduct during closing argument.[12]

As to the first of the foregoing contentions, the ICA concluded that, if Petitioner had testified that he was unaware that a single punch could cause death, "he would have opened the door to cross-examination about what he learned in the juvenile proceedings from Dr. Camara's testimony" inasmuch as " '[t]he proper scope of cross-examination includes full development of matters broached on direct examination, including facts reasonably related to matters touched on direct.' " *Schnabel,* 2010 WL 4546655, at *3 (quoting *State v. McElroy,* 105 Hawai'i 352, 356, 97 P.3d 1004, 1008 (2004) (quoting *State v. Napulou,* 85 Hawai'i 49, 57, 936 P.2d 1297, 1305 (App.1997))).

According to the ICA, although evidence of a defendant's prior bad acts is generally inadmissible, " '[p]rior bad act' evidence under [HRE] Rule 404(b) (1993) [ [13]] is admissible when 'it is 1) relevant and 2) more probative than prejudicial.' " *Id.* at *2 (quoting *State v. Maelega,* 80 Hawai'i 172, 183, 907 P.2d 758, 769 (1995)). The ICA determined that Dr. Camara's testimony would be relevant within the meaning of HRE Rule 401 (1993)[14] "if

---

**11.** Judge Michael D. Wilson gave the instruction, explaining that Judge Town was unable to be there due to prior obligations.

**12.** Petitioner alleged that the DPA engaged in misconduct on two occasions during closing arguments. The first related to power point slides. The second related to the DPA's urging the jurors to decide the case from their "gut." As indicated earlier, we affirm the ICA's conclusion that the use of the power point slide did not constitute prosecutorial misconduct. *See supra* note 2.

**13.** HRE Rule 404(b) provides in pertinent part as follows:

Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible where such evidence is probative of any other fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.

**14.** HRE Rule 401 provides that " '[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of conse-

[Petitioner] had testified that he did not know that one punch could cause death" because "even though the incident in the juvenile proceeding did not involve a single punch, it was evidence having a tendency to make [Petitioner's] proffered assertion that he did not know a single punch could cause death 'more probable or less probable than it would be without the evidence.'" *Id.* (quoting HRE Rule 401).

It was further decided that, because the court stated it intended to provide a limiting instruction [15] in the event Dr. Camara's testimony was admitted and because Respondent would be prevented from disclosing Petitioner's conviction in those proceedings, Dr. Camara's testimony would be more probative than prejudicial under HRE Rule 403 (1993). *Id.* The ICA ruled that if Petitioner had testified as indicated, he would have opened the door to cross-examination about what he learned in the juvenile proceedings from Dr. Camara's testimony. *Id.* It was ultimately held that the court's ruling as to the admissibility of Dr. Camara's testimony was not an abuse of discretion. *Id.* at *2–3.

As to the second contention raised by Petitioner, the ICA did "have a concern about the DPA saying '[d]on't get too caught up in the mumbo jumbo of all the words but use your common sense.'" *Id.* (brackets in original). However, the ICA observed that "upon objection from defense counsel, the [court] stated it would allow the argument as an illustration," noting "that 'the jury ha[d] the instructions[,]'" and "after a further objection and a bench conference, the [court] immediately gave a curative instruction." *Id.* The ICA stated, "Given these circumstances, in particular the immediate curative instruc-

tion ... as well as the strength of the evidence against [Petitioner], we conclude that the statements of the DPA were harmless beyond a reasonable doubt." *Id.*

## III.

On March 15, 2011, Petitioner filed an application for writ of certiorari (Application), urging this court to review the Memorandum Opinion of the ICA. Petitioner presents the following pertinent questions in his Application:

1. Whether the ICA gravely erred in affirming the [ ] court's holding that if [Petitioner] testified that he did not know that one punch could cause death[,] that [Respondent] could introduce Dr. Camara's testimony from [Petitioner's] juvenile proceedings[.]

. . . .

3. Whether the ICA gravely erred in holding that the DPA did not commit misconduct during closing arguments [.[16]]

On March 21, 2011, Respondent filed a Response to the Application.

## IV.

In connection with the first question, Petitioner argues that evidence from his juvenile proceedings was not admissible because such evidence was not relevant. *See* HRE Rule 401. Petitioner notes that Dr. Camara testified an orbital fracture resulting from several kicks and punches to the face could result in a subdural hematoma, which could cause death; by contrast, the instant case involved an alleged single punch to the head. Thus, he maintains that the juvenile incident was

quence to the determination of the action more probable or less probable than it would be without the evidence."

**15.** While the court did indicate that it would give a "limiting instruction" in the event evidence from Petitioner's juvenile proceedings was admitted, there is no indication in the record regarding what the limiting instruction would have been.

**16.** The other questions raised in Petitioner's Application were:

2. Whether the ICA gravely erred in holding that trial counsel was not ineffective for failing to subpoena the physician [who] had attended to the [decedent] prior to his death and who had signed the death certificate[.]

. . . .

4. Whether the ICA gravely erred in holding that there was sufficient evidence to sustain [Petitioner's] conviction where his use of force had been in self-defense[.]

5. Whether the ICA gravely erred in holding that there was sufficient evidence that [Petitioner] recklessly caused [decedent's] death[.]

To reiterate, we affirm the ICA's opinion as to the foregoing questions, and therefore, they are not specifically addressed herein.

not relevant because it "was factually dissimilar to the incident in the instant case." According to Petitioner, the court's error in ruling that the evidence would be admitted if Petitioner testified cannot be said to have been harmless because "it impermissibly infringed on [his] right to testify" under the Fifth and Fourteenth Amendments to the United States Constitution [17] and article I, sections 5 and 10 of the Hawai'i Constitution.[18]

Respondent's Response states that "Petitioner's presence at the [juvenile] proceeding ... makes it reasonable to presume he heard [Dr. Camara] render his opinion." Although the juvenile incident did not involve a single punch, Respondent contends Dr. Camara's testimony would have a tendency to make Petitioner's assertion that he did not know a single punch could cause death more or less probable than it would be without the evidence. Respondent asserts that Dr. Camara did not testify that multiple blows to a person's head were required to cause an orbital fracture or resulting subdural hematoma, but, rather, they could result in a subdural hematoma that could cause death. Respondent states, "Simply put," Dr. Camara's testimony indicated that "death can result from a powerful blow to the face."

Regarding any unfair prejudice, *see* HRE Rule 403, Respondent points out that the court made clear such testimony would only be allowed if Petitioner testified that he was unaware a single punch could cause death. Respondent additionally notes that, in the event that evidence was adduced, the court "would have issued a 'very limiting instruction' to ensure Petitioner would not suffer any unfair prejudice."

### V.

On April 28, 2011, supplemental briefing as to the applicability of HRS § 571–84(h) was ordered by this court with respect to Petitioner's first question. In his Supplemental Brief filed on May 9, 2011, Petitioner argues that HRS § 571–84(h) prohibits the use of evidence adduced in a juvenile proceeding "in any civil, criminal, or other cause ... for any purpose whatever." Petitioner asserts that in *State v. Nobriga*, 56 Haw. 75, 527 P.2d 1269 (1974), this court "confirmed that evidence adduced in a juvenile proceeding cannot be used in a subsequent criminal case involving the same defendant."

Petitioner contends that such use is also prohibited under HRS § 571–1 (2006 Repl.).[19] In that vein, Petitioner points out that in *State v. Riveira*, 92 Hawai'i 521, 993 P.2d 555 (2000) [hereinafter, *Riveira II* ], this court overruled the ICA majority in *State v. Riveira*, 92 Hawai'i 546, 993 P.2d 580 (App. 1999) [hereinafter, *Riveira I* ], and "adopted [the] dissenting opinion" which stated that under HRS § 571–1, " '[a]ny evidence given in any case under section 571–11 shall not in any civil, criminal, or other cause in any court be lawful or proper evidence against the child for any purpose whatever [ ] except in subsequent cases involving the same child under section 571–11.' " (Quoting *Riveira I*, 92 Hawai'i at 559, 993 P.2d at 593. (Acoba, J., dissenting).) (Brackets omitted.)

In sum, Petitioner contends that because HRS §§ 571–1 and 571–84(h) prohibit the use of evidence adduced in juvenile proceedings for any purpose whatsoever, the court's ruling as to the admissibility of the juvenile

---

**17.** The Fifth Amendment to the United States Constitution provides in relevant part that no person "shall be compelled in any criminal case to be a witness against himself[.]" The Fourteenth Amendment to the United States Constitution provides in relevant part that no "State [shall] deprive any person of life, liberty, or property, without due process of law[.]"

**18.** Article I, section 5 of the Hawai'i Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law, nor be denied the equal protection of the laws, nor be denied the enjoyment of the person's civil rights or be discriminated against in

the exercise thereof because of race, religion, sex or ancestry." Article I, section 10 provides in relevant part that no person shall "be compelled in any criminal case to be a witness against oneself."

**19.** HRS § 571–1, entitled "Construction and purpose of chapter[,]" also provides in part, that *"[a]ny evidence given in any case under section 571–11 shall not in any civil, criminal, or other cause in any court be lawful or proper evidence against the child for any purpose whatever* except in subsequent cases involving the same child under section 571–11." (Emphases added.)

proceedings was based on an incorrect interpretation of the law. Petitioner repeats that such error cannot be said to be harmless where it infringed on his constitutionally and statutorily protected right to testify.

In its supplemental brief filed on May 9, 2011, Respondent preliminarily declares that because Petitioner did not object to Dr. Camara's testimony based on HRS § 571–84(h), he may not argue on appeal that the statute barred the introduction of such evidence. Next, Respondent argues that HRS § 571–84.6, and not HRS § 571–84(h), is applicable in this matter.

HRS § 571–84(a) generally withholds juvenile records including transcripts from public inspection, except as provided in HRS § 571–84.6. HRS § 571–84(a) provides in relevant part as follows:

(a) The court shall maintain records of all cases brought before it. *Except as provided in section 571–84.6, in proceedings under section 571–11[,] . . . the following records shall be withheld from public inspection:* the court docket, petitions, complaints, motions, and other papers filed in any case; *transcripts of testimony taken by the court;* and findings, judgments, orders, decrees, and other papers other than social records filed in proceedings before the court.

(Emphases added.) In that regard, HRS § 571–84.6 (2006 Repl.)[20] allows for public inspection of records and public proceedings in certain limited circumstances. That statute provides in relevant part as follows:

(b) *Notwithstanding any other law to the contrary,* in any proceeding in which a minor age fourteen years of age or older has been adjudicated by the court under section 571–11(1) for an act that if committed by an adult would:

. . . .

(2) Result in serious bodily injury . . . of a victim;

---

20. The effective date of HRS § 571–84.6 was June 30, 1997. The incident occurred on April 22, 2007. HRS § 571–84.6 was in effect during subsequent evidentiary rulings by the court.

21. HRS § 571–84.6(a) provides that a " '[l]egal record' means petitions, complaints, motions, and other papers filed in any case; *transcripts of*

. . . .

*all legal records [*[21]*] related to the above stated proceeding shall be open for public inspection.*

(c) *Notwithstanding any other law to the contrary,* in any case in which a minor age sixteen years of age or older comes within section 571–11(1) is taken into custody for an act that if committed by an adult would:

. . . .

(2) Result in serious bodily injury . . . of a victim;

. . . .

*all legal proceedings related to the above stated case shall be open to the public. . . .*

(Emphases added.) As stated before, HRS § 571–84(h) provides that evidence in juvenile proceedings shall not be "lawful or proper evidence against the minor therein" "in any cause":[22]

(h) *Evidence given in proceedings under section 571–11(1) or (2) shall not in any* civil, *criminal,* or other *cause be lawful or proper evidence against the minor therein involved for any purpose whatever,* except in subsequent proceedings involving the same minor under section 571–11(1) or (2).

(Emphases added.)

Respondent asserts that because HRS § 571–84(a) and (h) both "deal with testimony taken by the court[,]" they "must be construed with reference to each other[.]" (Citing HRS § 1–16) (1993). According to Respondent, "[t]he clause '[n]otwithstanding any other law to the contrary,' prefacing HRS § 571–84.6(b) and (c) indicates that" those subsections "govern over . . . [HRS § ] 571–84(h)," which pertains to the exclusion of evidence. Respondent maintains that the legislative history of HRS § 571–84.6 also "supports the conclusion that [ ] 'transcripts

---

*testimony taken by the court;* and findings, judgments, orders, decrees, and other papers and adjudication data, other than social records, filed in proceedings before the court." (Emphasis added.)

22. HRS § 571–84(h) is re-quoted for convenience.

of testimony taken by the court' in [juvenile] proceedings[ ] . . . would not be exempt from use in future criminal proceedings." Respondent points to the following passage regarding HRS § 571–84.6:

*[T]he purpose of this act is to eliminate the confidentiality of certain records and proceedings of juvenile law violators* adjudicated for serious, repeat, or violent offenses in order to maintain public safety, to restore public confidence in the juvenile system, and to send a message to certain juvenile law violators that their actions will be treated seriously.

(Quoting 1997 Haw. Sess. Laws Act 317, § 1 at 755–56.) (Emphasis added.)

According to Respondent, under HRS § 571–84.6(b) and (c), the transcripts of Dr. Camara's testimony, as legal records, and Petitioner's juvenile proceedings, respectively, were accessible to the "public," which, in turn, is defined as " 'open or available for all to use, share, or enjoy.' " (Citing *State v. Hussein,* 122 Hawai'i 495, 522, 229 P.3d 313, 340 (2010).) Respondent asserts that, therefore, the evidence was also available for use against Petitioner in the instant case. Furthermore, Respondent urges that allowing the admission of " 'transcripts of testimony taken by the court' " "would promote the legislature's express intent 'to eliminate the confidentiality of certain records and proceedings of juvenile law violators' " and " 'send a message . . . that their actions will be treated seriously.' " (Quoting 1997 Haw. Sess. Laws Act 317, § 1 at 755–56.) Finally, Respondent avers that since the evidence sought to be admitted would be available for use in a sentencing hearing, (citing *Hussein,* 122 Hawai'i at 529, 229 P.3d at 347), it should likewise be available for use at trial.

## VI.

■ Although HRS § 571–84(h) was not raised by the parties, or noticed by the court or the ICA, we take judicial notice of the statute. *See Life of the Land, Inc. v. City Council of City & County of Honolulu,* 61 Haw. 390, 419, 606 P.2d 866, 885 (1980). In *Life of the Land,* this court found several

ordinances relevant to the appeal, although such ordinances were not in the appellate record. *See id.* This court concluded that "[t]he trial court . . . could have taken judicial notice of those ordinances, and their contents[.]" *Id.* It was explained that, "[a]uthorities are in conflict [on] whether an appellate court may take judicial notice of municipal ordinances, not in the appeal record, which the trial court could have judicially noticed." *Id. Life of the Land* determined, however, that "the authorities which permit appellate courts to take judicial notice of such ordinances are more consonant with reason" and therefore, took judicial notice of those ordinances. *Id.* at 419–20, 606 P.2d at 885.

In the instant case, the court "could have taken judicial notice of the [statute,]" *id.* at 419, 606 P.2d at 885, under HRE Rule 202(b) (Supp.2008), which provides in relevant part that "[t]he court shall take judicial notice of "the constitutions and statutes of . . . every state." *See also State v. West,* 95 Hawai'i 22, 26–27, 18 P.3d 884, 888–89 (2001). In *West,* this court noted that "[m]ost states with statutes mandating courts to take judicial notice of municipal ordinances require counsel to explicitly ask that the trial court take judicial notice of the particular municipal ordinance." *Id.* at 27 n. 10, 18 P.3d at 889 n. 10. However, this court "interpret[ed] the mandatory language of [HRE Rule 202(b) ] differently than other states have," holding that the courts of this state "are duty-bound to take 'judicial notice' of municipal ordinances[,]" "just as they do of state statutes." *Id.* at 26, 18 P.3d at 888.

According to this court, " '[a]lthough the law varies from jurisdiction to jurisdiction as to what laws are subject to judicial notice, . . . it is universally accepted that a court must judicially notice the public law of its own jurisdiction.' " *Id.* at 27, 18 P.3d at 889 (quoting *Jones on Evidence* at § 2:2 n.2) (brackets and ellipsis in original). It was thus concluded that "state circuit and district courts must treat ordinances like state statutes, specifically, *as not required to be admitted in evidence or to be expressly requested by counsel.*" *Id.* (emphasis added).[23]

---

**23.** It is observed that HRE Rule 202(b) was not in effect at the time *Life of the Land,* discussed

supra, *was decided.*

It would seem apparent from the foregoing that state statutes need not be admitted into evidence or brought to the attention of the court by the parties in order to be noticed by the court.[24] *West* reasoned, " 'It is axiomatic that a court must 'know' the law within its jurisdiction; hence a court is required to 'notice' *applicable* law and to instruct the jury thereon[.]' " *Id.* at 26–27, 18 P.3d at 888–89 (quoting Clifford S. Fishman & Anne T. McKenna, *Jones on Evidence* § 2:2 (7th ed.1992)) (emphasis added). We conclude HRS § 571–84(h) is the "applicable law" in this case. *Id.*

## VII.

The plain language of HRS § 571–84(h) provides that where a minor is adjudicated in a juvenile proceeding under HRS § 571–11(1) or (2), any evidence given therein is prohibited from use against the minor in subsequent proceedings, for any purpose whatsoever, unless the proceeding is a subsequent juvenile proceeding under HRS § 571–11(1). Dr. Camara's testimony constituted "evidence given in [Petitioner's juvenile] proceedings[.]" HRS § 571–84(h). The prosecution in the instant case sought to admit that evidence "against [Petitioner], the minor therein involved." Moreover, the admission of such evidence to impeach Petitioner in the event he testified that he did not know a single punch could cause the death of a person would be admission of the evidence for "any purpose whatever." Further, the proceedings herein constituted subsequent proceedings against Petitioner that were not juvenile proceedings under HRS § 571–11(1), but adult criminal proceedings. *Id.* Pursuant to the clear mandate of HRS § 571–84(h), Dr. Camara's testimony was inadmissible against Petitioner.

The prohibition against the use of Dr. Camara's testimony in this case is also confirmed by *Nobriga.* In that case, this court reviewed whether a trial judge could consider, at the sentencing stage, a presentence investigation report (PSI) that included the

adult-defendant's juvenile court record, in light of HRS § 571–84. 56 Haw. at 75, 527 P.2d at 1270. It was explained that the provisions of the Family Court Act, which include HRS §§ 571–1 and 571–84, "were designed to afford certain protections to the juvenile involved in an adversary proceeding in any court[.]" *Id.* at 77, 527 P.2d at 1270. On the other hand, "HRS 706–602 (Supp. 1973) is designed to assist the sentencing authority by requiring that certain basic information be made available in the form of a[PSI] which is made mandatory in certain instances." *Id.* at 77, 527 P.2d at 1271.

According to *Nobriga,* a *"clear distinction exists between the adversary proceeding in court and the sentencing process.* During the latter, the presiding judge is no longer dealing with the process of determining ... the guilt or innocence of the defendant, but rather must concern himself with imposing a fair, proper and just sentence." *Id.* (internal quotation marks and citation omitted) (emphasis added). *Nobriga* directed that the purpose of HRS § 571–84 is to *"prohibit the use of evidence against the child or minor involved in an adversary proceeding in any court other than Family Court "*; it is "not one of a blanket prohibition banning the use of juvenile records in a nonadversary proceeding, that is, at the sentencing stage." *Id.* at 78–79, 527 P.2d at 1271–72 (emphasis added). Thus, *Nobriga* held that the inclusion of a defendant's juvenile court record in the defendant's PSI does not violate HRS § 571–84. *Id.* at 81, 527 P.2d at 1273.

In *Riveira II,* this court examined whether a defendant's prior juvenile adjudication constituted a conviction for purposes of applying the repeat offender sentencing provision to the offense of driving without no-fault insurance. 92 Hawai'i at 522, 993 P.2d at 556. This court held that HRS § 571–1 *"mandates against* treating juvenile adjudications as convictions[,]" stating that "[t]he reasoning underlying our holding is addressed succinct-

---

24. As the dissent points out, the issue of whether Respondent would be able to admit Dr. Camara's testimony was highly contested between the par-

ties. *See* dissenting opinion at 1275–76. Those several discussions should have called HRS § 571–84 to the attention of the court.

ly by [the] dissent" in *Riveira I. Id.* (emphasis added).[25]

In *Riveira I*, the dissent reasoned that a juvenile adjudication could not be treated as a prior criminal conviction because, among other things, HRS § 571-1 directs, "without qualification," "that 'no adjudication by the [family] court of the status of any child under th[is] chapter [571] shall be deemed a conviction.'" 92 Hawai'i at 559, 993 P.2d at 593 (Acoba, J., dissenting) (brackets in original). In addition, "HRS § 571-1 instructs that any evidence used in law violation proceedings 'shall not in any . . . criminal . . . cause in any event be lawful or proper evidence against the child for any purpose whatever [ ] except in subsequent cases involving the same child under section 571-11.'" *Id.* (ellipses in original). According to the *Riveira I* dissent, "The plain import of this provision is that any evidence of no-fault insurance violations may only be used in subsequent family court proceedings" and "cannot be offered as evidence 'for any purpose whatever [ ]' in any court." *Id. Riveira II*, having adopted the

reasoning of the *Riveira I* dissent, also confirms that, while evidence presented in juvenile proceedings may be used as evidence in subsequent juvenile proceedings against the minor, it cannot be offered as evidence for any purpose whatsoever in any other court.[26]

■ In the trial herein, Respondent sought to introduce evidence given in Petitioner's juvenile proceedings. Respectfully, here, the court should have been alerted to the applicability of HRS § 571-84(h) inasmuch as Petitioner's insistence that the evidence was inadmissible bore directly on the long standing statutory bar to such evidence. Under the circumstances, HRS § 571-84(h) was directly and obviously applicable and plainly controlling.[27] As a result, in this case, we take judicial notice of HRS § 571-84(h). Applying it, we conclude that in light of HRS § 571-84(h), the court erred in ruling that if Petitioner testified on cross-examination that he did not know a single punch could cause the death of a person, Respondent could introduce evidence from Petition-

25. To reiterate, HRS § 571-1 provides in relevant part:

> Construction and purpose of chapter. . . .
> This chapter creates within this State a system of family courts and it shall be a policy and purpose of said courts to promote the reconciliation of distressed juveniles with their families, foster the rehabilitation of juveniles in difficulty, render appropriate punishment to offenders, and reduce juvenile delinquency. *The court shall conduct all proceedings to the end that no adjudication by the court of the status of any child under this chapter shall be deemed a conviction[.] . . . Any evidence given in any case under section 571-11 shall not in any* civil, *criminal,* or other *cause in any court be lawful or proper evidence against the child for any purpose whatever except in subsequent cases involving the same child under section 571-11.*
>
> (Emphases added.)

26. The dissent suggests that *Riveira I*'s bar against the use of juvenile evidence is not dispositive because *Riveira II* " 'summarily adopted the *Riveira I* dissent[,]' " and *Riveira II* did not involve the question of whether evidence from prior juvenile adjudications is admissible in a subsequent adult criminal trial. Dissenting opinion at 1285 n. 15. However, this court overturned the *Riveira I* majority and "summarily" adopted the *Riveira I* dissent because "[t]he reasoning underlying our holding is addressed succinctly by [the] dissent." *Id.* at 523, 993 P.2d at 556; *see also id.*

at 524, 993 P.2d at 558 ("The dissent addresses these concerns succinctly and clearly.") Second, contrary to the dissent, in the instant case, part of the rationale underlying the *Riveira I* dissent was that the juvenile system was intended to "promote the reconciliation of distressed juveniles with their families, foster the rehabilitation of juveniles in difficulty, render appropriate punishment to offenders, and reduce juvenile delinquency[,]" as evidenced in part by the mandate in HRS § 571-11 that evidence given juvenile proceedings "shall not in any civil, criminal, or other cause in any court be lawful or proper evidence against the child for any purpose whatever except in subsequent cases involving the same child under section 571-11." That rationale was adopted by this court in *Riveira II*, and thus affirms that Petitioner's juvenile evidence is inadmissible in the instant proceedings.

27. The dissent refers to the foregoing language as a "test" for when trial courts or appellate courts must take judicial notice of a statute. Dissenting opinion at 1277-78. The dissent states this "test" has no basis in our rules of penal procedure, evidence, appellate procedure, or HRE Rule 202(a). *See id.* However, the particular facts of this case give rise to the conclusion that HRS § 571-84 was directly and obviously applicable and plainly controlling. Whether this formulation is germane in any particular case would depend on the circumstances. The facts and circumstances of this case indicate

er's juvenile proceedings. Alternatively, we also conclude that the court's failure to apply HRS § 571–84(h) was plain error.[28]

## VIII.

Respondent is incorrect that HRS § 571–84.6(b) and (c),[29] as opposed to HRS § 571–84(h), govern the admissibility of evidence from juvenile proceedings in subsequent proceedings involving the minor.

## A.

As recounted, Respondent maintains that HRS § 571–84(a) and HRS § 571–84(h) must be construed with reference to each other because both HRS § 571–84(a) and (h) deal with transcripts of testimony given in juvenile proceedings. (Citing HRS § 1–16). According to Respondent, since HRS § 571–84(a) is subject to HRS § 571–84.6, HRS § 571–84(h) should likewise be subject to HRS § 571–84.6. Respondent invokes HRS

§ 1–16, which provides that "[l]aws in pari materia, or *upon the same subject matter,* shall be construed with reference to each other," and "[w]hat is clear in one statute may be called in aid to explain *what is doubtful in another.*" (Emphases added.)

However, HRS § 571–84(a) and (h) do not deal with "the same subject matter." HRS § 1–16. HRS § 571–84(a) specifically provides that "records," including "transcripts of testimony taken by the court[,]" "shall be withheld from *public inspection.*" (Emphasis added.) On the other hand, HRS § 571–84(h) provides that "[e]vidence given in juvenile proceedings" "shall not in any ... criminal ... cause be lawful or proper evidence against the minor therein involved." It is apparent that HRS § 571–84(a) deals with *public inspection of records,* while HRS § 571–84(h) governs the *use of evidence* given in a minor's juvenile case *against such minor* in subsequent proceedings. Accordingly, these two sections do not deal with the

we should take judicial notice of HRS § 571–84(h).

**28.** This court has the power to take notice of "[p]lain errors or defects affecting substantial rights ... although they were not brought to the attention of the court." Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2011). Here, the trial court plainly erred in ruling that evidence from Petitioner's juvenile proceedings would be admissible against Petitioner where the admission of such evidence was prohibited by statute. *See State v. Domingo,* 69 Haw. 68, 70, 733 P.2d 690, 692 (1987) (stating that where "the introduction of the evidence in question [is] prohibited by statute, it constitute[s] plain error and is noticeable by this court").

It is well-established that a court's error can be noticed for plain error. *see State v. Stenger,* 122 Hawai'i 271, 282, 226 P.3d 441, 452 (2010) (noting that "the court's failure to instruct" was reviewed under the plain error standard of review, which, in the case of erroneous jury instructions, is merged with the harmless beyond a reasonable doubt standard); *State v. Vellina,* 106 Hawai'i 441, 450, 106 P.3d 364, 373 (2005) (noting that plain error arose when circuit court's sentence to consecutive terms was based on the exclusive reliance of unproven assertions by the prosecutor that the defendant sold guns to a "drug dealer"); *State v. Aganon,* 97 Hawai'i 299, 304, 36 P.3d 1269, 1274 (2001) (noting that the "court's [error in] jury instructions were plainly erroneous"); *State v. Fagaragan,* 115 Hawai'i 364, 368, 167 P.3d 739, 743 (App.2007) ("We first consider whether the circuit court [plainly]

erred by entering judgment and sentencing [the defendant] on both Counts One and Two.")

Because the court's error also infringed on Petitioner's substantial right to testify, as elucidated herein, it may be noticed for plain error. *See State v. Staley,* 91 Hawai'i 275, 286, 982 P.2d 904, 915 (1999) ("Because the circuit court's error infringed upon [the defendant's] constitutional right to testify, we address it as plain error."); *see also State v. Wakisaka,* 102 Hawai'i 504, 515, 516, 78 P.3d 317, 328, 329 (2003) (stating that "the prosecution cannot comment on the defendant's failure to testify because this infringes on the defendant's right not to be a witness against her-or himself" and "the prosecution['s] improper[ ] comment[ ] on [the defendant]'s failure to testify" "constitutes plain error which affected [defendant]'s substantial rights"). This court "will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *Nichols,* 111 Hawai'i at 334, 141 P.3d at 981. Therefore, plain error review applies in this case.

**29.** Respondent contends that HRS § 571–84.6(b) and (c) suggest the transcripts from Petitioner's juvenile proceedings were admissible against him in this case. While Respondent notes that *records* from juvenile proceedings, that would include transcripts, are open to the public under HRS § 571–84(b), Respondent does not articulate how the fact that juvenile *proceedings* are open to the public under HRS § 571–84.6 would have any bearing on the admissibility of the transcript of Dr. Camara's testimony. Thus, our analysis focuses on whether HRS § 571–84.6(b) is applicable in the instant case.

same subject matter and should not be construed with reference to each other.

■ Assuming *arguendo*, the two sections could be said to deal with the same subject matter, inasmuch as "records" in juvenile cases, HRS § 571–84(a), and "evidence given in juvenile proceedings," HRS § 571–84(h), both could encompass transcripts of testimony, HRS § 1–16 relates to the use of one statute to "explain what is doubtful in another." But, " 'where the statutory language is plain and unambiguous, our sole duty is to give effect to its plain and obvious meaning.' " *State v. Kalama*, 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (quoting *Citizens for Protection of N. Kohala Coastline v. County of Hawai'i*, 91 Hawai'i 94, 107, 979 P.2d 1120, 1133 (1999)). HRS § 571–84(h) is not ambiguous and manifestly directs that evidence in Petitioner's juvenile proceedings was inadmissible in his trial herein, for any purpose whatsoever, impeachment or otherwise. Thus, there is nothing doubtful in HRS § 571–84(h) that would require resort to HRS § 571–84(a).

### B.

■ In addition, it is evident from the face of HRS § 571–84, that while the legislature made HRS § 571–84(a) subject to HRS § 571–84.6, the legislature did not subject HRS § 571–84(h) to the provisions of HRS § 571–84.6. HRS § 571–84(a) expressly provides that, *"[e]xcept as provided in section 571–84.6,"* "transcripts of testimony taken by the court" in juvenile proceedings, "shall be withheld from public inspection[.]" Contrastingly, HRS § 571–84(h), which makes no mention of HRS § 571–84.6, is not qualified by an exception clause. It is logical that HRS § 571–84(a) would be subject to HRS § 571–84.6, and HRS § 571–84(h) would not. HRS § 571–84(a) prohibits public inspection of records of juvenile proceedings, while HRS § 571–84.6(b) contains an exception to the prohibition in HRS § 571–84(a), by allowing public access to such records in certain prescribed instances. On the other hand, none of the subsections of HRS § 571–84.6

contain any exception to the prohibition in HRS § 571–84(h) that have to do with the inadmissibility of juvenile case evidence in subsequent proceedings.

### C.

■ Nor is it conceivable that, although HRS § 571–84(h) is not subject to HRS § 571–84.6, the phrase "[n]otwithstanding any other law to the contrary" in HRS § 571–84.6(b) indicates that its provisions are to apply even when a conflicting statute does not specifically make an exception for HRS § 571–84.6. The term "contrary" denotes a "conflict." *See Merriam Webster's Collegiate Dictionary* 765 (10th ed.1989) (defining "contrary," *inter alia*, as "being opposite to or in conflict with each other"). "[T]wo statutes conflict" where "[i]t is not possible to give effect to both[.]" *State v. Richie*, 88 Hawai'i 19, 35, 960 P.2d 1227, 1243 (1998). It is possible, however, to give effect to both HRS § 571–84.6 and HRS § 571–84(h). The transcripts of testimony given in Petitioner's prior juvenile proceedings could be open to the public for inspection, while at the same time, evidence given in such proceedings would be precluded from use in subsequent adversarial proceedings. Accordingly, HRS § 571–84(h) is not a "law to the contrary" of HRS § 571–84.6, and, thus, HRS § 571–84.6 is inapplicable here.

### D.

As observed, Respondent also maintains that the admission of the subject evidence would promote the legislature's objective of eliminating confidentiality of certain juvenile records and of sending a message.[30] Initially, the legislative history that Respondent quotes does not apply here inasmuch as it governs public inspection of juvenile records, not the admissibility of evidence given in juvenile proceedings. Thus, such legislative history is irrelevant.

Moreover, contrary to Respondent's position, the legislature did not "announce its departure from the previous 'rehabilitative

---

**30.** As indicated before, we conclude that HRS § 571–84(h) is plain and unambiguous. We address the legislative history of HRS § 571–84.6 only insofar as Respondent argues that the legislative history indicates such evidence would be admissible.

approach to juvenile justice'" in favor of "a new legislative policy to protect the public." In enacting HRS § 571–84.6, the legislature explained that "the juvenile system in Hawai'i and other states was originally designed to shield children from *publicity*, out of concern for the welfare of the child" and "'protect the young person from the stigma of his misconduct and is rooted in the principle that a court concerned with juvenile affairs serves as a rehabilitative and protective agency of the state.'" 1997 Haw. Sess. Laws Act 317, § 1 at 756 (citing *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 105, 99 S.Ct. 2667, 61 L.Ed.2d 399 (1979) (emphasis added)).

As opposed to Respondent's assertions, the legislature confirmed the rehabilitative objective of juvenile proceedings, stating that, "*[w]hile continuing to support the rehabilitative approach to juvenile justice,*" the legislature believed that "public safety and waning public confidence in the juvenile justice system *necessitate the development of a legislative policy which balances these concerns with the principles of protection and rehabilitation.*" *Id.* (emphases added). The legislature attempted to strike this balance by "*eliminat[ing] the confidentiality of certain records and proceedings* of juvenile law violators[,]" and did not express any intent to allow for the *admissibility of evidence* from juvenile proceedings in subsequent adversarial proceedings. *Id.* (emphases added). Thus, the foregoing legislative history does not support the admission of evidence from Petitioner's juvenile proceedings in this case.[31]

## IX.

Having determined that the court's ruling that evidence of Petitioner's juvenile proceedings could be admissible violated HRS § 571–84(h), we conclude the ruling constitutes reversible error. This court has explained that

> "[e]rror is not to be viewed in isolation and considered purely in the abstract. It must be examined in light of the entire proceedings and given the effect to which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error might have contributed to conviction."

*State v. Duncan*, 101 Hawai'i 269, 278, 67 P.3d 768, 777 (2003) (quoting *State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981)).

## A.

 As related, defense counsel noted on the record that the court's ruling was a reason Respondent decided not to testify. In this way, the court's error infringed upon Petitioner's constitutionally and statutorily protected right to testify. *Tachibana v. State*, 79 Hawai'i 226, 231, 900 P.2d 1293, 1298 (1995)[32] (quoting *State v. Silva*, 78 Ha-

---

**31.** Finally, Respondent's reliance on *Hussein* is misplaced. In *Hussein*, this court considered the Commentary on HRS § 706–604(2), that requires the court to furnish a copy of the PSI to the defendant and the attorneys because "'[t]he question of whether the defendant should be sentenced to imprisonment or to probation is no less significant than the question of guilt[.]'" 122 Hawai'i at 529, 229 P.3d at 347 (quoting Commentary on HRS § 706–604(2)) (brackets in original). According to Respondent, because juvenile records may be included in a PSI for purposes of sentencing, they should likewise be admissible against the defendant during the "guilt" phase. However, the Commentary cited in *Hussein* concerned the *defendant's right* to controvert the contents of the PSI. While the sentencing phase may be no less significant to a defendant inasmuch as both phases involve the defendant's liberty, the same rationale does not support a right of *the prosecution* to use evidence against a defendant, where such use is plainly prohibited by statute.

**32.** The *Tachibana* court explained that a defendant's right to testify is guaranteed by the constitutions and statute.

> The right to testify in one's own behalf arises independently from three separate amendments to the United States Constitution. It is one of the rights guaranteed by the due process clause of the fourteenth amendment as essential to due process of law in a fair adversary process.
>
> . . .
>
> The right to testify is also guaranteed to state defendants by the compulsory process clause of the sixth amendment as applied through the fourteenth amendment. . . .
>
> Lastly, the opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony, since every criminal defendant is privileged to testify in his [or her] own defense, or to refuse to do so.
>
> Because the texts of sections 5, 14, and 10 of article I of the Hawai'i Constitution parallel

wai'i 115, 122–23, 890 P.2d 702, 709–10 (App. 1995)). Error that infringes on one's constitutionally protected right cannot be said to be harmless beyond a reasonable doubt. *State v. Cuevas*, 53 Haw. 110, 115, 488 P.2d 322, 325 (1971) (concluding that "error is neither unimportant nor insignificant" where "it infringes upon a basic right of the accused"; "[in such instances, the error] raises a reasonable possibility that it might have contributed to the conviction" such that it "cannot [be said] that it was harmless beyond a reasonable doubt"); *see also State v. Amorin*, 61 Haw. 356, 362, 604 P.2d 45, 50 (1979) (concluding that because "trial court's error in admitting the defendant's illegally obtained confession infringed upon the defendant's constitutional right," "the error raised the reasonable possibility of having contributed to the conviction below" such that it "cannot [be] sa[id] that it was harmless beyond a reasonable doubt"); *State v. Mitchell*, 88 Hawai'i 216, 227–28, 965 P.2d 149, 160–61 (App. 1998) (concluding that the error that "violated [the defendant's] due process rights" "was not harmless beyond a reasonable doubt" because "[a]n accused's right to due process is of overriding importance").

■■■ The relevant question under the harmless beyond a reasonable doubt standard is " 'whether there is a *reasonable possibility* that error *might have* contributed to conviction.' " *Duncan*, 101 Hawai'i at 278, 67 P.3d at 777 (quoting *Heard*, 64 Haw. at 194, 638 P.2d at 308) (emphases added). Here, the admission of Dr. Camara's testimony was highly contested at trial and the court's erroneous ruling affected Petitioner's decision not to testify. Consequently, there is a "reasonable possibility" that the court's error "might have" contributed to his conviction.

the fourteenth, fifth, and sixth amendments to the United States Constitution, . . . the right to testify is also guaranteed by these parallel provisions of the Hawai'i Constitution.

. . .

There is also a statutory protection for the right to testify. HRS § 801–2 (1985) states: In the trial of any person on the charge of any offense, he or she shall have a right . . . to be heard in his or her defense.

### B.

■■■ The court's ruling was a factor in precluding testimony from Petitioner negating the requisite reckless state of mind.[33] As related, Petitioner indicated that he would testify he was unaware a single punch could cause the death of a person. However, the court ruled that if Respondent laid a foundation as recounted, *supra*, and Petitioner testified as indicated, the court would be inclined to allow Respondent latitude in admitting the evidence from the juvenile proceeding. An assertion by Petitioner that he did not know his one punch carried with it a substantial risk of death was evidence that could have negated the requisite state of mind. *Cf. State v. Pacheco*, 96 Hawai'i 83, 97, 26 P.3d 572, 586 (2001) (stating that, "had the jury believed Pacheco's testimony, it may well have harbored a reasonable doubt as to whether Pacheco had possessed the state of mind requisite to committing the offense of second degree escape"). Such testimony would have been corroborated, at least to some extent, by the medical examiner's testimony that the injury that caused decedent's death was "not very common" and "unique." However, the court's announced decision to allow evidence from the juvenile proceeding impeded Petitioner's proffer of evidence regarding his state of mind. Hence, it is reasonably possible that the court's error might have contributed to Petitioner's conviction inasmuch as the error was a consideration in his decision not to testify, and, thus, was not harmless beyond a reasonable doubt.

### C.

■■■ Such an error also affected Petitioner's claim of self-defense. *See Domingo*, 69 Haw. at 70, 733 P.2d at 692 (holding that the trial court's admission of a physician's testimony to impeach the defendant's testi-

79 Hawai'i at 231–32, 900 P.2d at 1298–99 (quoting *Silva*, 78 Hawai'i at 122–23, 890 P.2d at 709–10) (ellipses in original) (brackets omitted).

33. Respondent was required to prove, as an element of the offense, the requisite state of mind, i.e., that Petitioner knew there was a substantial and unjustifiable risk that his conduct could cause the death of another person and that Petitioner consciously disregarded that risk.

mony that decedent had "c[o]me at him with a sharp object[,]" where such admission was statutorily prohibited, "[could not] be said to be harmless beyond a reasonable doubt[,]" "[g]iven the assertion of self-defense and the fact that the jury might have returned a verdict of manslaughter, rather than murder"). "[T]he use of force upon or toward another person is justifiable when the *actor believes* [ 34] that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion." HRS § 703–304(1) (1993) (emphasis added). "The facts of consequence to the determination of self-defense . . . all concern the *actor's state of mind:* (1) whether the *actor reasonably believed* that [ ] force was necessary; and (2) whether the *actor reasonably believed* that he or she was threatened with one of the specified harms[.]" *State v. Kupihea,* 80 Hawai'i 307, 316, 909 P.2d 1122, 1131 (1996) (emphases added).

Consequently, "the critical factor in determining whether an actor's conduct is justified is the actor's state of mind or belief respecting facts and circumstances." Supplemental Commentary on HRS § 703–300 (1993); *see also State v. Augustin,* 101 Hawai'i 127, 128, 63 P.3d 1097, 1098 (2002) (stating that the reasonableness as to a defendant's use of force " 'is determined from the point of view of a reasonable person in the [d]efendant's position under the circumstances as he believed them to be"; in other words, the jury "must consider the circumstances as the [d]efendant subjectively believed them to be at the time he tried to defend himself") (quoting *State v. Pemberton,* 71 Haw. 466, 477, 796 P.2d 80, 85 (1990)) (brackets in original).

Petitioner was the only person who could testify as to his subjective belief of the facts and circumstances surrounding his use of force. The crux of his defense would be testimony regarding his belief that force was necessary and that decedent had in fact threatened him with harm. Petitioner's defense would have been corroborated by Reverio's testimony. Again, it is reasonably possible that the court's error might have contributed to Petitioner's conviction inasmuch the court's ruling as to the juvenile proceedings was a factor in his decision not to testify. Thus, the error cannot be said to be harmless beyond a reasonable doubt.

## X.

We next consider Petitioner's third question, whether the DPA engaged in misconduct during closing argument by advising the jury that the instructions were "mumbo jumbo," that the jury instructions could be disregarded,[35] and that the jurors could decide the question of guilt based on their "gut feeling[.]" Respondent argues that the court's instruction that the jury was not bound by the closing arguments would ensure the jury would base its decision on the evidence and law;[36] that the DPA made these statements in discussing reasonable doubt and reiterated that the jurors were to " 'apply common sense, the law[,] and the facts' when determining whether the evidence proved Petitioner's guilt beyond a reasonable doubt"; and that the court "took the uncommon and additional prophylactic step of issuing [an] admonition" to the jury that Respondent was required to prove Petitioner's guilt beyond a

**34.** HRS § 703–300(1) (1993), which defines "believes," states that " '[b]elieves' means reasonably believes[,]" and applies the "reasonable man standard with respect to justification for the use of force in self protection, in the protection of property, and in the protection of others." Commentary on HRS § 703–300 (quotation marks omitted).

**35.** Petitioner did not challenge this specific statement in his opening brief to the ICA. This statement was first noticed by the ICA. *See Schnabel,* 2010 WL 4546655, at *4.

**36.** In its Response, Respondent points to the following instruction:

Statements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence. . . .

. . . .
. . . . [W]e're going to hear closing arguments as you're well aware. You've heard the evidence. You have the law. It's the attorneys' views. Listen carefully but you're not bound by their recollections of the evidence or the law. . . .
(Ellipses in original.)

reasonable doubt *"after* [closing] arguments[.]" (Emphasis in original.)

Respondent concedes that "in hindsight, the [DPA] should have eschewed the inclusion of the obviously colloquial expression 'mumbo jumbo of all the words' for a more conventional phrase[,]" but argues that, "[c]onsidering the context in which the [DPA] made the statements, the immediate curative instruction of the court, and the 'strength of the evidence' against Petitioner," the ICA did not gravely err "in concluding the statements were 'harmless beyond a reasonable doubt.' " (Quoting *Schnabel,* 2010 WL 4546655, at *4.)

## XI.

 Here, the DPA's remarks during closing argument constituted misconduct.[37] The DPA stated, "And when you go in the deliberation room, *read the [jury] instructions but . . . [d]on't get too caught up in the mumbo jumbo of all the words* but use your common sense." (Emphasis added.) The term "mumbo jumbo," as used in the foregoing context, would mean "unnecessarily involved and incomprehensible language: gibberish[.]" *Merriam Webster's Collegiate Dictionary* at 765 (capitalization omitted). Thus, the DPA essentially suggested to the jury that the jury instructions were incomprehensible gibberish, thereby denigrating statements of law on which the jury had been or would be instructed.

The DPA reinforced the "mumbo jumbo" reference by telling the jury to "[p]ut aside those words [of the instructions]." By doing so, the DPA again reinforced the proposition that the jurors could disregard the law embodied in the instructions. The DPA told the jurors more than once, and in more than one way, to decide the case by "gut feeling," imploring each juror to "dig deep down inside and ask yourself," "based on your *gut feeling[,]* . . . Is he guilty?" (Emphasis added.) He further misstated the law in telling the jurors that basing Petitioner's guilt on their "gut feeling" was equivalent to the exercise of their "common sense."

The court instructed the jury that reasonable doubt "is a doubt in your mind about the defendant's guilt which arises from the evidence presented or from the lack of evidence and which is based upon *reason and common sense."* (Emphasis added.) "Reason" is defined, among other things, as "the power of comprehending, inferring or thinking esp[ecially] in [an] orderly rational way[.]" *Id.* at 974. "Common sense" is defined in part as "[g]ood, sound, ordinary sense" or "good judgment[.]" *Webster's Third New Int'l Dictionary* 540 (1960). In contrast, a "gut feeling" is something "visceral" "arising from one's inmost self[.]" *Merriam Webster's Collegiate Dictionary* at 519. Giving way to a "gut feeling" is the antithesis of reason—thinking in "an orderly and rational way," and common sense—exercising sound and prudent judgment, as extolled by the instruction. Accordingly, Respondent was incorrect in equating a "feeling inside" to common sense.

Respectfully, the court also erred in accepting Respondent's argument that "gut feelings" could be equated with common sense, and in ignoring the fact that common sense is to be considered in tandem with "reason." The DPA's statement, then, improperly "invite[d] the jury to base its verdict on considerations other than the evidence in the case," unguided by the law. *State v. Mars,* 116 Hawai'i 125, 143, 170 P.3d 861, 879 (App.2007). In sum, the DPA's remarks were plainly erroneous and amounted to prosecutorial misconduct. *State v. Cardus,* 86 Hawai'i 426, 433, 439, 949 P.2d 1047, 1054, 1060 (App.1997) (concluding that the prosecutor's statement during rebuttal argument "urg[ing] the jury to, in effect, ignore the jury instructions and follow their 'common sense' " "was improper" and "constituted prosecutorial misconduct").

## XII.

 Having determined that the DPA's statements amounted to misconduct, we must decide whether such misconduct warrants vacation. " 'Allegations of prosecutorial misconduct are reviewed under the

---

**37.** Although Petitioner alleges that the DPA's comments regarding "mumbo jumbo" and "gut" were two separate instances of misconduct, they are addressed together.

harmless beyond a reasonable doubt standard,' " and do not warrant vacation or reversal unless " 'there is a reasonable possibility that the error complained of might have contributed to the conviction.' " *State v. Mainaaupo*, 117 Hawai'i 235, 247, 178 P.3d 1, 13 (2008) (quoting *State v. Iuli*, 101 Hawai'i 196, 204, 65 P.3d 143, 151 (2003)). In deciding the foregoing question, we must consider the following factors: " '(1) the nature of the conduct; (2) the promptness of a curative instruction; and (3) the strength or weakness of the evidence against the defendant.' " *Id.* at 252, 178 P.3d at 18 (2008) (quoting *State v. Hauge*, 103 Hawai'i 38, 47, 79 P.3d 131, 140 (2003) (quoting *Pacheco*, 96 Hawai'i at 93, 26 P.3d at 582)).

## A.

█ The nature of the prosecutor's conduct was not harmless. As officers of the court, counsel are bound to respect the law, as embodied in the instructions, not to impugn it. The DPA's argument to the jurors encouraged disdain for the law. Contending that the jurors could decide the case on their "gut feelings" clashed with the instruction on reasonable doubt. In essence, the DPA's argument abrogated Respondent's duty to prove each element of the offense under the standards set forth in the reasonable doubt instruction as is constitutionally and statutorily required.[38] *See Murray*, 116 Hawai'i at 10, 169 P.3d at 962 ("The defendant's right to have each element of an offense proven beyond a reasonable doubt is a constitutionally and statutorily protected right."). "[A]lthough this court has previously allowed the prosecution wide latitude when making closing remarks, ... a prosecutor's comments may not infringe on a defendant's constitutional rights." *State v. Mattson*, 122 Hawai'i 312, 325, 226 P.3d 482, 495 (2010). Based on the foregoing, the misconduct was not harmless as to the first factor.

## B.

As to the second factor, no curative instruction was given in this case. The overarching fact, with respect to the impact of the court's ruling on the jury, was that the defense's objection was overruled. *Pacheco*, 96 Hawai'i at 96, 26 P.3d at 585 ("Regarding the second factor, the circuit court gave no curative instructions to the jury. Indeed, when the DPA first characterized Pacheco as an 'asshole' during his cross-examination of him, the circuit court overruled defense counsel's objection."); *see also State v. Meyer*, 99 Hawai'i 168, 172, 53 P.3d 307, 311 (App.2002) (stating that "no specific curative instruction was given by the court in this case because the court overruled defense counsel's objection to the DPA's [statements]"); *State v. McGriff*, 76 Hawai'i 148, 160, 871 P.2d 782, 794 (1994) ("Generally, a prosecutor's improper remarks are considered cured by the court's instructions to the jury, because it is presumed that the jury abided by the court's admonition to disregard the statement." (Internal quotation marks and citation omitted).); *Pemberton*, 71 Haw. at 475, 796 P.2d at 84 (noting that it is "presumed" that the jury will abide by a court's admonition to disregard an improper argument); *State v. Melear*, 63 Haw. 488, 497, 630 P.2d 619, 626–27 (1981) (noting that the circuit court "instructed the jury to disregard the arguments of the prosecutor[,]" which "removed any harm or prejudice ... caused by the prosecutor's statements"); *State v. Cavness*, 46 Haw. 470, 473, 381 P.2d 685, 686–687 (1963) ("When the Court has instructed that something which the[ jurors] have heard is not to be considered by them, we must presume in favor of their oath and public duty." (Internal quotation marks and citations omitted).). Consequently, "by overruling defense counsel's objection, the [ ] court, at least tacitly, placed its imprimatur upon the DPA's [improper remarks.]"[39] *Pacheco*, 96 Hawai'i at 96, 26 P.3d at 585.[40]

---

**38.** As noted in *State v. Murray*, 116 Hawai'i 3, 10 n. 8, 169 P.3d 955, 962 n. 8 (2007), HRS § 701–114 (1993) provides in relevant part that "no person may be convicted of an offense unless" "[e]ach element of the offense" is "proved beyond a reasonable doubt." (Emphases omitted.)

**39.** From the dissent's point of view, "overruling of the objection did not convey approval" of the prosecutor's improper remarks, or "vitiate the effect of the court's comments reminding the jury to follow the instruction on reasonable doubt[,]" the court cured the improper remark by referring to the jury instruction on reasonable doubt.

454

Unlike in *Cardus*, where the ICA concluded that similar comments did not warrant a mistrial,[41] the jurors here were never instructed to reject the DPA's entreaties. In that connection, the court's instruction that "pity, passion and prejudice have no play" in determining "reasonable doubt" was also insufficient to cure the misconduct because the instruction did "not relate[ ] to the prejudicial effects of the prosecutor's assertions" or "specifically address and correct the misstatements [ ] given."[42] *Espiritu*, 117 Hawai'i at 143–44, 176 P.3d at 901–02.[43] Similarly, although Respondent noted that the court instructed the jury that statements or remarks made by counsel are not evidence, that instruction was not a "curative instruction" because the court overruled the objection and, moreover, "the specific misstatements in question have to do with law and not evidence." *Id.* at 143, 176 P.3d at 901 (emphasis omitted); *see also id.* (where the prosecutor misstated the law by implying that an attempted manslaughter defense had additional elements not set forth in the statute, holding that, "[a]lthough the court did instruct the jury as to the elements of an attempted manslaughter defense, ... [t]he jury was not disabused of this error" "[b]e-

Dissenting opinion at 485, 279 P.3d at 1290. But it is clear the court's overruling of the defense's objection indicates that the improper prosecution argument was permissible. Further, by stating that it would allow the argument and noting for the jury that the DPA had "latitude" in making an argument, the court wrongly conveyed to the jury that equating common sense in the court's instruction with a "gut feeling" was acceptable and could guide the jurors' decision.

40. The dissent suggests that "all" of the foregoing cases are distinguishable, but refers only to *Pacheco* and *Meyer*. *See* dissenting opinion at 485-86, 279 P.3d at 1290-91. According to the dissent, all of the cases including *Pacheco* and *Meyer* are distinguishable because in those cases, the trial court did not refer the jury to an instruction that was "contrary to the argument being made by the prosecutor." *Id.* The dissent maintains it was the reasonable doubt instruction that was "contrary" to the prosecutor's argument and thus curative. *Id.* at 485-86, 279 P.3d at 1290-91. But the court did not sustain the objection and tell the jury to disregard the improper argument. *See* discussion *supra; see State v. Espiritu*, 117 Hawai'i 127, 143, 176 P.3d 885, 901 (2008) (holding that "[n]o curative instruction was given[,]" and the court's instructions did not "disabuse[ ]" the jury of the prosecutor's improper remarks); *Pacheco*, 96 Hawai'i at 96, 26 P.3d at 585 (noting that "the circuit court gave no curative instructions to the jury[ ]" insofar as it "overruled defense counsel's objection[,]" thereby "plac[ing] its imprimatur upon the [prosecutor's improper argument], risking the implication that it, too," believed the improper argument, and "invit[ed] the jury to share in that belief"); *Rogan*, 91 Hawai'i at 415, 984 P.2d at 1241 (noting that the failure to sustain the defendant's objection and, consequently, the lack of curative instruction weighed in favor of the conclusion that prosecutorial misconduct was not harmless beyond a reasonable doubt); *Meyer*, 99 Hawai'i at 172-73, 53 P.3d at 311-12 (recognizing that there "was no specific curative instruction given by the court in this case because the court overruled defense counsel's objection"). Indeed, it

confirmed the prosecution equating "gut feeling" with common sense. Citing the standard jury instruction on reasonable doubt but overruling the objection, as the court did in the instant case, does not suggest to the jury that the prosecutor's argument was "contrary" to the instruction, but rather, that the objection was wrong, leaving in place the prosecutor's improper remarks.

41. In *Cardus*, 86 Hawai'i at 433, 949 P.2d at 1054, the prosecutor "urged the jury to, in effect, ignore the jury instructions and follow their 'common sense.'" Following an objection and bench conference, defense counsel moved for a mistrial. *Id.* The trial court denied the defense's motion for mistrial but struck the statement and told the jury to disregard the argument. *Id.* The trial court then instructed the jury as follows: "Ladies and gentlemen, at this time I am going to ask you to please disregard the prosecutor's last statement. And ask you to please disregard the prosecutor [sic] last statement." *Id.* (brackets in original).

42. The dissent maintains that the court's reference to the foregoing jury instruction "nullified" the prosecutor's "improper argument" that the jury could ignore the law, and "sufficiently addressed" the "prejudicial impact" of that argument. Dissenting opinion at 485, 279 P.3d at 1290. But the court sustained the "gut feeling" remark as the prosecution's "take on common sense." And inasmuch as the court did not overrule the prosecutor's "improper argument," the court could not have "nullified" such argument.

43. The dissent maintains that, unlike in *Espiritu*, here the court referred the jury to the reasonable doubt instruction in regard to the prosecutor's arguments. Dissenting opinion at 486-87, 279 P.3d at 1291-92. However, *Espiritu* expressly stated that *"[n]o curative instruction was given[,]"* 117 Hawai'i at 143, 176 P.3d at 901 (emphasis added), because, as in the instant case, the court did not "disabuse" the jury of the incorrect prosecutorial argument, leaving the jury with the

cause [the defense's] objections to these arguments were overruled, [and] the jury would reasonably perceive that the misstatement of the law was not incorrect"). Here, the court's instruction simply did not address the DPA's misstatements.[44]

Lastly, because the court did not state its reasons for twice instructing the jury on reasonable doubt, any suggestion by Respondent that the second instruction was "prophylactic," after an apparent two-day break in the proceedings, is nothing more than speculation. The second general instruction on reasonable doubt also did not specifically address the improper nature and prejudicial effects of the comments. Thus, "the second factor . . . weighs heavily in favor of [Petitioner]." *Rogan,* 91 Hawai'i at 415, 984 P.2d at 1241.

### C.

The third factor requires consideration of the strength or weakness of the evidence against Petitioner. *Mainaaupo,* 117 Hawai'i at 252, 178 P.3d at 18. Although the medical examiner testified that decedent died as a result of a "traumatic subarachnoid hemorrhage" caused by an "assaultive blunt force

injury to the head[,]" [45] physicians at the hospital who treated decedent concluded that the he had died from an aneurysm. The medical examiner offered an explanation for the different conclusions. However, a question as to the "unique" [46] injury resulting in decedent's death was raised in the evidence by the medical examiner. The medical examiner indicated that the injury was "unique" because, "usually, if somebody falls, . . . [that is] what's called [a] subdural hemorrhage[,]" but decedent "didn't have any of that."

In addition, as previously noted, while Respondent's witnesses who had invited decedent to camp with them and observed the incident from a distance testified that Petitioner's action was unprovoked, there was contrary testimony. Reverio, who was standing next to Petitioner at the time of the incident, testified that after a disagreement, Reverio thought Petitioner and decedent "were going to fight" when Petitioner punched decedent once. Consequently, there was a dispute in the evidence as to what had occurred and whether Petitioner acted in self-defense.[47] Thus, the evidence in this

---

perception that the misstatement was not incorrect. *Id.*

44. Relying on cases from outside this jurisdiction, the dissent maintains that the test for the second prong should be whether "the entirety of the court's comments were sufficient to alleviate the prejudice caused by the prosecutor's improper remarks." Dissenting opinion at 485, 279 P.3d at 1290 (citing *Rodriguez v. Peters,* 63 F.3d 546, 559 (7th Cir.1995); *People v. Katzenberger,* 101 Cal.Rptr.3d 122, 128, 178 Cal.App.4th 1260 (Cal.Ct.App.2009); *Uvalle v. State,* Nos. 05–98–0466–CR, 05–98–0467–CR, 05–98–00468–CR, 1999 WL 592397, at *6 (Tex.Ct.App. Aug. 9, 1999) (not designated for publication); *Morrison v. State,* No. 05–94–01649–CR, 1997 WL 282232, at *4 (Tex.Ct.App. May 29, 1997) (not designated for publication)). With all due respect, the established and precedential test in this jurisdiction for this prong is whether a curative instruction was given, *see* cases cited *supra,* at 452-54, 279 P.3d at 1257–59, notwithstanding foreign decisions that conflict with our precedent.

45. According to the dissent, "the medical examiner's testimony provided strong support that Reuther's injury was caused by a punch that he did not anticipate." Dissenting opinion at 487, 279 P.3d at 1292. But there is nothing in the record indicating the medical examiner opined

that decedent "did not anticipate" a punch. *Id.* Instead, the examiner stated that when a person expects to be hit, it is unlikely that the brain will suffer trauma, but even if it is unexpected and a "blow is not really hard," trauma can occur. The medical examiner testified that a "traumatic subarachnoid hemorrhage" occurs "mostly when [the impact is] unexpected[,]" but "anything is possible[,]" so the medical examiner could not definitively state that the injury "can never happen[ ]" when a victim does not expect a blow.

46. The dissent asserts that this opinion takes the medical examiner's testimony out of context by stating that there was disputed evidence as to whether the punch caused death. Dissenting opinion at 488-89 n. 27, 279 P.3d at 1293–94 n. 27. However, the issue is not whether decedent died from the punch, but whether Petitioner acted recklessly in striking decedent; in that regard, testimony regarding the "unique" injury, would be a consideration in whether Petitioner acted recklessly.

47. The dissent focuses on the testimony of two witnesses, to the exclusion of Reverio's testimony. *See* dissenting opinion at 487, 279 P.3d at 1292. Reverio's testimony contradicted the testimony of Kaeo and Ako. Further, we do not dispute the medical examiner's testimony, *see* dissenting opinion at 488-89, 279 P.3d at 1293–94. However, as stated, the hospital believed decedent's cause of death was an aneurysm.

case was not so overwhelming [48] as to "outweigh" the effect of the misconduct and to render the DPA's improper comments harmless beyond a reasonable doubt, as previously noted.[49] *Shabazz*, 98 Hawai'i at 382, 48 P.3d at 629; *cf. Pacheco*, 96 Hawai'i at 83, 26 P.3d at 586 ("[W]e cannot say that the evidence against [the defendant] was so overwhelming as to render the DPA's personal disparagements of him and vigorous and improper attack on his credibility harmless beyond a reasonable doubt.") [50]

48. As opposed to the dissent's position that the evidence must be only "very strong[,]" dissenting opinion at 487, 279 P.3d at 1292 (citing *State v. Klinge*, 92 Hawai'i 577, 593, 994 P.2d 509, 525 (2000)), "overwhelming" evidence is the precedential standard by which to assess the strength of the evidence against a defendant. *See State v. Tuua*, 125 Hawai'i 10, 17, 250 P.3d 273, 280 (2011) ("[T]he strength of the evidence was not overwhelming and the credibility of the witnesses' versions of events was the pivotal issue at trial."); *Mainaaupo*, 117 Hawai'i at 255, 178 P.3d at 21 ("[W]e think that the evidence in this case is not so overwhelming that we are convinced that the DPA's intrusion into [the defendant's] right to remain silent may not have contributed to his conviction."); *see also Wakisaka*, 102 Hawai'i at 516, 78 P.3d at 329 ("In short, the evidence was not so overwhelming that we are convinced the prosecution's intrusion on [the defendant's] rights under article I, section 10 of the Hawai'i Constitution may not have contributed to [the defendant's] conviction."); *Pacheco*, 96 Hawai'i at 87, 26 P.3d at 586 ("[W]e cannot say that the evidence against [the defendant] was so overwhelming as to render the DPA's personal disparagements of him and vigorous and improper attack on his credibility harmless beyond a reasonable doubt."); *Rogan*, 91 Hawai'i at 415, 984 P.2d at 1241 ("[I]t can hardly be said that the case against [the defendant], which hinged on the credibility of the Complainant, was so overwhelming as to outweigh the inflammatory effect of the deputy prosecutor's comments."); *State v. Knight*, 80 Hawai'i 318, 327, 909 P.2d 1133, 1142 (1996) ("In regard to the third factor, the strength or weakness of the evidence against the defendant, the evidence against [the defendant], as described above, is overwhelming."); *State v. Samuel*, 74 Haw. 141, 149, 838 P.2d 1374, 1379 (1994) ("Furthermore, there was overwhelming evidence in the record to support the ... verdict beyond a reasonable doubt[.]"); *State v. Shabazz*, 98 Hawai'i 358, 382, 48 P.3d 605, 629 (App.2002) ("Hence, like the supreme court in *Rogan*, we cannot conclude that the case against [the defendants], which hinged on the credibility of the Complainant, was so overwhelming as to outweigh the inflammatory effect of the deputy prosecutor's comments.") (Internal citation and quotation marks omitted); *State v. Schmidt*, 84 Hawai'i 191, 203, 932 P.2d 328, 340 (App.1997) ("Thus, in light of the overwhelming evidence of [the d]efendant's guilt, we conclude that those of the prosecutor's comments which were improper were harmless beyond a reasonable doubt."). *Klinge* is distinguishable. *Klinge* focused on whether the misconduct prejudicially affected the defendant's substantial rights under *plain error review; it did* not, as here, analyze whether the error was harmless beyond a reasonable doubt such that vacation is warranted. *Id.* at 593, 994 P.2d at 525 ("[I]n light of the nature of the prosecutor's statement, the failure of defense counsel to object, and the strength of the evidence against [the defendant], we hold that any error ... by the prosecutor did *not prejudicially affect Klinge's* substantial rights.") (Emphasis added.). Thus, contrary to the dissent's position, *Klinge* cannot be relied upon for the proposition that the evidence need not be overwhelming in ascertaining whether the misconduct is harmless beyond a reasonable doubt.

49. The dissent maintains that this opinion "focuses" on the fact that "some evidence" contradicting Respondent's evidence was introduced, which, according to the dissent, is a "departure from this court's harmlessness jurisprudence[ ]" insofar as the "question" is whether Respondent's evidence is "strong enough to overcome the potential effect of the misconduct." Dissenting opinion at 488, 279 P.3d at 1293 (citing *State v. Valdivia*, 95 Hawai'i 465, 484, 24 P.3d 661 680 (2001); *Klinge*, 92 Hawai'i at 593, 994 P.2d at 525; *Rogan*, 91 Hawai'i at 415, 984 P.2d at 1241). Again, the "question" is whether the State's evidence, here, Respondent's, is "so *overwhelming* as to outweigh the [prejudicial] effect of the [improper] comments[,]" such that the improper comments "might [not] have contributed" to the defendant's conviction, as noted *supra. Rogan*, 91 Hawai'i at 415–16, 984 P.2d at 1241–42 (emphasis added). Second, despite the dissent's assertion that the majority opinion "focuses" on evidence that contradicts Respondent's evidence, this opinion considers the entire record, in arriving at the conclusion that improper remarks might have contributed to the conviction.

50. The dissent reaches the opposite conclusion by arguing the evidence demonstrated that Petitioner was "reckless" and did not act in self defense. Dissenting opinion at 487-88, 279 P.3d at 1292–93. According to the dissent, this evidence consisted of two "independent" witnesses who stated that the attack was unprovoked and unexpected and that Petitioner was under the influence of methamphetamine, the medical examiner who testified that the injury resulted from a punch that decedent did not anticipate, (this is rebutted *supra* ), and an "independent witness" who testified that Petitioner was larger than decedent. *Id.* at 487, 270 P.3d at 1292.

First, there is no "overwhelming evidence" of recklessness, for the reasons previously stated.

## D.

The prosecutor's remarks brought the jury instructions into disrepute, and uncorrected, such remarks "seriously affect the fairness, integrity, [and] ... public reputation of [the] judicial proceedings," *State v. Nichols*, 111 Hawai'i 327, 334, 141 P.3d 974, 981 (2006). Hence, based on these three factors, "there is a reasonable possibility[, then,] that [the DPA's improper remarks] might have contributed to [Petitioner's] conviction," *Duncan*, 101 Hawai'i at 278, 67 P.3d at 777, and the ICA gravely erred in concluding that "the statements of the DPA were harmless beyond a reasonable doubt[,]" *Schnabel*, 2010 WL 4546655, at *4.[51]

## XIII.

In sum, the dissent maintains that judicial notice may not be taken of HRS § 571–84(1); only plain error review is permissible, plain error review should not be granted with respect to the applicability of HRS § 571–84(1), and the prosecutor's remarks in final argument were harmless. Specifically, the dissent asserts, (1) pursuant to HRE Rule 103, Petitioner waived the argument that HRS § 571–84 precluded admission of the juvenile evidence by failing to specifically object on the ground that the admission of such evi-

dence was barred by HRS § 571–84, dissenting opinion at 468, 471-72, 279 P.3d at 1273, 1276–77; (2) HRE 202(b) does not allow this court to take notice of Petitioner's "potential objection," *id.* at 1273, 1276; (3) the "argument" that HRS § 571–84 precluded admission of the evidence is not noticeable as plain error, *id.* at 468, 478-480, 270 P.3d at 1273, 1283–85; (4) the court did not violate HRS § 571–84(h), *id.* at 480-83, 270 P.3d at 1285–88; and (5) the prosecutor's closing argument was improper, but was cured by the court's instructions to the jury, *id.* at 483-89, 279 P.3d at 1288–94.[52]

## XIV.

The dissent's first argument that Petitioner "waived" any "argument" pertaining to HRS § 571–84(h) is incomplete. HRE Rule 103(a)(1) provides that "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and[,]" "[i]n case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground *was not apparent from the context[.]*" (Emphasis added.)

To reiterate, at trial, Petitioner sought to prevent Respondent from admitting Dr. Camara's testimony, arguing that such evidence was not relevant, and that its probative value

---

Additionally, the two witnesses who believed Petitioner to be under the influence of methamphetamine, by their own admission, were under the influence of drugs themselves. Harold Kaeo had smoked marijuana and had a shot of alcohol, and Nicole Ako stated that she was "high on crystal methamphetamine." In any event, Petitioner's physical size, alleged drug use, and the testimony of two witnesses apparently under the influence of drugs themselves, would not present "overwhelming and compelling," *State v. Toyomura*, 80 Hawai'i 8, 27, 904 P.2d 893, 912 (1995), evidence of recklessness that could be concluded, outweighed the prejudice engendered by the prosecutor's comments in final argument. In light of other evidence that the injury was "unique" and Reveiro's testimony regarding self defense that is part of the record, the improper comments cannot be deemed harmless.

Second, as to the dissent's statement that the foregoing evidence showed Petitioner did not act in self defense, aside from Reveiro's testimony, Petitioner's "subjective[ ] belie[f,]" *Augustin*, 101 Hawai'i at 128, 63 P.3d at 1098, as to the circumstances regarding the use of force, would have had to be considered by the jury. However, a reason Petitioner did not testify was the court's

erroneous ruling on admission of the juvenile evidence.

**51.** The dissent asserts that as in *State v. Sawyer*, 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998), the court " 'effectively sustained' " Petitioner's objection to the improper remarks by reminding the jury that the of the instructions on reasonable doubt and that "pity, passion and prejudice have no play[.]' " Dissenting opinion at 486 n. 25, 279 P.3d at 1291 n. 25. In *Sawyer*, the prosecutor told the jury during closing arguments not to " 'let the law try to cloud you with all of these instructions when you look at it.' " *Id.* at 328, 966 P.2d at 640. *Sawyer* held that the court "effectively sustained and immediately cured any error by stating that the 'law has to be followed[.]' " In this case, the court could not have "effectively sustained" Petitioner's objection inasmuch as it *expressly overruled* Petitioner's objection. Also, a general reference to an instruction on reasonable doubt did not specifically address the denigration of the court's instructions.

**52.** Because this argument was addressed in footnotes accompanying the analysis of prosecutorial misconduct, *see supra*, it is not discussed further.

was substantially outweighed by the risk of prejudice. Consequently, and plainly, Petitioner did *not* "waive" his objection to the admissibility of the juvenile evidence.[53] Seemingly, the dissent's disagreement with this opinion, at least with respect to objections, comes down to its belief that Petitioner was not precise enough in objecting to the admission, of Dr. Camara's testimony. *See* dissenting opinion at 468, 471-72, 279 P.3d at 1273, 1276-77. "Case law from our state indicates ... that the purpose of requiring a specific objection is to inform the trial court of the error." *State v. Long*, 98 Hawai'i 348, 353, 48 P.3d 595, 600 (2002). However, *Long* explained that an appellate court will "consider a meritorious objection not voiced to the trial judge" when "the ground for exclusion *should have been obvious to [the] judge* and opposing counsel[,]" 98 Hawai'i at 354, 48 P.3d at 601 (internal quotation marks, citation, and emphasis omitted) (emphasis added). Although Petitioner did not specifically raise HRS § 571-84(h), its applicability should have been "apparent from the context[,]" HRE Rule 103(a)(1) of Petitioner's objection.[54] Applying *Long*'s rationale, the

ground for exclusion in HRS § 571-84 should have been obvious. *Id.*[55]

## XV.

 The dissent's second argument suggests that HRE Rule 202(b) does not allow this court to take judicial notice of HRS § 571-84. According to the dissent, "the doctrine of judicial notice does not provide an alternative basis for an appellate court to address [the] issue" of whether the use of evidence from Petitioner's juvenile proceedings was barred by HRS § 571-84, or "to address a potential objection to the admissibility of evidence which was not raised below."[56] Dissenting opinion at 468, 279 P.3d at 1273; *see also* dissenting opinion at 473-78, 279 P.3d at 1278-83. With all due respect, the dissent confuses the concepts of judicial notice and plain error. Indisputably, judicial notice does not allow a court to take notice of a "potential objection" or of error.[57] *Id.* Judicial notice, however, does allow this court to take notice of a *statute*, here, HRS § 571-84, even though it was not raised below.[58]

53. *Assuming, arguendo*, Petitioner "waived" any argument pertaining to HRS § 571-84, the court's error would be subject to plain error review. As stated both *supra* and *infra*, the court's error is noticeable for plain error under the facts of this case. For the same reasons, "a substantial right of [Petitioner was] affected" as a result of the court's error, as required by HRE Rule 103(a)(1).

54. Also, this court has recently affirmed that general objections are sufficient to preserve an error for appeal. *Cf. State v. Walker*, 126 Hawai'i 475, 273 P.3d 1161, 1176-77 (2012) (noting that as in *Wheeler*, 121 Hawai'i at 387, 219 P.3d at 1174, "in which the defendant *generally moved to dismiss* on the ground that the charge failed to state an offense without specifying which element of the offense was deficient[,]" *Walker*'s general objection to the charge was sufficient to deem the charge to have been objected to).

55. The dissent states that based on Petitioner's objection in this case, the applicability of HRS § 571-84 would not be "apparent or obvious" to the court. Dissenting opinion at 472 n. 5, 279 P.3d at 1277 n. 5. To the contrary, the proposition that juvenile evidence may not be used against the minor in subsequent criminal proceedings has been well established in this jurisdiction. *See* HRS § 571-84; *see also Nobriga*, 56 Haw. at 77, 527 P.2d at 1271; *Riveira*, 92 Hawai'i 521, 993 P.2d 555.

56. We apply the neutral principle that a court should take judicial notice of a law that is directly and obviously applicable and plainly controlling. It is error for the court not to do so, without regard to whether the prosecution or defendant would benefit by judicial notice. *See e.g., West*, 95 Hawai'i at 26-27, 18 P.3d 884, 888-89 (holding that the trial court must take judicial notice of the speed schedules, even where judicial notice is not "expressly requested by counsel[,]" and the speed limits properly noticed constitutes sufficient evidence in support of the prosecution's case).

57. Thus, judicial notice has nothing to do with whether "an issue ... is properly preserved" or "properly addressed" on appeal, *see* dissenting opinion at 474, 279 P.3d at 1279, or to "notice arguments raised for the first time on appeal." *Id.* at 478, 279 P.3d at 1283. Similarly, this opinion does not take "judicial notice of an evidentiary objection that was waived." *Id.* at 475, 279 P.3d at 1280.

58. The dissent asserts that judicial notice "establishes rules for determining how courts can ascertain the content of the law." Dissenting opinion at 469, 279 P.3d at 1274 (emphasis omitted). We do not take issue with this. However, HRE Rule 202 also presumes that "courts are at liberty to discover *and apply the law*, whatever its source, to the issues at hand." *Manual on the*

As mentioned, *West* construed HRE Rule 202(b) as allowing courts of this state to take judicial notice of statutes even if not "expressly requested by counsel." 95 Hawai'i at 27, 18 P.3d at 889. Moreover, *Life of the Land*, 61 Haw. at 418–19, 606 P.2d at 884–85, *Eli v. State*, 63 Haw. 474, 480, 630 P.2d 113, 115 (1981), *Demond v. Univ. of Hawaii*, 54 Haw. 98, 102–04, 503 P.2d 434, 437–38 (1972), establish this court's power to take judicial notice of enactments such as HRS § 571–84 not raised by the parties at trial.

In *West*, the defendant was charged with speeding, and during trial, the prosecution asked the circuit court to take judicial notice of ordinances establishing the speed limit to prove that the defendant's speed was in excess of the limit. 95 Hawai'i at 24, 27, 18 P.3d at 886, 889. On appeal, this court observed that HRE Rule 202(b) requires the courts to take judicial notice of the content of the applicable ordinances even when not expressly requested by counsel. *Id.* at 26–27, 18 P.3d at 888–89.

■ In *Life of the Land*, the plaintiffs, who opposed the construction of a high rise condominium building, referred to the "Kakaako Ordinance," an ordinance that was to control development, 61 Haw. at 394, 606 P.2d at 871, as "[s]ui generis" and "the only ordinance of its kind[,]" *id.* at 417–18, 606 P.2d at 884. However, this court took judicial notice of twenty-five other ordinances, despite the fact that only two were in the appellate record, to explain the City and County of Honolulu's land development and procedure, and to reject the plaintiffs' assertion that the approval of development was

invalid. *Id.* at 422, 606 P.2d at 886. The parties had not asked the court to review those ordinances, nor had they discussed the ordinances in their briefs. *Id.* at 416, 418, 419, 606 P.2d at 883, 884, 885.[59]

In *Eli*, also instructive, the defendant sought post-conviction relief pursuant to HRPP Rule 40, arguing, *inter alia*, that his guilty plea was not made knowingly, intentionally, and voluntarily. 63 Haw. at 480, 630 P.2d at 115 (1981). As to the foregoing claim, *Eli* noted that this court must "look at the entire record in order to determine whether the [defendant's] claims or recantation are credible and worthy of belief." *Id.* at 477, 630 P.2d at 116. "A silent record or a minimal record places the burden on the State to prove waiver." *Id.* at 477, 478, 630 P.2d at 116. But the record of the proceeding in which the defendant entered his plea was never submitted into evidence during the Rule 40 proceedings." *Id.* at 478, 630 P.2d at 116.

*Eli* stated that "[o]rdinarily, matters not presented to the trial court may not be considered by the appellate court on appeal." *Id.* *Eli* declared, however, that *"[w]here the equity of the situation dictates, we will use our discretion to take judicial notice of matters of which courts may properly take judicial notice but which are not part of the record on appeal." Id.* (emphasis added). This court took judicial notice of the transcript of the proceeding in which the defendant had pleaded guilty and determined that the defendant's plea was made voluntarily and intelligently.[60] *See id.* We conclude in

*Hawai'i Rules of Evidence § 202–2 (Supp.2011) (emphasis added).*

59. The dissent asserts that the instant case is different from *Life of the Land* because *Life of the Land* did not involve taking notice of "an evidentiary objection that was waived." Dissenting opinion at 475, 279 P.3d at 1280. First, to reiterate, the concept of judicial notice has nothing to do with waiver and must not be confused with plain error. In addition, although the dissent states that there is an "evidentiary framework" in place under which parties must specifically object or waive the objection, *id.* at 477-78, 279 P.3d at 1282-83, in fact, if a party fails to raise any argument, *evidentiary or otherwise*, that argument is generally deemed waived. *See State v. Moses*, 102 Hawai'i 449, 456, 77 P.3d 940, 947 (2003) ("As a general rule, if a party does not

raise an argument at trial, that argument will be deemed to have been waived on appeal[.]") Because the ordinances in *Life of the Land* were neither in the record nor raised in their briefs, under the dissent's approach the defendants presumably "waived" any argument regarding those twenty-five ordinances. Dissenting opinion at 468, 474, 279 P.3d at 1273, 1279. Nevertheless, in *Life of the Land*, this court took judicial notice of the ordinances for substantive purposes. That case established that this court may take judicial notice of sources of law when such notice obviously bears directly on the merits, even if such sources were not raised below or by the parties.

60. The dissent suggests that *Eli* took judicial notice on appeal because it was an HRPP Rule 40 petition and, thus, required the circuit court to look at the entire record. Dissenting opinion at 476, 279 P.3d at 1281. But *Eli's* decision to

line with *Eli* that "equity . . . dictates" notice of HRS § 571–84 under the circumstances of this case.

In *Demond*, the plaintiff challenged the denial by the Labor and Industrial Relations Appeal Board (Board) of her workmen's compensation claim against the University of Hawai'i (UH), for injuries incurred ten years earlier while she was employed by UH, but working in California. 54 Haw. at 99, 503 P.2d at 435. The plaintiff argued on appeal that although she had not given notice to UH of her injuries sooner, UH failed to disclose the existence and availability of workmen's compensation benefits as required by California law. *Id.* at 102, 503 P.2d at 437.

This court noted Demond neither argued that California law applied nor indicated a desire to take advantage of California law in the proceedings below. *Id.* at 102–03, 503 P.2d at 437. *Demond* said that "[w]e have held in numerous cases that this court on appeal will not consider issues beyond those that are properly raised in the trial court[,]" and applied that principle to workmen's compensation proceedings. *Id.* at 103, 503 P.2d

at 437. *Demond* acknowledged, however, that this court had the "power to take judicial notice of applicable foreign law, or to remand for its application[.]" *Id.* at 103, 503 P.2d at 437–38 (citing HRS § 623–1 (repealed 1980).) [61]

▉▉▉▉▉ Despite the dissent's argument that these prior cases are "factually distinguishable[,]" dissenting opinion at 475, 279 P.3d at 1280, the cases establish the principle that this court may take judicial notice on appeal, even for substantive purposes. *See West*, 95 Hawai'i at 27, 18 P.3d at 889, *Life of the Land*, 61 Haw. at 418–22, 606 P.2d at 884–86, *Eli*, 63 Haw. at 476–78, 630 P.2d at 115–16, and *Demond*, 54 Haw. at 103, 503 P.2d at 437–38.[62] Taking judicial notice of HRS § 571–84 is appropriate and necessary because the applicability of HRS § 571–84 was direct and obvious, and the statute plainly controlled in light of the facts of this case. In that regard, waiver of any "argument" by the parties has no relevance. *See, e.g., Stenger*, 122 Hawai'i at 282, 226 P.3d at 452.[63] Thus, the court erred in failing to take notice of HRS § 571–84 and, hence, we take notice of the statute.[64]

take judicial notice of a "matter[] not presented to the trial court," by its own language, hinged on taking judicial notice "where equity of the situation dictates," 63 Haw. at 478, 630 P.2d at 116.

61. HRS § 623–1 provided:

§ 623–1 Judicial notice of common law, state laws, and other statutes; ruling reviewable. Every court of this State shall take judicial notice of the common law and statutes of every state, territory, and other jurisdiction of the United States. The court may inform itself of such laws in such manner as it may deem proper, and the court may call upon counsel to aid it in obtaining information. The determination of such laws shall be made by the court and not by the jury, and shall be reviewable.

62. This court determined that under the specific circumstances in *Demond*, the plaintiff "should not at this late stage be allowed to rely on the law of California to establish her claim to benefits in this State." 54 Haw. at 103, 503 P.2d at 438. The dissent maintains that in light of the foregoing, *Demond* supports the position that this court may not take judicial notice of HRS § 571–84 since it was not raised below. See dissenting opinion at 476-78, 279 P.3d at 1281-83. In *Demond*, at all times prior to the appeal, the plaintiff "not *only failed to rely on California law but affirmatively argued* that she was eligible for

compensation under Hawaii law." *Id.* at 103, 503 P.2d at 438 (emphasis added).

This case is unlike *Demond*. In this case, Petitioner did not "affirmatively argue" at trial, *id.* at 103, 503 P.2d at 438, that HRS § 571–84 was inapplicable, or that the evidence given in his juvenile proceedings was admissible. Rather, Petitioner consistently maintained that such evidence was inadmissible. Moreover, in *Demond*, the plaintiff sought application of foreign law that was not directly and obviously applicable and plainly controlling. But we hold that judicial notice of HRS § 571–84 is controlling in light of the facts of this case.

63. HRE Rule 103(a) does not govern when, or under what circumstances, this court may take judicial notice of a statute.

64. To reiterate, we do not take judicial notice of the court's *error*, as the dissent seemingly maintains. Dissenting opinion at 478, 279 P.3d at 1283. The issue is not whether Petitioner failed to object to the admission of Dr. Camara's testimony on the ground that such admission would violate HRS § 571–84(h). Rather, it is apparent that judicial notice of HRS § 571–84(h) should have been taken. Consequently, *State v. Fox*, 70 Haw. 46, 55, 760 P.2d 670, 675 (1988) and *Republic v. Nenchiro*, 12 Haw. 189, 220 (Rep. 1899) cited by the dissent for the proposition that parties must raise objections to evidentiary er-

Next, the dissent states that HRS § 571–84 is "analytically indistinguishable" from the HRE and, hence, under our holding, trial courts must *sua sponte* consider all sources of law identified in HRE Rule 202(b), including the HRE since it is codified by statute. Dissenting opinion at 472-73, 473, 279 P.3d at 1277–78, 1278. We do not so hold. First, HRS § 571–84 is not a rule of evidence. A narrow construction of HRS § 571–84(h) as solely relating to the admissibility of evidence would be wrong. *See id.* at 473, 279 P.3d at 1278. HRS § 571–84(h) establishes, by statute, a state policy, as explained *supra*, of excluding certain juvenile proceedings from subsequent legal cases in order to protect and rehabilitate juveniles.

■ Moreover, the dissent's view that this opinion requires trial and appellate courts to notice all errors grounded in one of the sources of law identified in HRE Rule 202, without regard to whether substantial rights were affected, *id.* at 473-74, 279 P.3d at 1278–79, is mistaken. This opinion quite clearly does not require courts to "notice *any* error, even those that do not implicate substantial rights." *Id.* (emphasis in original). Where, as in this case, the court fails to notice a statute that obviously and undeniably governs, the failure of which has affected the substantial rights of a defendant, this court will apply the statute and vacate for the court's error.

## XVI.

The dissent's third argument is that the court's error in failing to apply HRS § 571–84(h) is not noticeable for plain error because (1) "objections" [65] to the admission of incompetent evidence that the defense failed to raise at trial are "generally" not subject to

plain error review, *id.* at 478, 279 P.3d at 1283, and (2) defendant's right to testify was not implicated in this case, *id.* at 479, 279 P.3d at 1284. Because we indicate that plain error may be an alternative ground for vacation, respectfully, we respond to what appears to be the dissent's wrong view of the plain error rule.

### A.

■ In tandem with the "purpose" of any "waiver rule[ ]" is the obligation to follow the law to ensure fairness and justice.[66] *See State v. Moriwake,* 65 Haw. 47, 55, 647 P.2d 705, 712 (1982) (noting that the "inherent power of the court is . . . the power to administer justice"). It is evident that in any scenario, this court may notice errors affecting a defendant's substantial rights, such as in this case. This is true even where the error may be related to the admissibility of evidence. *See State v. Pastushin,* 58 Haw. 299, 302, 568 P.2d 504, 506 (1977) (stating that "where inadmissible hearsay is so prejudicial as to deprive the defendant of his constitutional right to a fair trial, its admission will constitute ground for reversal, although defense counsel has failed to object"); *cf. State v. Grindles,* 70 Haw. 528, 530, 777 P.2d 1187, 1189 (1989) (noting for plain error, the "trial court's action in compelling [the defendant] to put on his evidence prior to the conclusion of the State's evidence[,]" because such error "violated his due process right to a fair trial"). Under the facts and circumstances of the cases cited to by the dissent,[67] the defendants' substantial rights were not affected, and therefore, plain error did not apply. On the other hand, in the instant case, the court's erroneous ruling infringed upon Petitioner's right to testify.

---

rors, dissenting opinion at 472-73, 279 P.3d at 1277–78, are not relevant.

**65.** To emphasize, the issue is not whether Petitioner "object[ed]" to the admission of evidence (for the failure to object is a prerequisite for application of the plain error rule), but whether the court erred in indicating it would grant admission of the juvenile evidence, so as to affect the substantial rights of the defendant. *State v. Miller,* 122 Hawai'i 92, 100, 223 P.3d 157, 165 (2010) (noting that, if error in the proceedings adversely affected the substantial rights of the defendant, the error is plain error); *see* HRPP Rule 52(b) (2008) ("Plain errors or defects affecting substantial rights may be noticed although

they were not brought to the attention of the court.")

**66.** It should be noted that the dissent maintains this court may not take judicial notice of HRS § 571–84, and the court's failure to apply HRS § 571–84(h) is not noticeable for plain error. The result is that the bar in HRS § 571–84(h) would be negated. Respectfully, the dissent's position would result in this court being complicit in a violation of HRS § 571–84(h).

**67.** *State v. Wallace,* 80 Hawai'i 382, 410, 910 P.2d 695, 723 (1996) and *State v. Uyesugi,* 100 Hawai'i 442, 463-64, 60 P.3d 843, 864-65 (2002).

In fact, plain error review *does* apply to erroneous evidentiary rulings that affect a defendant's substantial rights. In *State v. Santiago*, 53 Haw. 254, 261, 492 P.2d 657, 662 (1971), this court examined whether the prosecution's introduction of the defendant's prior convictions to impeach his credibility violated the defendant's constitutional right to testify in his own defense. Concluding that it did, and, thus, that plain error review was appropriate, this court emphasized that it was "concern[ed]" that admission of prior convictions would "compel [the defendant] to forego his privilege to testify." *Id.* at 260, 492 P.2d at 661.[68] Similarly, in the instant case, the court's ruling "compel[led Petitioner] to forego" testifying insofar as he expressly stated that he did not testify in part due to the court's ruling, thereby infringing upon his "substantial right" to testify.[69]

Additionally, *State v. Cummings*, 49 Haw. 522, 528, 423 P.2d 438, 442 (1967), demonstrates that evidentiary rulings, if affecting a defendant's substantial rights, can be reviewed for plain error. There, the defendant was convicted, after a jury-waived trial, of robbery in the second degree. *Id.* at 522, 423 P.2d at 440. At trial, a detective testified that, subsequent to his arrest, the defendant told the detective that he was "look[ing] for trouble with haoles[.]" *Id.* at 525, 423 P.2d at 441. There was no objection to the detective's testimony. The circuit court "sua sponte" addressed whether it could consider the oral statement in light of the fact that a statement elicited by police during an interrogation cannot be used against the defendant, if the defendant had requested and had been denied an opportunity to consult with a lawyer. *Id.* at 526, 423 P.2d at 441.

This court, noting that "the alleged error" could be a "matter not raised[ ]" insofar as "the question of the admissibility of defendant's damaging statement [was] not properly presented for the trial judge's ruling, nor specified as error in this appeal," nevertheless reviewed for plain error because the "[e]rroneous admission of evidence may constitute plain error if a fair trial of the accused was thereby impaired, or if it substantially prejudiced the accused." *Id.* at 528, 423 P.2d at 442 (internal quotation marks, citations, and parentheses omitted). In the instant case, as recounted, the erroneous ruling that would admit improper evidence affected Petitioner's substantial right to testify.[70] *See Domingo*, 69 Haw. at 70, 733 P.2d at 692 (stating that, where "the introduction of the evidence in question [is] prohibited by statute, it constitute[s] plain error and is noticeable by this court").

### B.

As to (2), the dissent disagrees that Petitioner's right to testify was infringed upon,

---

68. The dissent notes that the instant case does not "implicate" the concerns raised in *Santiago* because Respondent "offered to introduce the evidence without mentioning the result of the adjudication." Dissenting opinion at 479 n. 12, 279 P.3d at 1284 n. 12. With all due respect, the "adjudication" itself is not at issue inasmuch as no party or the court took the position that the adjudication in Petitioner's juvenile proceeding was admissible. The dissent's distinction, therefore, is inapposite.

69. The dissent suggests that plain error is inappropriate because Petitioner did not make an "offer of proof as to what his testimony would have been." Dissenting opinion at 480, 279 P.3d at 1285. "[T]he purpose of an offer of proof . . . is to provide an adequate record for appellate review and to *assist the trial court in ruling on the admissibility of evidence*." *State v. Pulse*, 83 Hawai'i 229, 248, 925 P.2d 797, 816 (1996) (citing 1 Wigmore, Evidence § 20(a) (Tillers rev. 1983)) (emphasis in original). In this regard, Petitioner stated on the record that if Respondent asked Petitioner on cross-examination whether he knew a single punch "could," cause death, Petitioner's "answer [would] be 'no.' " Thus, no offer of proof was necessary inasmuch as the foregoing plainly "assist[ed]" and was considered by "the trial court in ruling on the admissibility of [the] evidence" from Petitioner's juvenile proceedings, and, as a result, there is "an adequate record for appellate review" as to what Petitioner would have testified to. *Id.*

70. The dissent emphasizes that Petitioner stated on the record that the court's ruling was " '[of] the factors' " Petitioner considered in deciding not to testify, and suggests this should be considered in our plain error analysis. Dissenting opinion at 481-82, 279 P.3d at 1286–87. We respectfully reject the plain error analysis posited by the dissent under which this court would need to quantify the effect of a particular error on the defendant's fundamental rights. The error need only *"affect[ a] substantial right[ ]"* to be noticed for plain error. (Emphasis added.) HRPP Rule 52(b).

emphasizing that (a) the court's ruling was subject to change, (b) Petitioner could have testified and refrained from asserting that he did not know a single punch would cause a substantial risk of death, and (c) the court's ruling was " 'one of the factors' " contributing to Petitioner's decision not to testify. Dissenting opinion 480, 279 P.3d at 1285.

As to (a), the court's in limine ruling was not subject to change insofar as the court ruled that it would allow the cross-examination and later reconfirmed its ruling after the prosecution had rested its case. The court stated that it would "give latitude[ ]" to the prosecution to discuss the issue, over the defense's "objection[,]" and explained that it "would allow" on cross-examination the question whether Petitioner knew that one punch "could" cause death. After defense counsel stated that Petitioner did not testify in part because Respondent would be allowed to introduce Dr. Camara's testimony, the court acknowledged that Petitioner's statement was "accurate" and that it would "allow [the prosecutor] to get into the earlier [juvenile] situation[,]" thereby reconfirming that the court would have allowed the admission of such evidence if Petitioner testified. Thus, the ruling did not change. *See U.S. v. Greer*, 791 F.2d 590, 594 (7th Cir.1986) (reviewing the error of an in limine ruling even where the defendant failed to testify because there was a complete record insofar as the legal, not factual, "determinative question[ ]" was "whether a confession elicited in violation of a defendant's [F]ifth [A]mendment rights may ever be used for impeachment purposes").

As to (b), respectfully, criticism in response to the Supreme Court's decision in *Luce v. United States*, 469 U.S. 38, 41–43, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), highlights the flaw in the dissent's reasoning. In *Luce*, the Supreme Court held that a defendant must testify to preserve his or her right to appeal a trial court's in limine ruling that prior convictions are admissible for impeachment purposes. 469 U.S. 38, 40–42, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). "*Luce* has been subjected to little but steady and unrelenting criticism[.]" James Joseph Duane, *Appellate Review of In Limine Rulings*, 182 F.R.D.

666 (1999). One criticism of *Luce*, out of many, is that it "forces upon an accused what is arguably an unfair choice; testify under circumstances where it is virtually certain the prosecutor will regale the jury with tales of prior convictions, or refrain from testifying, deprive the jury of the accused's side of the story, and lose all chance to appeal." 28 Charles Alan Wright, et al., *Federal Practice and Procedure: Evidence* § 6119 at 123 n.49 (1st ed.1993). Since *Luce*, the Supreme Court has formally settled into the position that a defendant has a right to testify in his own behalf, *Rock v. Arkansas*, 483 U.S. 44, 49–51, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987), and "[i]n a host of other contexts, ... has held that a constitutional right may be violated, even where the accused is not strictly forbidden from exercising that right, *as long as some trial ruling undermines the right by improperly and unfairly making its exercise costly[,]* " Duane, *Appellate Review of In Limine Rulings*, 182 F.R.D. 666 (emphasis added) (internal quotation marks omitted). Indeed, requiring the defendant to testify in order to preserve the issue for appeal is wrong, since it fails to recognize "the significance that such impeachment has on the defendant's decision concerning the testimony." Paul F. Rothstein, *Federal Rules of Evidence: A Fresh Review and Evaluation*, 120 F.R.D. 299, 363 (1987).

States declining to adopt *Luce* have reasoned that

the problem of meaningful review is unfounded when the *record sufficiently demonstrates*, through an offer of proof, *the nature of the defendant's proposed testimony and that the defendant refrained from testifying when faced with impeachment by a prior conviction.* Under such conditions, a reviewing court would have a sufficient record to conduct a harmless error analysis.

*Warren v. State*, 121 Nev. 886, 124 P.3d 522, 527 (2005) (emphases added). In the instant case, it would be unwise to "apply" a rule that, in effect compelled Petitioner to make an "unfair choice" of either testifying under circumstances where it was "virtually certain" the prosecutor would "regale the jury" with Dr. Camara's testimony, or remain si-

lent and "deprive the jury" of his testimony and "lose all chance of appeal." 28 Charles Alan Wright, et al., *supra*, § 6119 at 123 n. 49. Of course, as noted previously, HRS § 571–84 bars the admission of evidence from a juvenile proceeding in the instant case, precluding any effort to "regale the jury" with Dr. Camara's testimony, further underscoring the inapplicability of *Luce*'s rationale to this case.

As to (c), as discussed *supra*, Petitioner's testimony was critical to his claim of self-defense insofar as the defense is based on the defendant's subjective belief and state of mind with respect to the facts and circumstances surrounding his or her use of force. Although the effect of the court's ruling on Petitioner's decision not to testify cannot be measured with precision, any error that infringes on a substantial right such as the right to testify may be noticed for plain error. *See Staley*, 91 Hawai'i at 286, 982 P.2d at 915 ("Because the circuit court's error *infringed* upon [the defendant's] constitutional right to testify, we address it as plain error" (emphasis added); *see also Wakisaka*, 102 Hawai'i at 515, 516, 78 P.3d 317, at 329).

## XVII.

The dissent's fourth argument that the court's ruling was not in violation of HRS § 571–84, maintains that (1) no appellate court has ruled on whether HRS § 571–84 "precludes a defendant's cross-examination regarding juvenile matters in order to rebut testimony by the defendant which the State argues was false or misleading[,]" dissenting opinion at 480, 279 P.3d at 1285; (2) "other state courts" have recognized that a defendant may not use "similar statutes to shelter such testimony from adversarial testing," *id.;* (3) the court's ruling was "contingent on [Petitioner] 'opening the door'" by testifying

that he did not know that one punch could kill, *id.* at 482, 279 P.3d at 1287; and (4) in the in limine ruling the court "offered the option of introducing the relevant evidence without reference to the adjudication or its result[,]" *id.* at 483, 279 P.3d at 1288.[71]

### A.

As to (1), respectfully, HRS § 571–84 plainly and unambiguously provides that such evidence may not be used "for any purpose" whatsoever. *Nobriga* and *Riveira I & II* have already directly confirmed that evidence, or what the dissent refers to as "juvenile matters[,]" dissenting opinion at 480-81, 279 P.3d at 1285–86, from a juvenile proceeding are inapplicable in any adversary proceeding. Nevertheless, the dissent contends that *Nobriga* did not deal with the question of whether "and to what extent evidence from prior juvenile adjudications was admissible at trial[,]" but held that "such evidence" was available for use in sentencing. *Id.* at 480 n. 15, 279 P.3d at 1285 n. 15. But *Nobriga* expressly stated that the juvenile evidence is inadmissible in an "adversary proceeding." 56 Haw. at 79, 527 P.2d at 1272. In that regard, it expressly "ruled" on the issue of "whether" evidence from prior juvenile adjudications was admissible, *see* dissenting opinion at 480-81, 279 P.3d at 1285–86, and concluded that it was not.

*Riveira I & II* also confirmed that the subject evidence is inadmissible in a criminal trial. In that case, this court adopted the analysis set out in the *Riveira I* dissent, including that portion of the dissent stating that, pursuant to HRS § 571–1, any evidence used in juvenile law violation proceedings "cannot be offered as evidence for any purpose whatever [ ] in any court[,]" *Riveira I*, 92 Hawai'i at 559, 993 P.2d at 593 (Acoba, J., dissenting) (internal quotation marks and citation omitted) (brackets in original).[72]

71. *Luce, see supra*, is persuasive as to the dissent's fourth argument which is therefore, not addressed further.

72. According to the dissent, *Riveira II*'s holding that "a juvenile adjudication" may not be treated as a "conviction for purposes of applying a repeat offender sentencing statute[,]" makes it distinguishable from the instant case. Dissenting opinion at 480 n. 15, 279 P.3d at 1285 n. 15. But the ICA dissent's reasoning in *Riveira I*, that was

adopted in *Riveira II*, is directly applicable. There, because the express language of HRS § 571–1 provides that no adjudication by the family court shall be deemed a conviction, such an adjudication could not be treated as a conviction. *Riveira I*, 92 Hawai'i at 559, 993 P.2d at 593; *see Riveira II*, 92 Hawai'i at 523-24, 993 P.2d at 556–57 (adopting dissent's observation in *Riveira I* that treating a juvenile adjudication as a criminal conviction is violative of the provisions in HRS chapter 571 and a rejection of the family

## B.

As to (2), despite the controlling precedent from this jurisdiction flatly prohibiting the use of the challenged evidence, the dissent looks to three cases from outside this jurisdiction for support, suggesting that such evidence may be admissible. *See* dissenting

opinion at 480-82, 279 P.3d at 1285-87. With all due respect, the dissent's reliance on such cases overlooks the fundamental fact that HRS § 571-84(h) mandates the exclusion of such evidence, despite what may be culled from the law of other jurisdictions. Moreover, two of the three cases cited are not contrary,[73] and the third case, *State v. Rodri*

court system). Similarly, HRS § 571-84 expressly prohibits the admission of evidence from a juvenile proceeding for any purpose whatsoever, and, "in the absence of any specific language in a statute to the contrary," *Riveira I*, 92 Hawai'i at 559, 993 P.2d at 593, HRS § 571-84(h) "control[s,]" *id.*

**73.** In *Lineback v. State*, 260 Ind. 503, 301 N.E.2d 636, 637 (1973), the Indiana Supreme Court determined that a character witness can be asked whether he knew the defendant was an "incorrigible juvenile" so that the "jury may determine whether the so-called character witness is, in fact, conversant with the defendant's reputation in the community...." The dissent maintains in *Lineback*, stands for the general proposition that evidence from juvenile proceedings may be admissible in "certain narrow circumstances." Dissenting opinion at 481 n. 16, 279 P.3d at 1286 n. 16. But unlike the statute in *Lineback* which precluded *our* statute, HRS § 571-84, prohibits the use of evidence from juvenile proceedings *"for any purpose whatever,"* with the exception of use in subsequent juvenile proceedings of the type set forth under the statute.

In addition, the dissent states that *Lineback* suggests that " 'an entirely different principle of law' arguably prevails if a defendant gives false or misleading testimony.' " Dissenting opinion at 481 n. 16, 279 P.3d at 1286 n. 16 (quoting *Lineback*, 301 N.E.2d at 637). First, *Lineback* more specifically stated that " 'an entirely different principle of law prevails when a defendant *directly places* his reputation in the community before the jury through character witnesses.' " 301 N.E.2d at 637. Elaborating on that "different principle of law[,]" *id. Lineback* explained that, " '[w]hen a defendant tenders his supposed good character in evidence, he thereby invites scrutiny and disclosure of specific instances of his misconduct to depreciate the weight of the testimony of his character witness, although the answers elicited may incidentally impute to him other guilt.' " *Id.* (quoting *Jordan v. State*, 232 Ind. 265, 110 N.E.2d 751, 753 (1953)). *Lineback* explained, "[a]lthough juvenile matters are secret and the results thereof not open to public scrutiny as a general proposition, a defendant who places his reputation before the jury through character witnesses opens his entire life to scrutiny." Even if this jurisdiction had adopted a similar exception to the prohibition set forth in HRS § 571-84(h), such exception would not be implicated under the facts of this case. Petitioner did not "directly place[ ] his reputation in the community" thereby opening "his entire life to scrutiny." *Id. Lineback* is thus inapposite.

Also, subsequent to *Lineback*, the Indiana Supreme Court determined that such questioning "is proper only as a means of testing the witness' actual knowledge of the defendant's general reputation in the community, *and not as a means of discrediting the defendant or of proving the truth of the assertion.*" *Randolph v. State*, 269 Ind. 31, 378 N.E.2d 828, 833 (1978) (emphasis added). Insofar as the instant case did not involve the attempted admission of evidence as a means of testing a character witness's "actual knowledge" of reputation evidence, *Lineback* is inapplicable.

In *State v. Marinski*, 139 Ohio St. 559, 41 N.E.2d 387, 388 (1942), *"the defendant[,] upon his own insistence and over the prosecuting attorney's objection[,]"* testified as to how he spent the previous years of his life, but failed to mention that he was incarcerated for juvenile delinquency. (Emphasis added). The prosecutor, on cross-examination, asked about this part of the defendant's history. The Ohio court relied heavily on the fact that because the "defendant himself" "insisted upon narrating the story of his previous years[,]" the prosecutor could question the defendant about the testimony. Contrary to the dissent's suggestion, *see* dissenting opinion at 482, 279 P.3d at 1287, in this case, Petitioner did not "insist upon narrating the story of his previous years." *Marinski*, 41 N.E.2d at 388. In fact, Petitioner "insist[ed that there be no mention of his "previous years." *Id.*

Furthermore, *Malone v. State*, 130 Ohio St. 443, 200 N.E. 473, 477 (1936), which was discussed in *Marinski*, is directly applicable to this case. There, the prosecutor asked the defendant if he had "wrecked a railroad train[,]" which was a "matter[ ]" "disposed of" in juvenile court. *Id.* The Ohio Supreme Court explained that the "defendant was being examined as to *matters* which had been the subject of proceedings in the juvenile court," *id.* at 478, and held that the questioning was improper inasmuch as "the law prohibits the use of juvenile court proceedings, *or of proof developed thereon*, against a child in any other court to *discredit him* or to mark him as one possessing a criminal history[,]" *id.* (emphases added).

Similarly, in the instant case, the prosecutor would have questioned Petitioner about "matters[,]" i.e., Dr. Camara's testimony, that were "developed" in a prior juvenile proceeding, to "discredit" Petitioner, and, thus, the evidence was inadmissible. Although the dissent attempts to distinguish *Malone*, *see* dissenting opinion at 481 n. 17, 279 P.3d at 1286 n. 17, noting that the prosecutor in that case pointed to several matters in the defendant's juvenile proceedings, *Malone's* decision did not hinge on the number of "matters

*guez*, 126 Ariz. 28, 612 P.2d 484, 486 (1980), which the dissent maintains is "particularly instructive[,]" dissenting opinion at 481-82, 279 P.3d at 1286-87, is in fact inapposite. There, the Arizona court held that "juvenile records" are admissible when "the defendant presents favorable evidence regarding his juvenile history[.]" 612 P.2d at 487.

The Arizona court was applying a statute, unlike the one in the instant case, that provided in pertinent part that "[t]he *disposition* of a child in the juvenile court may not be used against the child in any case or proceeding in any court other than a juvenile court[.]" *Id.* at 486 (emphasis added). The dissent concedes that the Arizona statute is narrower than HRS § 571-84 insofar as it does not prohibit "[e]vidence given in" juvenile proceedings, HRS § 571-84(h), but maintains that the "reasoning" applies because *Rodriguez* stands for the proposition that even a seemingly absolute bar on the admission of juvenile evidence must yield to competing concerns on occasion. Dissenting opinion at 482 n. 19, 279 P.3d at 1287 n. 19. However, unlike HRS § 571-84(h), the statute at issue in *Rodriguez* did not expressly provide that the disposition of the minor in the juvenile court may not be used against the minor "for any purpose whatever[.]" In view of the foregoing statutory language in HRS § 571-84(h), the dissent's approach would run counter to the express directive in the statute.

## C.

■ In connection with (3), the dissent maintains that the ruling was "contingent on"

Petitioner "opening the door" on direct examination by testifying that he did not know that one punch could kill. Dissenting opinion at 482, 279 P.3d at 1287. According to the dissent, because Dr. Camara stated that "a punch and some kicks carried a substantial risk of death[,]" it would be reasonable that Petitioner "should have known" that a single unexpected punch also carried such a risk. *Id.*

■ Respectfully, this is wrong. Initially, inasmuch as HRS § 571-84(h) expressly prohibits the admission of evidence, irrespective of the substance of his testimony, Petitioner could not "open" any "door" that would have admitted the evidence from the prior juvenile proceeding. Despite the court's ruling, such evidence was barred.[74] *See Nobriga*, 56 Haw. at 79, 527 P.2d at 1272 (expressly stating that the evidence is inadmissible in an "adversary proceeding"); *cf. Santiago*, 53 Haw. at 260, 492 P.2d at 661 ("[T]o convict a criminal defendant where prior crimes have been introduced to impeach his credibility as a witness violates the accused's constitutional right to testify in his own defense."). HRS § 571-84(h) establishes a state policy that evidence in a family court juvenile proceeding is inadmissible in any adversary proceeding in other courts because the core purposes of juvenile proceedings are to protect and rehabilitate the juvenile.

In any event, realistically, Petitioner would not have "opened the door"[75] to the use of

---

which had been the subject of proceedings in the juvenile court." *Id.* at 452, 200 N.E. at 477. The reference to a single matter from those proceedings would have been improper under *Malone*. Likewise, under HRS § 571-84(h), the use of *any* evidence from a defendant's juvenile proceedings is plainly prohibited.

74. The dissent disagrees with the proposition that Petitioner could not have "opened the door" to the use of the juvenile evidence because HRS § 571-84 completely bars the use of such evidence under all circumstances. The dissent contends that there is a distinction between "using a *privilege* as a as a 'sword' rather than merely a 'shield.'" Dissenting opinion at 482 n. 20, 279 P.3d at 1287 n. 20 (emphasis added). In light of the plain language of HRS § 571-84 prohibiting the use of juvenile evidence "for any purpose[,]" the barring of evidence is not a "privilege" similar to the "physician-patient privilege" as assert-

ed by Petitioner, and so the shield/sword reference is not apt. *Id.* Because HRS § 571-84 is not a "privilege," *State v. Peseti*, 101 Hawai'i 172, 180, 65 P.3d 119, 127 (2003), cited by the dissent, *see id.*, in which this court stated that the statutory privileges "may often give way to a strong public interest[,] is inapplicable. Moreover, *Peseti* held "that, when a statutory privilege interferes with a defendant's constitutional right to cross-examine, then, upon a sufficient showing by the defendant, the witness' statutory privilege must, in the interest of the truth-seeking process, bow to the defendant's constitutional rights. *Id.* at 181, 65 P.3d at 128. The dissent does not point to a right of constitutional magnitude to which HRS § 571-84(h) must give way.

75. "Opening the door" has been defined as where "the party introduces evidence or takes some action that makes admissible evidence that

the juvenile evidence on direct examination. It was not Petitioner that sought to introduce Dr. Camara's testimony in this case but Respondent that sought to admit Dr. Camara's testimony in its case-in-chief. The court's ruling, although it would have disallowed Respondent from introducing the evidence in its case-in-chief would have allowed Respondent to use the evidence to impeach Petitioner on cross-examination. Without any reference to the juvenile incident or the evidence by Respondent, Petitioner could not have "opened the door" to its use.

In connection with (4), the dissent suggests that because "HRS § 571–84(h) does not apply absent an adjudication[,] ... [i]t would follow that ... the admission of information relating to [the] misconduct" of the juvenile who was adjudicated would be admissible in adult adversarial proceedings because "[o]therwise a juvenile who was adjudicated would stand in a substantially better position at his adult trial than one who was not adjudicated, despite having engaged in the same conduct." Dissenting opinion at 483, 279 P.3d at 1288. It should be apparent, however, that there would be even more reason for the court to exclude reference to the "misconduct[,]" *id.*, of a juvenile where he or she was not adjudicated a law violator. The dissent suggests, nevertheless, that evidence of the misconduct, without the adjudication of a law violation, should be admissible. This would contravene the ban against use of the evidence for any purpose whatsoever in HRS § 571–84(h). The same would apply to efforts of admitting "bad acts" under HRE Rule 404(b). Dissenting opinion at 483 n. 22, 279 P.3d at 1288 n. 22.

### E.

█ Ultimately, in any event, it would not be a "reasonable inference" that Petitioner "should have known," based on Dr. Camara's testimony, that one punch could have caused death. *See* HRE Rules 403, 404. As stated previously, Dr. Camara did not expressly testify that punching and kicking

someone several times in the face could cause a substantial risk of death. The State asked Dr. Camara, "[B]ased on your education, training and experience, with respect to the injuries to [complainant] ..., *did the injury create a substantial risk of death?* (Emphasis added.) He replied, *"No."* (Emphasis added.) The State then showed Dr. Camara "HPD Form 13." He explained, "When I filled this out, *I was thinking more in terms of an injury of the severity that [complainant] had[,] could have led him to have a subdural hematoma."* On cross-examination, Dr. Camara affirmed that, "when [he] talked about substantial risk of death with brain hemorrhaging causing a subdural hematoma, [he] said ... *the type of injury [complainant] had could cause a subdural hematoma but in this case it didn't[.]* " (Emphasis added.) Dr. Camara was asked on cross-examination whether in his conclusion regarding complainant's injuries creating a substantial risk of death, he was "talking about *possibilities[,]* " and he responded, "The risk, yes." (Emphasis added.)

The instant case involved a single punch to decedent's head that did not result in a fracture of any kind, and plainly, the multiple kicks and punches in the juvenile case did not cause death. In the instant case only one punch caused death. In light of the logical opposing conclusions that would be drawn from the two incidents, the existence of the supposed fact that one punch could cause death and that Petitioner would know this, would not be made more or less probable by evidence that the multiple kicks and punches in the juvenile case that were far more "severe" did *not* cause death.

Because similarity between the two incidents is lacking, evidence of Dr. Camara's testimony, and the qualifications therein, would not tend to prove the "fact" that Petitioner would know from such testimony that one punch could create a *substantial* risk of death more or less probable. The facts in

---

would have previously been inadmissible; e.g., when a criminal defendant introduces evidence of his good character, he 'opens the door' to prosecution evidence of bad character." 21 Charles Alan Wright, et al., *Federal Practice and Procedure: Evidence* § 5039 at 829 (2d ed.2000);

*State v. McElroy,* 105 Hawai'i 352, 357, 97 P.3d 1004, 1009 (2004) ("When a defendant testifies to certain facts or issues during his direct examination, he 'opens the door' to further inquiry into those matters on cross-examination.") (Internal quotation marks and citation omitted.)

the juvenile proceedings were not so similar to the facts in this case so as to impute to Petitioner knowledge of the fatal effect of one punch. *See* discussion, *supra*. Moreover, Dr. Camara testified on cross-examination that the "risk" of death was only a "possibility," not that it was "substantial," removing the existence of Petitioner's knowledge as a fact from the realm of probability.

Also, admission of the doctor's testimony rests on several unstated assumptions that undercut the testimony's probative value. There is nothing to establish that Petitioner, who was a juvenile at the time, could deduce from Dr. Camara's opinion testimony that a single punch could cause the same injuries, of the same severity, suffered by complainant, which could then in turn, create a substantial risk of death to decedent. It would have to be assumed that Petitioner, as a juvenile, understood the import of the testimony and that although the doctor rendered an *opinion* with respect to a specific case, that opinion could be treated as a matter of incontrovertible fact in all cases so as to impeach Petitioner in the instant case. Under these circumstances, Dr. Camara's testimony was not probative of whether Petitioner knew a single punch could purportedly cause a *substantial* risk of death. In sum, the juvenile evidence was neither relevant nor probative of the fact that Petitioner would know a single punch could cause a substantial and unjustifiable risk of death, but would only result in unfair prejudice. *See* HRE Rules 403, 404.

### XVIII.

For the reasons set forth herein, the September 10, 2008 judgment of conviction and sentence filed by the court as to Manslaughter is vacated and the case remanded to the court for a new trial. The ICA's December 15, 2010 judgment is affirmed in part and vacated in part on the grounds set forth herein.

Dissenting Opinion by RECKTENWALD, C.J., in which NAKAYAMA, J., joins.

This case requires us to consider one of the recurring questions faced by appellate courts in an adversarial system of justice: whether to address a possible error in the admission of evidence against a defendant in a criminal case, when the defendant failed to object in the trial court. We have visited this issue many times recently, utilizing the principle of plain error that is expressly set forth in Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b). The court today relies on plain error and concludes that it is appropriate to reach an argument not raised by the defendant at trial, a conclusion with which I respectfully disagree. However, the court goes further and also relies on the concept of judicial notice to reach that argument.

Respectfully, such an approach is contrary to our rules of evidence and penal procedure. Moreover, the evidence in question—which related to a prior juvenile proceeding involving defendant Less Allen Schnabel, Jr.—was admissible in any event. Because I believe that the appeal is otherwise without merit and that Schnabel received a fair trial, I respectfully dissent.

Schnabel was indicted for manslaughter, pursuant to Hawai'i Revised Statutes (HRS) § 707-702(1)(a), and unauthorized entry into a motor vehicle in the first degree, pursuant to HRS § 708-836.5, in connection with the death of Christopher Reuther. It was undisputed that Reuther died from a single punch to the head from Schnabel during a confrontation at a beach park. In order to show that Schnabel was aware of the risk that a punch to the head could kill, the state sought to introduce evidence relating to a prior juvenile proceeding involving Schnabel. Schnabel objected and sought to exclude that evidence on the grounds of relevancy and unfair prejudice, pursuant to Hawai'i Rules of Evidence (HRE) Rules 402 and 403. The trial court, after several exchanges with counsel, indicated an "inclination" to "give [the State] some latitude" to cross-examine Schnabel with regard to the evidence.

Schnabel never raised HRS § 571-84 [1] as a possible ground for excluding the evidence in

1. HRS § 571-84(h) (2006) provides: "Evidence given in proceedings under section 571-11(1) or

(2) shall not in any civil, criminal, or other cause be lawful or proper evidence against the minor

either the circuit court, the Intermediate Court of Appeals (ICA), or his application for a writ of certiorari to this court. It was not until this court requested supplemental briefing on the statute that Schnabel addressed the issue. Under the circumstances, Schnabel waived his argument that the circuit court's in limine ruling violated the statute, *see* HRE Rule 103(a)(1) (requiring a "timely objection or motion to strike" that states "the specific ground of the objection, if the specific ground was not apparent from the context"), and the argument is not noticeable as plain error, *see State v. Wallace*, 80 Hawai'i 382, 410, 910 P.2d 695, 723 (1996) (holding that an evidentiary ruling did not violate the defendant's "fundamental rights" and thus could not be noticed as plain error).

Respectfully, the doctrine of judicial notice does not provide an alternative basis for an appellate court to address this issue. As set forth below, HRE Rule 202(b), entitled "Judicial Notice of Law," establishes rules for determining how courts can ascertain the *content* of a law. Nothing in the rule purports to address the distinct question of whether an appellate court can address a potential objection to the admissibility of evidence which was not raised below. The majority's interpretation of the rule to allow that result runs contrary to the principles of review which are explicitly set forth in HRE Rule 103 and HRPP Rule 52(b).

In any event, the circuit court's in limine ruling did not violate HRS § 571–84(h) because the court did not propose to admit the fact of the juvenile adjudication and because the use of the evidence was conditioned on Schnabel "opening the door" during his testimony.

Schnabel also challenges the following closing argument by the Deputy Prosecuting Attorney (DPA):

> And when you go in the deliberation room, *read the [jury] instructions* but use your common sense. That's what this is

all about. It's about common sense. *Don't get too caught up in the mumbo jumbo of all the words but use your common . sense. . . . [D]ig deep down inside and ask yourself, deep down inside, you know, the gut feeling that we talk about deep down inside. Put aside those words.* You've heard them. You're analyzing them. And then you reach down deep inside, deep down inside: Is he guilty? And if you can say that, that's your common sense.

(Emphasis added).

I believe that, although the remarks were improper, they were cured by the court's instructions to the jury. Therefore, I would affirm the conviction.

## I. Factual Background

In brief summary, the evidence at trial showed the following. Reuther, an avid photographer and aspiring lawyer, came to Hawai'i in April of 2007 to visit the University of Hawaii's law school. The evening he arrived, Reuther drove to Zablan Beach Park in Nanakuli.[2] Shortly after arriving, a group at the beach park called Reuther over to their campsite and began talking with him. Several individuals who conversed with Reuther at the campsite described Reuther as a "friendly" "cruise guy[,]" and indicated that "[h]e had smiles the whole time."

At some point in the evening, Reuther left the group and headed to his car. Harold Kaeo and Nicole Ako, who met Reuther for the first time that night, testified that Schnabel punched Reuther in the parking lot without any provocation or warning. Specifically, Ako testified that just before Schnabel punched Reuther in the parking lot, she heard Schnabel say, "[g]et the fuck out of here." When asked whether Reuther "lunged towards [Schnabel]" or "charg[ed] [Schnabel] like he was going to tackle him[,]" Ako responded, "No." Kaeo and Ako also testified that, in their opinion, Schnabel was

therein involved for any purpose whatever, except in subsequent proceedings involving the same minor under section 571–11(1) or (2)."

**2.** Reuther's sister, Heather Litton, testified that she received Reuther's backpack from the police

department after his death, and found a travel guide that "explicitly stated [Nanakuli State Park] was a great place to learn about local people and be treated with true aloha spirit."

under the influence of "ice," or methamphetamine, at the time. They also acknowledged being under the influence of drugs at the time. The witnesses indicated a strong aversion to testifying against Schnabel because they either knew him or were his friends. The medical examiner testified that the death-causing injury resulted from a blow to the head which Reuther did not anticipate.

Kristie Reverio was the defense's only witness. Reverio, who was with Schnabel at the time of the incident, testified that Reuther took a photograph of Schnabel and her, that Schnabel confronted Reuther, and that Reuther assumed a fighting stance against Schnabel before Schnabel punched. Reverio testified that she knew Schnabel for over a year because of Schnabel's close friendship with Reverio's brother and that Schnabel was her friend as well.

## II. In Limine Ruling

In his application, Schnabel challenged the circuit court's in limine ruling, arguing that the evidence from his juvenile proceeding was inadmissible pursuant to HRE Rule 402 because it was not relevant.[3] This court, in an order granting Schnabel's request to continue oral argument, requested supplemental briefing on the applicability of HRS § 571–84(h). In his supplemental memorandum, Schnabel argues that the circuit court's ruling violated HRS § 571–84(h).

The background of the court's in limine ruling was as follows. On February 6, 2008, the State filed a notice of intent to use at trial the testimony which Dr. Jorge Camara gave at Schnabel's juvenile proceeding.[4] According to the State, Schnabel was adjudicated a law violator for the offense of Assault in the First Degree. A partial transcript of Dr. Camara's testimony indicates that the complainant in that proceeding was punched in the face and was subsequently kicked. Prior to the juvenile proceeding, Dr. Camara signed a police form in which he stated that

the "injury" created a "substantial risk of death[.]" During his testimony in the juvenile proceeding, Dr. Camara clarified that the orbital fracture which the complainant sustained could not have caused the risk of death by itself, but that "[a]ny injury that could rupture the bones of the socket of the eye could have also led to a subdural hematoma[,]" which created the risk of death.

The State sought to show that Schnabel, having heard Dr. Camara's testimony, was aware of the risk of death from "similar acts[.]" On June 19, 2008, at the first hearing on the issue, the State initially indicated that it wanted to call Dr. Camara in its case in chief to testify regarding his testimony at the juvenile proceeding. However, the State then offered the possibility of reading the transcript of the juvenile testimony into the record and omitting any reference to the fact that Schnabel was adjudicated a law violator. At that time, the court postponed its ruling, noting that if any evidence were to be admitted, the court would give the jury a "limiting instruction[.]"

During the next discussion, on June 25, 2008, the court decided to "deny this prior incident completely." When the State asked for reconsideration or clarification on June 27, 2008, the court noted that "reconsideration is not going to happen" but asked whether the defense "would object to having Dr. Camara come in or cross-examining [Schnabel] saying weren't you in a room when you heard a doctor say 'X' and 'Y' and 'Z'." Defense counsel responded that she would object. The court noted the need "to take this under advisement and read over [sic] again[,]" but indicated its "inclination . . . to give [the State] some latitude" if Schnabel responded in the negative to the question whether he knew that one punch could kill. That was the last actual ruling by the court on the record.

3. At trial, Schnabel also argued that the evidence was more prejudicial than probative, pursuant to HRE Rule 403. This argument did not appear in Schnabel's briefing on appeal.

4. The State noted that, "[i]f there are any references to any matters within the discovery materi-

als that defense counsel may construe as 'prior bad acts' evidence under Rule 404(b), [HRE], defense counsel should file the appropriate trial motions to preclude the presentation of such evidence."

The last discussion on the subject took place on July 2, 2008, when the State rested its case and defense counsel notified the court that Schnabel decided not to take the stand in part because of the court's earlier ruling. The court then summarized what had occurred for the record. The court described its earlier ruling as follows: "[if] the door was opened, [the court] would give a very limiting instruction there, but allow [the DPA] to get into the earlier situation[.]"

## A. Judicial notice rules do not excuse Schnabel's failure to present the HRS § 571–84(h) argument at trial and on appeal

Schnabel did not argue in the circuit court, the ICA or in his initial application to this court that evidence relating to his juvenile proceeding was inadmissible under HRS § 571–84(h). Nevertheless, the majority concludes that HRE Rule 202(b), concerning judicial notice of state statutes, permits this court to take judicial notice of this potential objection. Majority Opinion at 444-45, 279 P.3d at 1249–50. However, nothing in HRE Rule 202(b) or the caselaw interpreting it supports the view that the rule relieves a party of the obligation to make "a timely objection or motion to strike" that states "the specific ground of objection, if the specific ground was not apparent from the context," HRE Rule 103(a)(1), or that the failure to do so should not be examined for plain error, *see* HRPP Rule 52(b).

HRE Rule 103 provides as follows:

**Rulings on Evidence.**

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; or

(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal.

(b) Record of offer and ruling. The court may add any other or further statement which shows the character of the evidence, the form in which it was offered, the objection made, and the ruling thereon. It may direct the making of an offer in question and answer form.

(c) Hearing of jury. In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury.

(d) Plain error. Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court.

HRPP Rule 52(b) states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Read together, HRE Rule 103 and HRPP Rule 52(b) establish a framework under which a criminal defendant who objects to the admission of certain evidence must articulate a "specific ground" for the objection, unless it is apparent from the context. This requirement conserves judicial resources and fosters the truth-seeking process. *See* A. Bowman *Hawaii Rules of Evidence Manual* § 103–2 (2010–11 ed.) (hereinafter *"HRE Manual"*) (stating that objections must be "specific" and "timely" and that "[s]pecific, timely objections promote informed rulings by trial courts, enable proponents to pursue corrective measures, and illuminate points for appellate review"). The purpose of requiring "specific" and "timely" objections is to provide the trial court with the opportunity to correct the alleged error. *See State v. Long*, 98 Hawai'i 348, 353, 48 P.3d 595, 600 (2002) ("Case law from our state indicates ... that the purpose of requiring a specific

objection is to inform the trial court of the error.") (citations omitted);[5] *State v. Fox*, 70 Haw. 46, 55, 760 P.2d 670, 675 (1988) ("Fairness to the trial court impels a recitation in full of the grounds supporting an objection to the introduction of inadmissible matters. Otherwise, the court would be denied the opportunity to give the objection adequate consideration and rule correctly.") (citation omitted); *Republic v. Nenchiro*, 12 Haw. 189, 220, 1899 WL 1549, at *22 (Rep.1899) ("[Defendants] cannot be allowed to quietly stand by and allow the case to proceed throughout a long trial without raising any objection where they are represented by able and competent counsel and then [present the objections] after conviction[.]"). This recognized purpose to allow the trial court to prevent error would be frustrated by using judicial notice in these circumstances.

Failure to state an objection as required by HRE Rule 103 results in the waiver of the objection. *HRE Manual* § 103–2[1] ("An opponent who fails to object is held to have waived the appellate point."); *see also State v. Matias*, 57 Haw. 96, 101, 550 P.2d 900, 904 (1976) (holding, in a case decided prior to the adoption of the HRE, that "there can be no doubt that the making of an objection upon a specific ground is a waiver of all other objections") (internal quotation marks and citation omitted); *Onaka v. Onaka*, 112 Hawai'i 374, 386, 146 P.3d 89, 101 (2006) (noting that "[t]he rule in this jurisdiction prohibits an appellant from complaining for the first time on appeal of error to which he has acquiesced or to which he failed to object") (citation and ellipses omitted). However, an appellate court "may" notice an unobjected-to "plain error" if it affects the "substantial rights" of a criminal defendant. HRPP Rule 52(b). Put another way, these rules authorize the review of unobjected-to errors in the admission of evidence only when there is plain error. Thus, it is within this established framework that this court "may" notice error based on HRS § 571–84(h).

Nevertheless, the majority contends that judicial notice allows the court to address the HRS § 571–84(h) issue here because the ground for exclusion should have been "obvious." Majority Opinion at 458, 279 P.3d at 1263. Our rules of evidence and penal procedure reflect the view that the party against whom evidence is offered has the obligation to object. The majority suggests that the court's obligation to sua sponte raise the objection will only arise in cases in which the applicable law is "directly and obviously applicable and plainly controlling." Majority Opinion at 458 n. 56, 279 P.3d at 1263 n. 56. However, as this case illustrates, the question of whether a law is applicable and controlling may not be readily apparent, and even experienced trial counsel and judges could reasonably come to a contrary conclusion. Moreover, the "directly and obviously applicable and plainly controlling" test has no basis in the text of any of our rules of penal procedure, evidence or appellate procedure, and most notably, none in the asserted basis for the authority to notice such error, HRE Rule 202(a). *See* Majority Opinion at 458 n. 56, 279 P.3d at 1263 n. 56.

The majority also suggests that its ruling is not expansive because HRS § 571–84(h)

---

5. The majority asserts that *Long*'s rationale can be applied to this case to support its position that this court may notice HRS § 571–84 as the basis of Schnabel's objection. *See* Majority Opinion at 458, 279 P.3d at 1263. However, in *Long*, this court stated that a general objection for "lack of foundation" will preserve an issue for appellate review where "the objection is overruled and, *based on the context*, it is evident what the general objection was meant to convey." 98 Hawai'i at 353, 48 P.3d at 600 (emphasis added). Here, Schnabel made an objection based on "relevancy," and from the context, it was not apparent or obvious that HRS § 571–84(h) formed the basis of his objection. Thus, the majority's reliance on *Long* for the proposition that notice should be taken of HRS § 571–84(h) as a ground for objection is misplaced.

In addition, the majority cites *State v. Walker*, 126 Hawai'i 475, 273 P.3d 1161 (2012), for the proposition that general objections are sufficient to preserve an error for appeal. Majority Opinion at 458 n. 54, 279 P.3d at 1263 n. 54. Respectfully, the holding in *Walker* did not address the requirement of "specific" and "timely" objections under HRE Rule 103(a)(1), but rather the distinct issue of whether Walker's indictment properly charged an included offense. *Id.* at 477–79, 273 P.3d at 1163–64. Thus, *Walker* is distinguishable from the instant case insofar as it did not address evidentiary objections. Rather, it addressed whether the liberal construction standard, applicable to challenging an indictment for the first time on appeal, applied in

represents "a state policy" rather than a rule of evidence. Majority Opinion at 461, 279 P.3d at 1266. Respectfully, since HRS § 571–84(h) speaks directly to the question of admissibility of juvenile adjudications, it is analytically indistinguishable in this context from the provisions of the HRE. Thus, the principles that the court adopts here will apply to those rules as well.

The majority's reading of HRE Rule 202(b), as permitting the appellate courts to notice potential grounds for excluding evidence that were not raised in the trial court, would have the effect of nullifying HRPP Rule 52(b) and much of HRE Rule 103(a) and (d). HRPP Rule 52(b) provides that a court "may" notice plain error affecting "substantial" rights. However, under the majority's view of judicial notice, it would appear that the court can notice *any* error, even those that do not implicate substantial rights, as long as the alleged error is based on one of the sources of law identified in HRE Rule 202(b).[6] Majority Opinion at 444–45, 279 P.3d at 1249–50. Those sources of law include Hawai'i statutes, and hence the HRE, which were adopted by statute in 1980. 1980 Haw. Sess. Laws Act 164, § 1 at 244.

Respectfully, the majority's approach misconstrues the purpose of HRE Rule 202, and is inconsistent with our substantial body of caselaw applying plain error review since the Hawai'i Rules of Evidence were adopted. Rule 202 provides in relevant part:

**Judicial notice of law.**

(a) Scope of rule. This rule governs only judicial notice of law.

Walker's case. *Id.* at 489–91, 273 P.3d at 1176–77.

6. The majority suggests that its approach would be limited to situations where "the court fails to notice a statute that obviously and undeniably governs, the failure of which has affected the substantial rights of a defendant[.]" Majority Opinion at 461, 279 P.3d at 1266. However, there is nothing in the plain language of HRE Rule 202(b) to support the limitations suggested by the majority. The rule does not distinguish between errors involving statutes and those involving other sources of law, nor does it provide a basis for addressing some types of errors (those that are obvious and undeniable, and that implicate substantial rights) but not others. This is because the rule is concerned solely with determining the content of the law, *see infra* at 1278–

(b) Mandatory judicial notice of law. The court shall take judicial notice of (1) the common law, (2) the constitutions and statutes of the United States and of every state, territory, and other jurisdiction of the United States, (3) all rules adopted by the United States Supreme Court or by the Hawai'i Supreme Court, and (4) all duly enacted ordinances of cities or counties of this State.

(c) Optional judicial notice of law. Upon reasonable notice to adverse parties, a party may request that the court take, and the court may take, judicial notice of (1) all duly adopted federal and state rules of court, (2) all duly published regulations of federal and state agencies, (3) all duly enacted ordinances of municipalities or other governmental subdivisions of other states, (4) any matter of law which would fall within the scope of this subsection or subsection (b) of this rule but for the fact that it has been replaced, superseded, or otherwise rendered no longer in force, and (5) the laws of foreign countries, international law, and maritime law.

(d) Determination by court. All determinations of law made pursuant to this rule shall be made by the court and not by the jury, and the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under these rules.

Nothing in HRE Rule 202 purports to limit or modify the principles set forth in Rule 103 or HRPP Rule 52(b). To the contrary, Rule 202 deals with the distinct issue of how various provisions and sources of law should be established.[7] For certain well-defined and

79, and not the distinct question of whether evidentiary error should be noticed when it was not raised in the trial court. The latter issue is addressed directly by HRE Rule 103 and HRPP Rule 52(b), and those rules should govern here.

7. The commentary to the Rule is consistent with this analysis, and describes the various provisions that governed the determination of the law prior to the enactment of Rule 202. Commentary to HRE Rule 202 (stating that this rule "generally restates statutory law"). Thus, for example, it notes that although early Hawai'i caselaw provided that the law of foreign jurisdictions was "an issue of fact that required pleading and proof" that was subject to determination by the trier of fact, a 1976 statute (that was repealed in 1980) provided that it was an "issue for the

widely circulated sources of law, such as federal and state statutes and constitutions, the common law, rules adopted by the United States and Hawai'i Supreme Courts, and ordinances from counties located in Hawai'i, the court must take judicial notice of their content. *See State v. West,* 95 Hawai'i 22, 26, 18 P.3d 884, 888 (2001) ("We hold that the courts are duty-bound to take 'judicial notice' of municipal ordinances."); *State v. Vallejo,* 9 Haw.App. 73, 79, 823 P.2d 154, 158 (1992) ("[HRE Rule 202(b)] requires the courts to take judicial notice of all duly enacted ordinances. When the court took judicial notice of the Schedules filed with the clerk, it took judicial notice of [Revised Ordinances of Honolulu (ROH)] § 15–7.2. Consequently, the ordinance was proved.") (internal footnote omitted); *Hiner v. Hoffman,* 90 Hawai'i 188, 192 n. 3, 977 P.2d 878, 882 n. 3 (1999) ("We take judicial notice of the ROH because [HRE Rule 202(b)], requires the courts to take judicial notice of all duly enacted ordinances.") (internal quotation marks omitted). For other sources of law, which were presumably less-widely available in 1980, such as the law of foreign countries or ordinances from municipalities in other states, the court "may" take notice of the law upon the request of a party. *See Doe v. Doe,* 98 Hawai'i 144, 146 n. 3, 44 P.3d 1085, 1087 n. 3 (2002) (taking judicial notice of the Hague Convention under HRE Rule 202(c)); *Roxas v. Marcos,* 89 Hawai'i 91, 117 n. 16, 969 P.2d 1209, 1235 n. 16 (1998) (noting that "[t]his court may take judicial notice of the law of foreign countries[]" under HRE Rule 202(c)(5)); *Dominguez v. Price Okamoto Himeno & Lum,* No. 28140, 2009 WL 1144359, at *3 (Haw.App. Apr. 29, 2009) (SDO) ("The circuit court did not abuse its discretion in taking judicial notice of Japan law pursuant to [HRE Rule 202] and Hawai'i Rules of Civil Procedure (HRCP) Rule 44.1.") (citation omitted). Nothing in the rule or its commentary suggests that it addresses the distinct question of whether an issue arising under one of these sources of law is properly pre-

served for appellate review or otherwise properly addressed by the appellate court.

Respectfully, the majority's construction of HRE Rule 202(b) is not consistent with this court's substantial caselaw, which addresses whether issues relating to the admissibility of evidence may be addressed by an appellate court even though they were not raised below. Those cases either hold that the issue was waived, or address it as plain error. *See, e.g., State v. Fields,* 115 Hawai'i 503, 528, 168 P.3d 955, 980 (2007) (declining to notice plain error in regard to an out-of-court statement that purportedly violated defendant's right of confrontation under the Hawai'i Constitution); *State v. Crisostomo,* 94 Hawai'i 282, 290, 12 P.3d 873, 881 (2000) ("A hearsay objection not raised or properly preserved in the trial court will not be considered on appeal. This is true even where the testimony is objected to on other grounds."); *State v. Sua,* 92 Hawai'i 61, 76, 987 P.2d 959, 974 (1999) (determining that defendant waived the issue of whether certain prior inconsistent statements were properly recorded pursuant to HRE Rule 802.1(1)(C) because the defendant failed to object at trial on that ground, thereby rendering those statements admissible); *Wallace,* 80 Hawai'i at 410, 910 P.2d at 723 (finding that the defendant's argument based on the HRE was waived for failure to object at trial and was not noticeable as plain error); *State v. Samuel,* 74 Haw. 141, 147, 838 P.2d 1374, 1378 (1992) ("Appellant's attorney failed to preserve this alleged 'error' by not objecting to it at trial. The general rule is that evidence to which no objection has been made may properly be considered by the trier of fact and its admission will not constitute grounds for reversal.").

In support of its position, the majority relies on four cases: *Life of the Land, Inc. v. City Council of City and Cnty. of Honolulu,* 61 Haw. 390, 606 P.2d 866 (1980); *West,* 95 Hawai'i at 22, 18 P.3d at 884; *Eli v. State,* 63 Haw. 474, 630 P.2d 113 (1981); and *Demond v. Univ. of Hawaii,* 54 Haw. 98, 503 P.2d 434 (1972). Respectfully, these cases are distin-

court" although not subject to judicial notice. *Id.* In short, these predecessors to HRE Rule 202, just like Rule 202 itself, deal with the question of how various sources of law are estab-

lished, rather than whether issues related to those sources of law have been properly preserved or are otherwise subject to appellate review.

guishable and do not support the majority's expansive interpretation of the rule's effect. In *Life of the Land*, the plaintiffs opposed the construction of a high-rise building project, and they brought suit against the City Council and other city officials challenging the approval of the developers' application for variance or modification of an interim development control (IDC) ordinance, referred to as the "Kakaako Ordinance." 61 Haw. at 393–94, 606 P.2d at 871. As a preface to addressing the issues before it, this court stated:

> Preliminarily, we preface our consideration of the first three issues by reviewing the program of interim control of land development pending the formulation of updated development policies and plans, which has been in effect, not only in the City and County of Honolulu, but also in municipalities of mainland United States, for many years.
>
> *The Kakaako Ordinance was a part of such program. The program is carried out by the enactment and operation of interim development control ordinances similar to the Kakaako Ordinance, which will be referred to, hereafter in this opinion, as IDC ordinances.*
>
> *We think that such review will place the Kakaako Ordinance in proper perspective because, in the presentation of their case in the circuit court and in this court, plaintiffs treated the Kakaako Ordinance as Sui generis, the only ordinance of its kind,* and the approval of the Developers' application for variance and modification as the only approval given by the City Council under section IV–A of that ordinance.

*Id.* at 417–18, 606 P.2d at 884 (emphasis added).

This court observed that only the Kakaako Ordinance and an ordinance that extended its expiration date were in the record on appeal. *Id.* at 419, 606 P.2d at 885. Nevertheless, this court took judicial notice of other "IDC ordinances" enacted by the City Council in

order to "place the Kakaako Ordinance in proper perspective[.]" *Id.* at 417–22, 606 P.2d at 884–86. This court took judicial notice pursuant to HRS § 622–13(b),[8] which provided one of the ways a county ordinance could be proven prior to the enactment of HRE Rule 202(b). *Id.* at 419, 606 P.2d at 885. Accordingly, *Life of the Land* is factually distinguishable, since it did not involve this court taking judicial notice of an evidentiary objection that was waived.

Likewise, *West*, which involved a traffic infraction, does not support the majority's position. 95 Hawai'i at 23, 18 P.3d at 885. At issue in *West* was whether the district court properly took judicial notice of the speed limit under HRE Rule 202(b). *Id.* at 26–27, 18 P.3d at 888–89. At trial, the following exchange occurred:

> THE STATE: May the Court take judicial notice that the posted speed limit on Lunalilo Home Road traveling in the makai direction is 30–miles–an–hour as indicated by the speed schedule? This is on file with the District Court.
>
> THE COURT: You have it there?
>
> THE STATE: Yes, your Honor.
>
> THE COURT: You showed West?
>
> THE STATE: And may the record reflect that I'm showing speed schedule-this is schedule four, speed limit, 30 miles-an-hour under Section 15–7.2(3)(a) of the Revised Ordinances of City and County of Honolulu, State of Hawaii, to defense counsel [sic].
>
> THE COURT: Based upon West's objection to those materials, it will be-noted by the Court over the objections of West. So you have your record on that now.

*Id.* at 24, 18 P.3d at 886 (footnotes and some brackets omitted).

The ICA held that the trial court erred in taking judicial notice of the speed schedules, because it determined that they were not ordinances for purposes of judicial notice. *Id.* This court disagreed with the ICA's hold-

---

8. At the time, HRS § 622–13(b) (1968) (repealed 1980) provided, in pertinent part:

A certified copy or copies of an ordinance or ordinances of any county may be filed by the clerk of the county with any court and thereaf-

ter the court may take judicial notice of the ordinance or ordinances and the contents thereof in any cause, without requiring a certified copy or copies to be filed or introduced as exhibits in such cause.

ing. *Id.* at 27, 18 P.3d at 889. As a threshold matter, this court held that "the courts are duty-bound to take 'judicial notice' of municipal ordinances" pursuant to HRE Rule 202(b). *Id.* at 26–27, 18 P.3d at 888–89. This court noted the following justifications for the trend in taking judicial notice of municipal ordinances: "(1) accessibility and (2) verifiability." *Id.* at 27 n. 10, 18 P.3d at 889 n. 10. In holding that the trial court properly took judicial notice of the speed limit, this court explained that the City Council had properly delegated authority to the County Director of Transportation and that it would be "wholly impractical" to require the City Council "to pass ordinances setting the speed limit for each and every street in the county." *Id.* at 27–28, 18 P.3d at 889–90. Thus, *West* stands for the proposition that speed limits do not need to be "proven," but must be judicially noticed in the same way as municipal ordinances. Accordingly, the holding of *West* does not support the majority's position that this court may use judicial notice to consider Schnabel's HRS § 571–84(h) argument without resorting to plain error. Majority Opinion at 458-59, 279 P.3d at 1263–64.

*Eli* is also distinguishable because it involved taking judicial notice of the underlying record in a case involving a HRPP Rule 40 petition. In *Eli*, the defendant sought post-conviction relief pursuant to HRPP Rule 40 based in part on the argument that his guilty plea was not made knowingly, intentionally, and voluntarily. 63 Haw. at 480, 630 P.2d at 115. With regard to HRPP Rule 40 petitions, this court stated in pertinent part:

> In a petition seeking relief under Rule 40 on [the] ground that the guilty plea was entered into involuntarily, *the [circuit] court is required to look at the entire record in order to determine whether the petitioner's claims or recantation are credible and worthy of belief.* The record is vital to the ultimate determination of whether the plea was made voluntarily; as this court has repeatedly emphasized, it will not presume from a silent record a waiver of a constitutional right.

*Id.* at 477, 630 P.2d at 116. (Emphasis added).

However, this court noted that "the verbatim record [of the proceeding in which the defendant entered his guilty plea] was never submitted in evidence or called to the [circuit] court's attention during the Rule 40 proceedings." *Id.* at 478, 630 P.2d at 116. Noting that other courts have taken judicial notice of a record in similar circumstances, this court, in the exercise of its discretion, took judicial notice of the verbatim record. *Id.* Thus, *Eli* involved taking judicial notice of a record where the proceeding itself "required" the circuit court "to look at the entire record," which is not the case here. *Id.* at 477, 630 P.2d at 116.

Although the majority also relies on *Demond*, this case appears to run counter to the majority's position. *Demond* involved a University of Hawaiʻi employee who was injured in an automobile accident in California while doing research there. 54 Haw. at 100, 503 P.2d at 436. After the accident, the employee sent letters to the university informing it of the accident and her injuries, but not of the circumstances in which the accident occurred. *Id.* The university's reply letters did not disclose that the employee might be eligible for worker's compensation benefits. *Id.* The employee sought worker's compensation almost ten years after the accident. *Id.* at 101, 503 P.2d at 436. At the hearing, the university asserted a statute of limitations defense, and the Director of the Department of Labor and Industrial Relations denied the employee's claim. *Id.* "On appeal to the Labor and Industrial Relations Appeal Board the denial was affirmed on the ground that [the employee] failed to notify [the university] of the compensable nature of her injuries and failed to file her claim within the prescribed limitation period." *Id.* On appeal, the employee argued that she complied with the notice requirement and her claim was not barred by the limitation period. *Id.* at 101, 503 P.2d at 101.

In support of her argument regarding the limitation period, the employee pointed to a section of the California Labor Code, which provided a basis for the tolling of the limitation period, and Section 97–8 of the Hawaiʻi

Workmen's Compensation Law.[9] *Id.* at 102, 503 P.2d at 437. This court, however, stated:

> [E]ven if it is assumed that Section 3713 of the California Labor Code and Section 97–8 of our laws are authority for all that [the employee] claims, *the issue is not properly before us and need not be considered on this appeal. In the proceedings below [the employee] did not mention the possibility that California rather than Hawaii law applied. Nor did she indicate at any time a desire to take advantage of the procedure set forth in Section 97–8.*
>
> We have held in numerous cases that this court on appeal will not consider issues beyond those that are properly raised in the trial court[.]. . . . Although we have never considered the application of this general rule to workmen's compensation proceedings, we are of the opinion that it should apply, particularly in cases where the unique procedure contemplated by Section 97–8 is involved.

*Id.* at 102–03, 503 P.2d at 437 (emphasis added) (citations omitted).

This court recognized "its power to take judicial notice of applicable foreign law, or to remand for its application[.]" *Id.* at 103, 503 P.2d at 437–38 (citing HRS § 623–1 (repealed 1980)[10]). However, this court explained that "nothing in the record suggest[ed] that it [was] appropriate to do so in this case," because "[a]t all times prior to this appeal [the employee] not only failed to rely on California law but affirmatively argued

that she was eligible for compensation under Hawaii law." *Id.* at 103, 503 P.2d at 437–38. Accordingly, this court stated:

> In these circumstances, the orderly and efficient administration of our workmen's compensation system requires that [the employee] should not *at this late stage* be allowed to rely on the law of California to establish her claim to benefits in this state.

*Id.* at 103–04, 503 P.2d at 438.

The majority focuses on the fact that *Demond* acknowledged "that this court had the 'power to take judicial notice of applicable foreign law, or to remand for its application[.]' " Majority Opinion at 460, 279 P.3d at 1265 (quoting *Demond*, 54 Haw. at 103, 503 P.2d at 437–38). I agree that pursuant to HRE Rule 202(b) and (c), this court has that authority.[11] The majority overlooks, however, the reason why this court in *Demond* affirmed on the basis of the limitation period notwithstanding the relevant law cited by the employee. Put simply, "this court on appeal will not consider issues beyond those that are properly raised in the trial court[.]" *Demond*, 54 Haw. at 103, 503 P.2d at 437. This court noted that this general rule was particularly applicable given the "unique procedure contemplated by Section 97–8[,]" *id.*, which involved the "director, the appellate board, and the court" reasonably determining the employee's rights. *Id.* (citing RLH § 97–8).

Similarly, this general rule applies to the instant situation because an evidentiary

---

9. Revised Laws of Hawai'i (RLH) § 97–8 (1955), concerning "[i]njuries without the Territory," provided in pertinent part:
 > If a workman who has been hired without the Territory is injured while engaged in his employer's business, and is entitled to compensation for the injury under the law of the State or territory where he was hired, he shall be entitled to enforce against his employer his rights in this Territory as if his rights are such that they can reasonably be determined and dealt with by the director, the appellate board and the court in this Territory.

10. Prior to the adoption of the HRE in 1980, HRS § 623–1 governed judicial notice of "common law, state laws, and other statutes[.]" As explained *supra*, HRE Rule 202 "generally restates statutory law," including HRS § 623–1. Commentary to Rule 202. HRS § 623–1 provided:

Every court of this State shall take judicial notice of the common law and statutes of every state, territory, and other jurisdiction of the United States. The court may inform itself of such laws in such manner as it may deem proper, and the court may call upon counsel to aid it in obtaining information. The determination of such laws shall be made by the court and not by the jury, and shall be reviewable.

11. As stated *supra*, HRE Rule 202(b) allows this court to take judicial notice of the content of HRS § 571–84(h), but the rule does not relieve Schnabel of the obligation under HRE Rule 103(a)(1) to make a timely, specific objection based on HRS § 571–84(h). Accordingly, Schnabel's HRS § 571–84(h) argument can only be reviewed for plain error under HRPP Rule 52(b).

framework exists where parties are expected to make timely, specific objections when challenging the admissibility of evidence. *See* HRE Rule 103(a)(1). Here, Schnabel failed to argue before the trial court that HRS § 571–84(h) barred the use of evidence from his juvenile proceeding. Rather, "[a]t all times prior to this appeal" Schnabel not only "failed to rely on" HRS § 571–84(h), "but affirmatively argued that" the evidence was inadmissible on relevancy grounds. *Demond,* 54 Haw. at 103, 503 P.2d at 438. Thus, although this court is obligated to take judicial notice of statutes pursuant to HRE 202(b), this court is not obligated to notice arguments raised for the first time on appeal. Accordingly, absent plain error, "the issue is not properly before us[.]" *Id.* at 102, 503 P.2d at 437.

As set forth above, our prior cases do not support the majority's reading of HRE Rule 202(b). Rather, there is an established evidentiary framework in place that this court has consistently applied, under which objections must be made, and if not, review is for plain error. Accordingly, this court should not depart from this longstanding precedent and use HRE Rule 202(b) to address Schnabel's HRS § 571–84(h) argument.

## B. Schnabel's argument based on HRS § 571–84(h) is not noticeable as plain error

As an alternative to its judicial notice analysis, the majority also concludes that Schnabel's argument based on HRS § 571–84(h) can be noticed as plain error. Majority Opinion at 446-47, 279 P.3d at 1251–52. As a preliminary matter, we have repeatedly stated that this court's "power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system-that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *Fields,* 115 Hawai'i at 529, 168 P.3d at 981 (quoting *State v. Rodrigues,* 113 Hawai'i 41, 47, 147 P.3d 825, 831 (2006)); *see also State v. Aplaca,* 96 Hawai'i 17, 22, 25 P.3d 792, 797 (2001); *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993). Even when an alleged

error affects a defendant's substantial rights, this court still has discretion to determine whether review for plain error is appropriate. *See Rodrigues,* 113 Hawai'i at 47, 147 P.3d at 831 ("We *may* recognize plain error when the error committed affects the substantial rights of the defendant.") (emphasis added) (quoting *State v. Cordeiro,* 99 Hawai'i 390, 405, 56 P.3d 692, 707 (2002)). This discretion is articulated in HRPP Rule 52(b), which states that "[p]lain errors or defects affecting substantial rights *may* be noticed although they were not brought to the attention of the court." (Emphasis added). The majority also recognizes that plain error review is discretionary. *See* Majority Opinion at 447 n. 28, 279 P.3d at 1252 n. 28. Under the circumstances of this particular case, I respectfully disagree with the majority that this court should exercise its discretion in recognizing plain error. *See Fox,* 70 Haw. at 56, 760 P.2d at 676 ("[T]he decision to take notice of plain error must turn on the facts of the particular case to correct errors that seriously affect the fairness, integrity, or public reputation of judicial proceedings.") (quotation marks and citation omitted). For the following reasons, I do not believe that the alleged error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.*

The alleged error stemmed in this case from an evidentiary ruling. As discussed *supra,* an established framework exists in which objections to the admission of incompetent evidence, which a party failed to raise at trial, are generally not subject to plain error review. For instance, this court held in *Wallace* that the defendant's relevance-based objection to the introduction of the gross weight of cocaine failed to preserve the distinct issue of whether the scale used to weigh the cocaine was accurate. 80 Hawai'i at 410, 910 P.2d at 723. This court then went on to note that plain error review was not available in that case:

It is the general rule that evidence to which no objection has been made may properly be considered by the trier of fact and its admission will not constitute ground for reversal. It is equally established that *an issue raised for the first time on appeal will not be considered by the reviewing court-Only where the ends of*

*justice require it, and fundamental rights would otherwise be denied, will there be a departure from these principles.* [HRPP Rule 52(b) (1994) ]. *We find no such justification here.*

*Id.* (emphasis added) (quoting *State v. Naeole,* 62 Haw. 563, 570–71, 617 P.2d 820, 826 (1980)).[12]

Likewise, in *State v. Uyesugi,* this court declined to notice plain error where the defendant failed to preserve a potential HRE 403 objection to the admission of evidence. 100 Hawai'i 442, 463–64, 60 P.3d 843, 864–65 (2002). On appeal, the defendant argued, inter alia, that the trial court's admission of testimony and an exhibit that contained a picture of firearms that were not used in the crime "created an overmastering hostility against him." *Id.* at 463, 60 P.3d at 864. This court distinguished the case relied on by the defendant, and then stated:

> Further support for affirmance is found in HRE Rule 103. *[The defendant] had the burden of 'creating an adequate record' in which he has articulated the flaw in the circuit court's actions.* See HRE Rule 103; *see also* Addison M. Bowman, Hawai'i Rules of Evidence Manual § 103–2 at 7–8 (1990). *In the absence of an objection and/or proper record, the admission of the testimony and picture does not amount to plain error.*

*Id.* at 463–64, 60 P.3d at 864–65 (emphases added) (footnote omitted).

Accordingly, this court held "that the circuit court did not commit plain error, when, without objection it allowed introduction of one picture of [the defendant's] firearms and permitted testimony of a weapons expert." *Id.* at 464, 60 P.3d at 865.

**12.** In *State v. Santiago,* 53 Haw. 254, 492 P.2d 657 (1971), this court used plain error review to announce a new evidentiary rule, i.e., disallowing "the introduction of prior convictions in a criminal case to prove the defendant's testimony is not credible[.]" *Id.* at 260–61, 492 P.2d at 661–62. This court declared that the use of evidence of prior felonies solely to attack the defendant's credibility as a witness raised particularized concerns of chilling the exercise of the right to take the stand in one's own defense. *Id.* at 258–61, 492 P.2d at 660–61. Specifically, this court was concerned with the risk that criminal defendants will avoid taking the stand out of

The majority asserts that review for plain error is appropriate because the court's ruling infringed on Schnabel's right to testify. Majority Opinion at 447 n. 28, 279 P.3d at 1252 n. 28. Respectfully, I disagree with this conclusion. While I agree that a defendant's right to testify is a fundamental right, this right is not implicated in the instant case. The record makes clear that the court's in limine ruling prior to Schnabel's testimony was preliminary and subject to revision.[13] Indeed, the ruling itself contained several qualifications based on how the evidence would develop:

> THE COURT: Okay. Well, counsel, *I need to take this under advisement and read over [sic] again.* I would allow "could", you know, what I instruct is another thing and read over Dr. Camara's testimony [sic] and *my inclination* is to give [the DPA] *some latitude* over your strong objection but—and I'm not going to help—*I don't want to go into that with the jury now because we don't know if we're going to get there. I think it's premature.* I don't want to have this whole jury panel snake bit right out of the box that's why I changed my mind. The depth and breadth and intensity of this jury's emotions about this case frankly surprise me, and it shouldn't have because the organs were donated. The family—it struck many of the jurors as an untoward tragic, unprovoked act and—but that's just the media. *We're going to hear the rest of the story as I mentioned.* Okay. *So I've ruled and I'm taking under advisement.*
>
> [Defense counsel]: Can I—
>
> THE COURT: Yes.
>
> [Defense counsel]:—for the record object to the you're [sic] not asking the jurors about this—

concern that testifying would make evidence of prior convictions admissible at trial and available for the jury to rely on in finding guilt. *Id.* However, the in limine ruling in the instant case does not implicate such concerns. As discussed *infra,* the court's ruling indicates that Schnabel could have taken the stand without opening the door to the disputed evidence.

**13.** In fact, the court had already once changed its ruling during the course of prior discussions on the issue.

THE COURT: Right.

[Defense counsel]:—in voir dire that would be my motion if you're going to reconsider this at all.

THE COURT: Okay. Thank you. Your objection's noted. *I need to think about it and hear the evidence come out.*

(Emphasis added).

In addition, the court's ruling indicated that Schnabel would have had to "open the door" in order for the evidence to come in. Specifically, the court *post hoc* characterized its ruling as follows: *"[if t]he door was opened,* [the court] would give a very limiting instruction there, but allow [the DPA] to get into the earlier situation[.]" (Emphasis added). Thus, it appears that as long as Schnabel did not testify on direct examination that he was unaware that one punch could kill, the trial judge would have excluded the evidence from Schnabel's prior juvenile proceeding. Accordingly, Schnabel could have testified without risking the disputed evidence would come in.[14]

Moreover, it is unclear whether the court's ruling actually caused Schnabel not to testify. Defense counsel stated that it was "one [of] the factors" that Schnabel considered in deciding not to testify, which implies that there were other reasons that contributed to his decision. Thus, even if the court ruled the evidence inadmissible, Schnabel still may have declined to take the stand. Because the effect of the court's ruling was speculative, and Schnabel did not make an offer of proof as to what his testimony would have been, I do not believe it is appropriate for this court to exercise its discretion and recognize plain error. *Cf. Warren v. State,* 121 Nev. 886, 124 P.3d 522, 527 (2005) ("[T]he problem of meaningful review is unfounded when the record sufficiently demonstrates, *through an offer of proof,* the nature of the defendant's proposed testimony and that the defendant refrained from testifying when faced with impeachment by a prior conviction.") (emphasis added). In accordance with our prior cases, plain error should be "exercised sparingly and with caution[,]" *Fields,* 115 Hawai'i at 529, 168 P.3d at 981, and I believe that the record before this court counsels against exercising that discretionary power.

C. **The in limine ruling did not violate HRS § 571–84(h)**

Even assuming arguendo that this court can address Schnabel's HRS § 571–84(h) argument, the circuit court's ruling did not violate that statute. Hawai'i appellate courts have not ruled on whether HRS § 571–84(h) precludes cross-examination of a defendant, regarding juvenile matters, in order to rebut testimony by the defendant which the State argues was false or misleading.[15] However,

14. I respectfully disagree with the majority's assertion that this argument is "flaw[ed]" based on criticism of the United States Supreme Court's ruling in *Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). Majority Opinion at 463, 279 P.3d at 1268. *Luce* held that a defendant must testify to preserve his right to appeal an allegedly improper ruling concerning impeachment of the defendant with a prior conviction. 469 U.S. at 42–43, 105 S.Ct. 460. As noted by the majority, this holding has been subject to criticism. Majority Opinion at 463-64, 279 P.3d at 1268–69.

However, I do not suggest that Schnabel was required to testify to preserve his right to appeal. Rather, I note that Schnabel *could have* testified without "opening the door" to the disputed evidence. Because *Luce* did not address this circumstance, it is not applicable here.

15. Respectfully, although the majority relies on *State v. Nobriga,* 56 Haw. 75, 527 P.2d 1269 (1974), Majority Opinion at 445, 279 P.3d at 1250, that case did not deal with the question of whether and to what extent the evidence from prior juvenile adjudications was admissible at trial. Rather, it held that, despite the seemingly broad language of HRS § 571–84(h), such evidence was available for use in sentencing. *Nobriga,* 56 Haw. at 78–79, 527 P.2d at 1271–72.

The majority also relies on the dissenting opinion in *State v. Riveira (Riveira I),* 92 Hawai'i 546, 993 P.2d 580 (App.1999) (Acoba, J., dissenting), *rev'd,* 92 Hawai'i 521, 993 P.2d 555 (2000), and the majority opinion in *State v. Riveira (Riveira II),* 92 Hawai'i 521, 993 P.2d 555 (2000). Majority Opinion at 445-46, 464-65 n. 72, 279 P.3d at 1250–51, 1269–70 n. 72. However, this court's sole holding in *Riveira II* was that a juvenile adjudication may not be treated as a conviction for purposes of applying a repeat offender sentencing statute because HRS § 571–1 explicitly provided that "no adjudication by the [family] court of the status of any child under this chapter shall be deemed a conviction [.]" 92 Hawai'i at 522–23, 993 P.2d at 556–57. Although *Riveira II* "summarily adopted the dissent" in *Riveira I* on this point, *id., Riveira II* did not address the issue of whether and to what extent the evidence from prior juvenile adjudications was admissible at

other state courts interpreting similar statutes have recognized that the defendant may not use the statute to shelter such testimony from adversarial testing, thereby subverting the truth-seeking function of the trial. *Lineback v. State*, 260 Ind. 503, 301 N.E.2d 636, 637 (1973) (holding that "evidence of the disposition of a juvenile matter" is admissible where "defendant tenders his supposed good character in evidence") (block quote formatting and citation omitted);[16] *State v. Marinski*, 139 Ohio St. 559, 41 N.E.2d 387, 388 (1942) (noting that a similarly-worded statute should not be interpreted to "enable a defendant to employ the statute for the purpose of deception" and holding that evidence of the defendant's juvenile adjudications was admissible where he "place[d] himself in a favorable light before the court and jury" by "narrating the story of his previous years").[17]

*State v. Rodriguez*, 126 Ariz. 28, 612 P.2d 484, 486–88 (1980), is particularly instructive.

In that case, a defendant charged with murder in the first degree moved in limine to preclude the admission of his juvenile record, which included an adjudication as a delinquent. *Id.* at 485–86. In his motion, the defendant relied on Arizona Revised Statutes § 8–207(C) which provided that "[t]he disposition of a child in the juvenile court may not be used against the child in any case or proceeding in any court other than a juvenile court, whether before or after reaching majority, except ... for the purposes of a presentence investigation and report." *Id.* at 486. The trial court denied the motion, stating that, "in denying that motion I'm not denying [the defense] leave to make objections in the course of the trial if they are appropriate, but at this time I will not preclude the juvenile records." *Id.* The State did not mention the juvenile record in its case in chief and defense counsel opted not to present any evidence.[18] *Id.* The defendant

---

trial, and therefore is not dispositive of the issue before this court.

**16.** The majority asserts that *Lineback* is inapposite. Majority Opinion at 465-66 n. 73, 279 P.3d at 1270–71 n. 73. However, *Lineback* stands for the general proposition that statutes prohibiting the introduction of evidence from juvenile proceedings do not act as an absolute shelter, and that under certain narrow circumstances, evidence from juvenile proceedings may be introduced. 301 N.E.2d at 637.

In *Lineback*, the statute at issue stated, in pertinent part, that "*[t]he disposition of a child* or any evidence given in the court *shall not be admissible as evidence against the child in any case* or proceeding in any other court." *Id.* (emphasis added, internal quotation marks omitted). Although the statute in *Lineback* was different from the one at issue here, the reasoning in *Lineback* is still applicable. The plain language of the statute in *Lineback* would arguably have barred the question regarding the defendant's reputation in the community as an "incorrigible juvenile." *Id.* Notwithstanding the plain language of the statute, the court in *Lineback* recognized that "an entirely different principle of law prevails when a defendant directly places his reputation in the community before the jury through character witnesses." *Id.* Similarly, even though HRS § 571–84(h) prohibits evidence from a juvenile proceeding for "any purpose whatever, except in subsequent proceedings[,]" HRS § 571–84(h), "an entirely different principle of law" arguably prevails if a defendant gives false or misleading testimony. *Lineback*, 301 N.E.2d at 637.

**17.** The majority asserts that *Marinski* is distinguishable because there, the defendant "insisted upon" discussing his "previous years." Majority Opinion at 465-66 n. 73, 279 P.3d at 1270–71

n. 73. However, the circuit court's narrow ruling requiring Schnabel to "open the door" for the evidence to come in, comports with the holding of *Marinski*. It appears from the record that if Schnabel had insisted upon testifying that, as set forth by the circuit court, "he was completely unaware, totally unaware" that if he "hit somebody in the head, that [it] might cause [the person] serious injury or death[,]" then the prosecutor, on cross-examination, could have been allowed to ask Schnabel, "[W]eren't you in a room when you heard a doctor say 'X' and 'Y' and 'Z'."

The majority further asserts that *Malone v. State*, 130 Ohio St. 443, 200 N.E. 473 (1936), a case cited in *Marinski*, is "directly applicable to this case." Majority Opinion at 465-66 n. 73, 279 P.3d at 1270–71 n. 73. Yet, the facts of *Malone* are distinguishable. In *Malone*, the prosecutor asked the defendant whether he had "wrecked a railroad train[,]" "wrecked an engine on the New York Central Belt Line [,]" "held up a man by the point of a gun[,]" "entered a place and burglarized it and took some property[,]" "committed burglary and larceny[,]" and "escaped twice from the Hudson Boys Farm[.]" 200 N.E. at 477. Indeed, these questions were undoubtedly linked to express "matters" in the defendant's previous juvenile proceedings and prohibited by the relevant statute. In contrast, the proposed question in the instant case, i.e., whether Schnabel was in a room when he heard a doctor say "X" and "Y" and "Z," cannot fairly be described as the same type of juvenile "matter" prohibited in *Malone*.

**18.** The opinion states that the defendant "strongly opposed counsel's decision, and submitted a motion to have his attorney dismissed and a new attorney appointed[,]" but that the trial court denied that motion. *Rodriguez*, 612 P.2d at 486.

was found guilty and appealed, arguing that the trial court erred in its in limine ruling. *Id.* at 485–87.

The Arizona Supreme Court noted that it had previously held that juvenile records were inadmissible as "evidence in chief" or as impeachment evidence, but also noted that exceptions existed to this general rule. *Id.* at 486. One such exception applied where the defendant "waives [the protection of the statute] by opening the door to his past." *Id.* at 487 (citing *Marinski,* 139 Ohio St. 559, 41 N.E.2d 387). The court stated that defense counsel had indicated an intention to use the insanity defense at trial. *Id.* at 487. Noting that the insanity defense makes "all prior relevant conduct of the person's life" relevant, the court held that, "[h]ad defense counsel chosen to present evidence relating to defendant's sanity, he would have opened the door to defendant's past and waived the [statutory protection] of his juvenile records." *Id.*

The rationale of *Rodriguez* is applicable to the case at bar. As in *Rodriguez,* the trial court in the instant case denied Schnabel's in limine motion to preclude the introduction of juvenile matters. As the defendant in *Rodriguez,* Schnabel did not testify at trial and was convicted. In addition, in both cases "[the in limine] ruling did not admit the juvenile records, but merely denied their total preclusion until it became apparent as to the context in which they were to be offered." [19] *Id.*

Most importantly, the ruling here was contingent on Schnabel "open[ing] the door" by testifying that he did not know that one punch could kill.[20] The State argued in the circuit court that Dr. Camara's statement at Schnabel's juvenile hearing gave Schnabel notice that a punch and some kicks carried a "substantial risk of death[.]" It was a reasonable inference to put to the jury that, if Schnabel heard Dr. Camara's statement, he should have known that a single unexpected punch also carried such a risk. The jurors were free to rely on their own judgment and common sense in evaluating that inference. Thus, had Schnabel testified that he did not know that one punch could kill, he would have opened the door for rebuttal by the State with regard to Dr. Camara's statement and how he understood it.[21]

The opinion also states that "[t]he defendant did not insist on exercising his right to take the stand and testify in his own behalf." *Id.* at 490.

19. I respectfully disagree with the majority's conclusion that the rationale in *Rodriguez* is inapplicable because of differences in the underlying statutes. Majority Opinion at 465-66, 279 P.3d at 1270–71. Although the statute in *Rodriguez* was narrower than that in the instant case because it prohibited only the use of the "*disposition* of a child in the juvenile court[,]" the court had interpreted the statute to prohibit the instruction of "juvenile *records.*" 612 P.2d at 485-86 (emphasis added). Nevertheless, the court noted that there are exceptions to this prohibition, including where a defendant "open[s] the door" to that evidence. *Id.* at 487. Accordingly, *Rodriguez* stands for the proposition that even a seemingly absolute bar on the admission of juvenile records must, on occasion, yield to competing concerns.

20. Respectfully, the majority's argument that Schnabel could not "open" any "door" because HRS § 571-84(h) expressly prohibits the admission of evidence ignores the recognized distinction between using a privilege as a "sword" rather than merely a "shield." *See People v. Johnson,* 90 Misc.2d 777, 395 N.Y.S.2d 885, 885-88 (1977) (permitting the witness' juvenile records to be admitted as impeachment evidence and holding that the witness had waived the protection of the Family Court Act by giving misleading testimony), *rev'd on other grounds by People v. Johnson,* 78 A.D.2d 298, 434 N.Y.S.2d 389 (1981); *State v. L.J.P.,* 270 N.J.Super. 429, 637 A.2d 532, 536–37 (N.J.Super.Ct.App.Div.1994) (In discussing the physician-patient privilege, the court noted, "if the patient discloses emotional or mental problems by filing an action in which those problems are at issue, at least limited disclosure is warranted despite the privilege. The patient/litigant cannot be permitted to use the privilege as a 'sword' rather than merely a 'shield' ") (citations omitted). Under this analysis, the statute would not protect a defendant if he perjured himself or gave misleading testimony.

Moreover, this court in other circumstances has recognized that statutory privileges can yield to countervailing interests. *See State v. Peseti,* 101 Hawai'i 172, 180, 65 P.3d 119, 127 (2003) ("The scope of a statutory privilege, however, is tempered by the principle that 'privileges preventing disclosure of relevant evidence are not favored and may often give way to a strong public interest.' ") (quoting *L.J.P.,* 637 A.2d at 537).

21. This conclusion would not allow the State to introduce evidence of juvenile adjudications solely for the purpose of impeaching the defendant's credibility as a witness. HRE 609 specifically

Lastly, the circuit court's in limine ruling did not violate HRS § 571–84(h) because the court offered the option of introducing the relevant evidence without reference to the adjudication or its result. By its plain language, HRS § 571–84(h) does not apply absent an adjudication. HRS § 571–84(h) (*"Evidence given in proceedings under section 571–11(1) or (2) shall not in any civil, criminal, or other cause be lawful or proper evidence against the minor therein involved for any purpose whatever, except in subsequent proceedings involving the same minor under section 571–11(1) or (2)."*) (emphasis added). Thus, it does not preclude the introduction of juvenile misconduct which was not adjudicated. It would follow that, even if a juvenile was adjudicated a law violator, the statute does not prohibit the admission of information relating to such misconduct without reference to the adjudication and its result. Otherwise a juvenile who was adjudicated would stand in a substantially better position at his adult trial than one who was not adjudicated, despite having engaged in the same conduct.[22] *Cf. Laney v. State Farm Mut. Auto. Ins. Co.,* 198 W.Va. 241, 479 S.E.2d 902, 907–09 (1996) (stating that, although an in limine ruling based on a statute similar to HRS § 571–84(h) precluded a plaintiff from adducing "evidence . . . directly related to the juvenile proceeding" of the defendant, the plaintiff could still "try to establish at trial exactly what the defendant admitted" at the juvenile proceeding).

Although the State initially sought to introduce Dr. Camara's testimony by transcript, the DPA subsequently noted that the State could introduce the needed evidence without mentioning "that the defendant was ultimately convicted or adjudicated by the [family] court[.]" The court's proposed cross-examination question, "weren't you in a room when you heard a doctor say 'X' and 'Y' and 'Z'[,]" also did not mention the adjudication or its result.

Therefore, the circuit court's ruling did not violate HRS § 571–84(h).

## III. Closing Argument

Prior to closing argument, the circuit court read and provided copies of the following relevant instructions to the jury:

You must presume the defendant is innocent of the charges against him. *This presumption remains with the defendant throughout the trial of the case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.*

The presumption of innocence is not a mere slogan but an essential part of the law that is binding upon you. *It places upon the prosecution the duty of proving every material element of the offense charged against the defendant beyond a reasonable doubt.*

*You must not find the defendant guilty upon mere suspicion or upon evidence which only shows that the defendant is probably guilty.* What the law requires before the defendant can be found guilty is not suspicion, not probabilities, but proof of the defendant's guilt beyond a reasonable doubt.

What is a *reasonable doubt* ?

It is *a doubt in your mind about the defendant's guilt which arises from the evidence presented or from the lack of evidence and which is based upon reason and common sense.* Each of you must decide, individually, whether there is or is not such a doubt in your mind *after careful and impartial consideration of the evidence.*

addresses that situation and allows such impeachment only with adjudications involving a crime of dishonesty. HRE 609(c) ("Evidence of juvenile convictions is admissible to the same extent as are criminal convictions under subsection (a) of this rule."); HRE 609(a) (prohibiting impeachment of credibility by criminal convictions not involving a crime of dishonesty).

**22.** The majority states that "[i]t should be apparent, however, that there would be even more reason for the court to exclude reference to the 'misconduct' of a juvenile where he or she was not adjudicated a law violator." Majority Opinion at 467, 279 P.3d at 1272 (brackets and internal citation omitted). Under HRE Rule 404(b), however, "[e]vidence of other crimes, wrongs, or acts" may be admissible for certain purposes, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." Thus, the "misconduct" of a juvenile who was not adjudicated a law violator could be admissible under HRE Rule 404(b) at a subsequent adult trial.

Be mindful, however, that a doubt which has no basis in the evidence presented, or the lack of evidence, or reasonable inferences therefrom, or a *doubt which is based upon imagination, suspicion or mere speculation or guesswork is not a reasonable doubt.*

What is proof beyond a reasonable doubt?

If, after consideration of the evidence and the law, you have a reasonable doubt of the defendant's guilt, then the prosecution has not proved the defendant's guilt beyond a reasonable doubt and it is your duty to find the defendant not guilty.

If, after consideration of the evidence and the law, you do not have a reasonable doubt of the defendant's guilt, then the prosecution has proved the defendant's guilt beyond a reasonable doubt and it is your duty to find the defendant guilty.

. . . .

*You must not be influenced by pity for the defendant or by passion or prejudice against the defendant.* Both the prosecution and the defendant have a right to demand, and they do demand and expect, that *you will conscientiously and dispassionately consider and weigh all of the evidence* and follow these instructions, and that you will reach a just verdict.

(Emphasis added).

During the State's rebuttal closing argument, the following exchange took place after the DPA discussed the jury instructions relating to recklessness and witness credibility:

[DPA:] And when you go in the deliberation room, read these instructions but use your common sense. That's what this is all about. It's about common sense. Don't get too caught up in the mumbo jumbo of all the words but use your common sense.

Do your best to understand what we're talking about and then dig deep down inside and ask yourself, deep down inside, you know, the gut feeling that we talk about deep down inside. Put aside those words. You've heard them. You're analyzing them. And then you reach down deep inside, deep down inside: Is he guilty? And if you can say that, that's your common sense.

[Defense counsel:] Objection, your honor.

THE COURT: I'm going to allow this by way of illustration. The jury has the instructions. Overruled.

[DPA:] If you can tell yourself, you reach deep down inside and you tell yourself, you know what, deep down inside I know he's guilty, that is your common sense.

[Defense counsel:] Your honor, objection. May I make a record?

THE COURT: Yes. Come on up. Make a record please.

(The following proceedings were held at the bench:)

[Defense counsel:] Your honor, the fact whether the jury knows he's guilty is not the issue and they cannot decide it on their gut. It's whether the State has proven beyond a reasonable doubt that he's guilty that they have to answer. To say it otherwise implies that if you have a gut feeling he's guilty, he's just guilty, forget the instructions.

[DPA:] No. The argument is that the feeling inside is your common sense speaking to you. Common sense is what supports all of their decisions in applying the law and determining what the facts are.

[Defense counsel:] But that's not what you're saying.

THE COURT: Well, anyway, I'll remind them that the instructions apply without—pity, passion don't apply, and the definition of reasonable doubt is in there and I'll let you keep going. Objection overruled.

(The following proceedings were held in open court in the presence of the jury:)

THE COURT: Ladies and gentlemen of the jury, I give the attorneys some latitude at closing. The instructions you have as to what reasonable doubt is and isn't and that pity, passion and prejudice have no play, I'll allow you to argue that basically as an illustration of your take on common sense. There's no definition of reason and common sense so I'll give you a little bit of latitude over objection. Thank you.

[DPA:] Yes. And, ladies and gentlemen, that's why we asked you in the beginning—we laughed about it—we asked, do you have common sense, and there was humour [sic] about it being a loaded question but, really, that's what it is. It's applying common sense, the law and the facts as you see them.

I agree with the majority that the DPA's "mumbo jumbo[,]" "[p]ut aside those words[,]" and "gut feeling" remarks improperly denigrated the judicial process and could be interpreted as inviting the jury to ignore the law. However, I respectfully disagree with the majority's suggestion that "no curative instruction was given in this case." Majority Opinion at 453, 279 P.3d at 1258. After the court overruled the initial objection, the prosecutor continued making the same argument and defense counsel objected again. The court then addressed the jury immediately after the ensuing bench conference. Viewed in context, it was clear that the court's comments to the jury at that point referred to the prosecutor's improper statements. Moreover, the court's comments specifically reminded the jury of "[t]he instructions you have as to what reasonable doubt is and isn't and that pity, passion and prejudice have no play[.]" By referring specifically to those instructions, the court nullified any suggestion by the prosecutor that the jury could ignore the law, and thus sufficiently addressed the prejudicial impact of the prosecutor's improper argument. *See State v. Wakisaka*, 102 Hawai'i 504, 516, 78 P.3d 317, 329 (2003) ("Generally, we consider a curative instruction sufficient to cure prosecutorial misconduct because we presume that the jury heeds the court's instruction to disregard improper prosecution comments.") (citations omitted).

Although the court went on to say that it was overruling the objection, it did so by noting specifically that it was allowing the prosecutor to "illustrat[e] ... [the DPA's] take on common sense." After the court's comments, the prosecutor agreed with the court, and made no further reference to

"mumbo jumbo" or "gut feelings." Instead, the prosecutor properly argued that the jury's task was to "apply[ ] common sense, the law and the facts as you see them." Thus, viewed in context, the court's overruling of the objection did not convey approval of the prosecutor's earlier improper statements, or vitiate the effect of the court's comments reminding the jury to follow the instruction on reasonable doubt without regard to pity, passion or prejudice.

In suggesting that no curative instruction was given here, the majority relies on cases in which either: (1) there was no objection made to the prosecutors' improper remarks, and hence no instruction given, or (2) an objection was made and overruled without further comment by the court. *State v. Pacheco*, 96 Hawai'i 83, 91–92, 95, 97–98, 26 P.3d 572, 580–81, 584, 587–88 (2001) (holding that no curative instruction was given where the court, "[w]ithout explanation, ... overruled defense counsel's objection" after the first instance of prosecutorial misconduct, and "[d]efense counsel did not object" after the second instance of misconduct); *State v. Meyer*, 99 Hawai'i 168, 170–73, 53 P.3d 307, 309–12 (App.2002) (noting that no "specific" curative instruction was given where the court overruled defense counsel's objection without explanation or further instruction).[23]

Respectfully, these cases are all distinguishable from the instant situation, where the court specifically referred the jurors to jury instructions which were contrary to the argument being made by the prosecutor. The test should be whether, viewed in context, the entirety of the court's comments were sufficient to alleviate the prejudice caused by the prosecutor's improper remarks. *See People v. Katzenberger*, 178 Cal. App.4th 1260, 101 Cal.Rptr.3d 122, 128 (2009). In *Katzenberger*, a California appellate court held that a trial court cured the prosecutor's mischaracterization of reasonable doubt when it initially overruled an objection but subsequently reread to the jury the instruction on reasonable doubt:

**23.** In fact, the ICA in *Meyer* held that, although the "there was no specific curative instruction" in that case, "generally relevant jury instructions can cure improper arguments by a prosecutor;

especially where, as here, such instructions were given repeatedly." 99 Hawai'i at 172–73, 53 P.3d at 311–12 (emphasis added) (citations omitted).

*Although the trial court overruled defendant's objection* to the Power Point presentation allowing the presentation to go forward, the court later told the jury (after defendant vigorously contended during his argument that the presentation of the Statue of Liberty did not represent reasonable doubt at all) that it would "clarify" the issue by reading the jury instruction on reasonable doubt. The court proceeded to instruct the jury with the correct definition of reasonable doubt. Under these circumstances, the jury was alerted to the dispute regarding the presentation and *impliedly told by the trial court to rely on the jury instruction.* We presume they did so.

*Id.* at 128 (emphasis added) (citation omitted); *see also Rodriguez v. Peters,* 63 F.3d 546, 559 (7th Cir.1995) (holding that a prosecutor's remark that a witness had been relocated, a matter that was not in evidence, did not require a retrial in part because the trial court, after overruling the defense's objection, "nonetheless issued a contemporaneous limiting and clarifying instruction to the jury stating, 'that's not the evidence,' and that [the witness's] location at the time of the trial 'has nothing to do with the case' "); *Uvalle v. State,* Nos. 05–98–00466–CR, 05–98–00467–CR, 05–98–00468–CR, 1999 WL 592397, at *6 (Tex.Ct.App. Aug. 9, 1999) (not designated for publication) ("Initially, we note that al-

though the trial judge overruled appellant's objection [to the prosecutor's alleged reference to matters not in evidence], he immediately instructed the jury to 'remember the evidence as they heard it.' A trial judge's instruction will generally cure any harm created by an improper question.") (citations omitted);[24] *Morrison v. State,* No. 05–94–01649–CR, 1997 WL 282232, at *4 (Tex.Ct. App. May 29, 1997) (not designated for publication) (holding that a trial court's overruling the defense's objection and then instructing the jury to disregard the prosecutor's gestures "cured" the prosecutor's implication that the defendant was a cocaine user). That test was met here.[25]

The majority also relies on *State v. Espiritu,* 117 Hawai'i 127, 176 P.3d 885 (2008). Majority Opinion at 454, 279 P.3d at 1259. In *Espiritu,* the allegedly curative instructions were given in the regular course, i.e., along with all other instructions. 117 Hawai'i at 143, 176 P.3d at 901. Here, the circuit court, immediately after the improper remark, referred the jurors to the reasonable doubt instruction and reminded them not to be influenced by pity, passion, and prejudice. It was readily apparent that the instruction was in response to the DPA's remarks. Therefore, *Espiritu* is distinguishable.

Because the circuit court's comments to the jury cured any prejudice, I do not believe

**24.** Texas Rules of Appellate Procedure Rule 47.7(a) provides, "Opinions and memorandum opinions not designated for publication by the court of appeals under these or prior rules have no precedential value but may be cited with the notation, '(not designated for publication).' "

**25.** The majority relies on three factors in determining that the instructions in this case were insufficient: (1) the defense objection was overruled; (2) the jurors were not instructed to reject the DPA's remarks; and (3) the instructions given did not "relate[ ] to" or "correct" the DPA's remarks. Majority Opinion at 452-54, 279 P.3d at 1257–59. However, this court has held that a prosecutor's improper remarks were harmless beyond a reasonable doubt in substantially similar circumstances. *See State v. Sawyer,* 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998). In *Sawyer,* during closing arguments, "the DPA told the jury not to 'let the law try to cloud you out with all of these instructions when you look at it. You just come down to common sense.' The defense objected, and the court in-

structed the jury that the law had to be followed." *Id.* at 328, 966 P.2d at 640. This court concluded that the remarks were improper, and characterized them as "an attempt by the DPA to encourage the jury to use its common sense." *Id.* at 329 n. 6, 966 P.2d at 641 n. 6. Moreover, although the trial court did not explicitly sustain the objection or tell the jury to disregard the improper argument, *id.,* this court nonetheless concluded that the trial court *"effectively"* sustained the DPD's objection and *immediately cured any error* by stating that the 'law has to be followed and it's the jury's standpoint.' " *Id.* (emphasis added).

Similarly, in the instant case, the DPA encouraged the jury to use "common sense," but also made other improper remarks that characterized the jury instructions as "mumbo jumbo" and encouraged the jury to "[p]ut aside those words" in favor of their "gut feeling[.]" By reminding the jury of "[t]he instructions [they had] as to what reasonable doubt is and isn't and that pity, passion and prejudice have no play," the circuit court "effectively sustained" the objection to the improper remarks and cured the error. *See id.*

it is necessary to assess the strength of the evidence against the defendant. *See Wakisaka*, 102 Hawai'i at 516, 78 P.3d at 329 ("Generally, we consider a curative instruction sufficient to cure prosecutorial misconduct because we presume that the jury heeds the court's instruction to disregard improper prosecution comments.") (citations omitted); *Klinge*, 92 Hawai'i at 595–96, 994 P.2d at 527–28 (omitting the harmlessness analysis where the prosecutor misstated the elements of an offense in rebuttal closing and the court responded to defense counsel's objection by stating, "Let him finish[,]" but where the court instructed the jury on the elements of the offense before and after the presentation of evidence).

However, because the majority concludes that the instruction was insufficient, it goes on to assess the strength of the evidence against Schnabel. The majority concludes that the evidence was not overwhelming, and therefore the error was not harmless. Majority Opinion at 455-56, 279 P.3d at 1260-61. At the outset, overwhelming evidence is not required in order to render an error harmless.[26] *Klinge*, 92 Hawai'i at 593, 994 P.2d at 525 ("While the evidence in this case was not overwhelming, a reasonable trier of fact might fairly conclude upon the evidence that [the defendant] left the objects at the churches in reckless disregard of the risk of terrorizing and/or evacuation.").

The evidence that Schnabel was reckless and did not punch Reuther in self defense was very strong. Two apparently independent (and indeed, reluctant) witnesses for the State testified that the attack was unprovoked and unexpected. According to Kaeo, who observed Reuther walking back to his car "[t]he whole time[,]" Schnabel followed Reuther "from behind[,]" and when Reuther reached his car, Schnabel "whacked" Reuther in the face. Kaeo repeatedly denied that Reuther, in any way, provoked Schnabel into hitting him. Based on what Kaeo saw, he was "positive" that there was no provocation. Ako testified that just before Schnabel punched Reuther in the parking lot, she heard Schnabel say, "[g]et the fuck out of here." When asked whether Reuther "lunged towards [Schnabel]" or "charg[ed] [Schnabel] like he was going to tackle him[,]" Ako responded, "No."

Moreover, the medical examiner's testimony provided strong corroborating evidence that Schnabel was reckless and did not punch Reuther in self defense. The medical examiner testified that Reuther's cause of death was a "[t]raumatic subarachnoid hemorrhage" caused by an "assaultive blunt force injury to the head." The medical examiner stated that the hospital thought it was a ruptured aneurism, but that conclusion was drawn based on scans and prior to the medical examiner's autopsy. The medical examiner testified that when the autopsy was performed, "[she] did not see any aneurysms as the doctors suspected, but instead saw this tear right in the middle" where "you never see an aneurysm[.]" The medical examiner explained that the stretching of blood vessels can cause this type of tear, and that stretching occurs when there is rotational acceleration of the head, but the brain lags. The medical examiner further explained that when one expects a blow, "that sudden acceleration/deceleration is not there." In contrast, the medical examiner explained that when one does not expect a blow, "even if the blow is not really hard, the brain goes through that acceleration/deceleration process[.]" Accordingly, the medical examiner's testimony provided strong support that Reuther's injury was caused by a punch that he did not anticipate.

The only person who testified to the contrary was not an independent witness; Reverio was the sister of Schnabel's close friend and, in fact, identified Schnabel as her friend. There was also uncontradicted testimony

---

26. Although the majority cites a string of cases to support its position that "overwhelming evidence" is required in order to render an error harmless, there are a number of cases that hold otherwise. *See State v. Valdivia*, 95 Hawai'i 465, 484, 24 P.3d 661, 680 (2001) (concluding that the evidence against defendant was not "so weak" as to favor finding the DPA's remarks harmful and holding that the DPA's statements were "harmless beyond a reasonable doubt"); *State v. Mara*, 98 Hawai'i 1, 17, 41 P.3d 157, 173 (2002) (concluding that the prosecutor's remark was harmless after considering the "strength of the overall evidence" against the defendant and holding that the prosecutor's improper comment "[did] not constitute reversible error").

from an independent witness that Schnabel was much larger than Reuther. Moreover, the two independent witnesses testified that they believed that Schnabel was under the influence of methamphetamine at the time of the confrontation. Thus, the State adduced independent witness testimony and forensic evidence that indicated that Schnabel, under the influence of methamphetamine, struck Reuther, a person much smaller than himself, without provocation or warning. The only contrary evidence came from a non-independent witness.

Unlike in a typical "credibility contest," here the testimony of independent witnesses and forensic evidence strongly supported the State's theory of the case. In such situations, this court has consistently found strength of the evidence to weigh in favor of the State for purposes of the harmlessness analysis. Compare Pacheco, 96 Hawai'i at 96–97, 26 P.3d at 585–86 (characterizing as a "credibility contest" a trial where the defendant's testimony conflicted with that of the police officers regarding the defendant's intent to commit the offense of second degree escape from the police) and State v. Rogan, 91 Hawai'i 405, 415, 984 P.2d 1231, 1241 (1999) (holding that strength of the evidence weighed against the State when, in the absence of "independent eyewitnesses or conclusive forensic evidence[,]" the case "turned on the credibility of ... the [c]omplainant and [the defendant]") with State v. Maluia, 107 Hawai'i 20, 27, 108 P.3d 974, 981 (2005) (holding that strength of the evidence weighed against the defendant where the State's case was supported by two independent witnesses and evidence of a blood alcohol content which "rais[ed] additional doubts as to the defendant's credibility") and Klinge, 92 Hawai'i at 593, 994 P.2d at 525 (holding that strength of the evidence weighed against the defendant where the defendant's case hinged on his own testimony

and the State's case was supported by photographs and independent witnesses).

The majority's analysis of the strength of the evidence focuses on the fact that some evidence (i.e., Reverio's testimony) contradicting the State's case was introduced. Majority Opinion at 455-56, 279 P.3d at 1260–61. Respectfully, this approach is a departure from this court's harmlessness jurisprudence. As the name of this factor, "strength or weakness of the evidence," and this court's case law indicate, the question is not merely whether some evidence in the defendant's favor exists, but whether the State's evidence is strong enough to overcome the potential effect of the misconduct. Valdivia, 95 Hawai'i at 484, 24 P.3d at 680 ("[T]he evidence against [the defendant] was not so weak as to favor finding the remarks harmful."); Klinge, 92 Hawai'i at 593, 994 P.2d at 525 ("While the evidence in this case was not overwhelming, a reasonable trier of fact might fairly conclude upon the evidence that [the defendant] left the objects at the churches in reckless disregard of the risk of terrorizing and/or evacuation."); Rogan, 91 Hawai'i at 415, 984 P.2d at 1241 (holding that the evidence against the defendant, which turned on the credibility of the complainant and the defendant, "was [not] so overwhelming as to outweigh the inflammatory effect of the [DPA's racially charged] comments").

The majority also states that there was some doubt as to whether Schnabel's punch caused Reuther's death because of the evidence that the hospital staff that treated Reuther after the incident concluded that he died from an aneurysm. Majority Opinion at 455, 279 P.3d at 1260. This argument is contrary to Schnabel's position at trial. During closing argument, defense counsel explicitly acknowledged that the punch killed Reuther: "[Schnabel] punched [Reuther].... [Reuther] died from that punch. We know that.... Those facts are not in dispute." [27]

---

27. The majority also relies on the medical examiner's testimony that the injury was "unique" for the proposition that the jury could have reasonably arrived at the conclusion that the death was not caused by Schnabel's strike. Majority Opinion at 455, 279 P.3d at 1260. This takes the word "unique" out of the context of the examiner's testimony:

There was no bruising to the other areas. Usually, if somebody falls, you get what's called subdural hemorrhage. He didn't have any of that; only he had this subarachnoid hemorrhage. That's what was so unique about this.

Contrary to the majority's implication, the medical examiner consistently testified that an

In sum, considering the curative effect of the instruction and the strength of independent witness testimony and forensic evidence against Schnabel, the DPA's remarks were harmless.

Accordingly, I respectfully dissent.

"assaultive blunt force injury" "and nothing else" had caused the death in this case.